UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WIXOM INDUSTRIAL ONE, LLC, a Michigan limited liability company,

Plaintiff,

v.

CITY OF WIXOM,

Defendant.

Case No.

Hon.

---

WILLIAMS WILLIAMS RATTNER & PLUNKETT PC
*Attorneys for Plaintiff*
Richard Rassel (P57540)
John Gaber (P45294)
380 N. Old Woodward Ave, Suite 300
Birmingham, MI 48009
(248) 642-0333

MANTESE HONIGMAN, PC
*Attorneys for Plaintiff*
Ian Williamson (P65056)
1361 E. Big Beaver Road
Troy, MI 48083
(248) 457-9200

---

**COMPLAINT FOR DECLARATORY JUDGMENT, INJUNCTIVE RELIEF AND DAMAGES**

Plaintiff Wixom Industrial One, LLC ("Wixom One") states as follows for its Complaint for Declaratory Judgment, Injunctive Relief and Damages against Defendant City of Wixom (the "City"):

## INTRODUCTION

1. Wixom One owns property in the City's M-1 Light Industrial district. Over the past two years, Wixom One has spent tens of thousands of dollars developing a proposed industrial park called Midwinds Park, which is planned as a campus that consists of three separate buildings to house data processing facilities. Data processing and data communications and other computer and information technology-related services are a permitted, by-right use in the City's M-1 district, but as yet there are no such facilities ("data centers") in the City.

2. On multiple occasions, the City confirmed to Wixom One and its agents that the proposed Midwinds Park data center development is a permitted, by-right use in the M-1 Light Industrial district. For many months until late 2025, the City worked cooperatively with Wixom One as it continued to refine the Midwinds Park design and prepare for site plan review. However, after several Michigan communities began to receive negative publicity relating to poorly sited hyperscale data centers, the City and its legislative City Council body ("Council") abruptly initiated unlawful efforts to impose an illegal moratorium (directed solely at Wixom One and Midwinds Park) to buy time to revise the City's zoning ordinance in ways

that are intended to permanently kill Midwinds Park and effectively and unlawfully exclude and eliminate "data centers" as a possible use within the City.

3. The City and Council have spent the past six months proposing the inclusion of increasingly restrictive criteria into the City's zoning ordinance in an apparent attempt to prevent Wixom One from ever receiving a building permit for Midwinds Park. Even after the City and Council began their hostile campaign, Wixom One spent months trying to work with the City in good faith to reasonably refine the proposed ordinance text amendments, but the City has instead proposed layer upon layer of impractical and discriminatory standards that are far more stringent than those applied to other similary situated industrial uses and are effectively impossible to meet.

4. On March 24, 2026, without Planning Commission review and without prior public notice or a public hearing, the Council passed an "Authorizing Resolution" that purports to create a police power moratorium prohibiting the approval, establishment or use of data centers within the City (the "Moratorium"). The Moratorium directly targeted Midwinds Park, as Councilmember Peter Behrmann acknowledged during a Council meeting on July 14, 2026, and was implemented to freeze the project for a time so as to then permanently prevent any consideration or approval of Midwinds Park.

5. Wixom One submitted a clean application for site plan review for Midwinds Park on June 2, 2026, along with a request for a waiver from the improper Moratorium. The City has unlawfully refused to consider and has held hostage the application, which must be approved in the ordinary course pursuant to MCL § 125.3501. On July 14, 2026, Council summarily rejected Wixom One's waiver request without any discussion, fact-finding, or stated basis except for Councilmember Behrmann's predetermined and conclusory statement that the waiver request was "unreasonable as it relates to the potential health, safety and welfare impacts in the City."

6. The City's actions are contrary to Michigan law and violate the due process and equal protections afforded by the Michigan and United States Constitutions and constitute exclusionary zoning in violation of Michigan law. Wixom One requires the Court's assistance to invalidate the City's illegal police power Moratorium and to compel the City to comply with its existing zoning ordinance; review the Midwinds Park application for site plan approval without further delay; approve the application pursuant to MCL § 125.3501 and issue a building permit to Wixom One; and refrain from any further efforts to block the Midwinds Park project through bad faith and undue delay.

**JURISDICTIONAL ALLEGATIONS**

7. Plaintiff Wixom Industrial One, LLC is a Michigan limited liability

company with a registered office at 23 Cambridge Boulevard, Pleasant Ridge, MI 48069.

8. Defendant City of Wixom is a home-rule city municipal corporation with its principal office at 49045 Pontiac Trail, Wixom, MI 48393.

9. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 because Wixom One's claims arise under the Constitution, laws, or treaties of the United States, and under 28 U.S.C. § 1367 as to all other claims that are so related to claims over which this Court has original jurisdiction that all such claims form part of the same case or controversy.

10. Defendant is located in this district and therefore this Court is a proper venue for this action under 28 U.S.C. § 1391(b).

## FACTUAL ALLEGATIONS

### Wixom One and the Midwinds Park Project

11. Wixom One is a Michigan limited liability company created to acquire and develop industrial property in the City of Wixom. The company's Manager, Dennis Griffin, is a prolific real estate developer who has worked with municipalities throughout Southeast Michigan to successfully plan and execute well-designed and thoughtful projects.

12. Wixom One owns real property located in the City of Wixom commonly known as 30625 S. Wixom Road (the "Property").

13. Initially, Wixom One became aware of the Property through marketing efforts by CBRE, which marketed the property explicitly for data center development based on the City's ordinance language which confirms that data centers are a permitted use in the M-1 Light Industrial district and the availability of at least 100 megawatts of power at the Property as confirmed by DTE Energy ("DTE").

14. Wixom One began working on its proposed Midwinds Park development during the latter half of 2024. At all relevant times, Wixom One communicated with and engaged with the City to ensure a smooth development process. Accordingly, the City's employees have been aware of Wixom One's development plans for many months.

15. While data centers have become a common national news item over the past 18-24 months due to the construction of massive "hyperscale" data centers to service the artificial intelligence industry, data centers—even large ones—have existed in the United States for at least the past decade without any significant controversy. Data centers are necessary to support a wide variety of different applications, including but not limited to: cloud-based data hosting for businesses, public sector users, emergency first responders (police, fire, ambulance) and consumers; storing, archiving, and recovering data for both individual consumers and businesses as well as public sector users (police, fire, ambulance); delivering

streaming media, websites, and social media content to consumers; hosting and storing data relating to the large and growing online gaming industry; processing financial trades, banking transactions, payments, and market data; operating e-commerce, retail, fulfillment, and logistics platforms; operating both ordinary and emergency first responder (police, fire, ambulance) based telecommunications networks and moving ordinary internet traffic; hosting and running critical manufacturing, automotive, and industrial software systems including ERP systems; and storing and maintaining electronic medical records for physicians, hospital systems, and hundreds of millions of patients worldwide.

16. Demand for data center availability and services has been rapidly increasing for years in the Metro Detroit area. The demonstrated public need for data center capacity in Michigan informed the Michigan Legislature's passage of Public Acts 181 and 207 of 2024, which provide tax incentives for the development and construction of data centers that, *inter alia*, pay rates for electric service that do not require residential customers to subsidize infrastructure and service costs and meet certain environmental requirements such as LEED certification and use of clean energy to power operations. The City has itself admitted the demonstrated public need for data centers by historically zoning and planning for data centers in appropriate districts, like the M-1 Light Industrial district in which the Property is located.

17. Wixom One designed the Midwinds Park project to help meet the need for additional data center capacity in the region by constructing a state-of-the-art facility in an industrial district that offers access to sufficient electrical power without the need for substantial infrastructure improvements and is appropriately screened from residential areas.

18. Per its pending but City frozen June 2, 2026 site plan application, Midwinds Park consists of three buildings with a combined total of 519,400 square feet, of which roughly 450,000 is usable operations floor area. The buildings and required parking are expected to cover just under 50% of the Property, leaving over 27 acres for landscaping, wetlands preservation, and stormwater management.

19. Midwinds Park is much smaller than all other known existing and proposed hyperscale data center facilities in Michigan and is appropriately sited in an industrial zone.[1] By way of comparison, the Hyperscale Data Dowagiac data center which has been the subject of numerous news articles is directly adjacent to, and across the street from, numerous residences. As is discussed below, Midwinds Park is nothing like the Dowagiac center, which is actually a cryptocurrency mining operation that is being converted to a data center.

[1] The Hyperscale Data Dowagiac building, which is the closest in size, is roughly 100,000 square feet larger than the total square footage of all three of the Midwinds Park buildings combined. All other known hyperscale data centers that exist, are under construction, or are currently in development are much larger.

20. Midwinds Park is thoughtfully designed with specific attention focused on mitigating issues that have arisen with controversial data center projects in Michigan and around the country, including but not limited to excessive water/utility consumption and noise issues. As noted, Midwinds Park is completely surrounded by industrial properties and is not adjacent to or in proximity to any residential property.[2] The proposed cooling system is a closed loop system that does not require a significant amount of water from the municipal water system. The buildings are designed with adaptive reuse in mind and can readily be converted to other industrial uses if the need for data processing and storage diminishes.

21. Understanding that the noise resulting from continued operation of data centers has become a hot button issue nationally, Wixom One's design team has proactively taken steps to reduce the anticipated sound levels at Midwinds Park. Among other things, the mechanical equipment is shielded and located on the site in areas that are intentionally distant from any nearby residential receptors. The buildings were developed and sited with integrated soundscape design to create an "acoustic canyon" that further contains and dissipates sound even before it reaches

[2] The nearest residential or residentially used property is 2,200 feet from the Property. There is a parcel zoned "VCA-C" or Village Center Area – Core that is 530 feet from the Property which was once approved for condo development, but the project never broke ground and site plan approval has therefore expired per Section 18.17.080(C) of Wixom's zoning ordinance.

the boundaries of the Property, and long before it can travel to any residential property.

22. Nevertheless, as is described below, the City and Council have now made it clear that they will not even consider all of Wixom One's careful planning and design strategies and are instead barreling forward towards predetermined outcomes that are based on misinformation, public pressure, and purely political considerations. In short, the City and Council intend to "move forward with a hostile ordinance," as a City resident recently encouraged them to do, without regard for Wixom One's due process and equal protection rights or Michigan's strict prohibition against exclusionary zoning with respect to lawful land uses at MCL § 125.3207.

**<u>The Property and the City's Zoning Ordinance</u>**

23. The Property is in the M-1 Light Industrial zoning district, and the adjacent parcels on all sides are also M-1 Light Industrial-zoned properties. There are no residential properties adjacent to the Property

24. Section 18.09.010 of the City's zoning ordinance provides that "the general intent of the industrial districts is to provide for a range of industrial and office development divided into two districts that are appropriately located in the city for the following specific purposes," including "[t]o provide sufficient space, in appropriate locations, to meet the needs of the municipality's expected future

economy for certain types of research, office, industrial, warehouse, manufacturing and related uses." (**Ex 1**, *Wixom Zoning Ordinance Excerpt*).

25. Table 9.02, found in Section 18.09.020 of the City's zoning ordinance, includes the following description of a use under "Office and R&D Uses":

> Design and development of computer hardware and software, data communications, information technology, data processing and other computer-related services.

This use is marked with a "P" for both M-1 and M-2, indicating that "data communications, information technology, data processing and other computer-related services" is a permitted use in both the M-1 Light Industrial and General Industrial (M-2) districts. (**Ex 1**).

26. According to the City's Future Land Use Plan map included in the City's recently adopted Master Plan, the area surrounding the Property is expected and intended to continue in its industrial use into the foreseeable future. (**Ex 2**, *Wixom Future Land Use Map*).

**Timeline of Midwinds Park Prior to Proposed Ordinance Revisions**

27. The following timeline identifies key events relating to Wixom One's initial progress in the Midwinds Park development process from the acquisition of the Property through mid-December 2025, when Council and the Planning Commission began to discuss revisions to the City's zoning ordinance that have culminated in the current attempt to kill Midwinds Park. As is reflected below, the

City and its consultants confirmed in writing on multiple occasions that a data center would be a by-right, permitted use in the M-1 light industrial zoning district:

| Date | Event and Significance |
|---|---|
| | Wixom One acquired the Property. |
| 11/30/24 | Wixom One initiated discussions with DTE regarding the availability of power at the Property. |
| 2024/2025 | Wixom One hired architects, engineers, and other real estate professionals to evaluate the Property and assist in developing a plan for a data processing facility that is reasonable in scale, has access to adequate power, is designed to help minimize water use, and is appropriately sited away from residential districts. |
| 4/2025 | Wixom One provided all required information to DTE for its power application, including a completed preliminary engineering study. |
| 8/5/25 | Assistant City Manager and Director of Economic Development Drew Benson sent an email to Wixom One principal Dennis Griffin acknowledging a discussion with Griffin about potential data center uses and forwarding the specific language in the zoning ordinance that permits such use. |
| 10/1/25 | Benson confirmed in an email to Brandon Carnegie of CBRE that data centers are a permitted use in the M-1 Light Industrial district. (**Ex 3**, *Benson Email 10/1/25*). Carnegie was acting on behalf of Dennis Griffin and Wixom One, and Benson knew this. |
| 10/29/25 | Griffin met with Benson and Passalacqua to review and discuss some preliminary concept plans for the Wixom One data center project. |
| 11/18/25 | At a City Council meeting, Councilmembers noted that data centers had become a “hot topic” in neighboring communities. Benson acknowledged that under the City’s zoning ordinance, “data centers were allowed in our M-1 and M-2 Industrial Districts” and the City “has received some interest in data centers.” Council passed a motion to ask Planning Commission to review applicable regulations and make recommendations to Council. (**Ex 4**, *11/18/25 City Council Minutes*). |
| 12/11/25 | The City’s outside planning consultants at Carlisle Wortman Associates, Inc. confirmed in a memorandum to Planning Commission that “data centers are allowed by right in the City’s industrial zones due to the broad language of the ordinance.” (**Ex 5**, |

| | |
|---|---|
| | *Carlisle Wortman Memo 12/11/25*). |

**Planning Commission's Initial Discussions**

28. On December 15, 2025, the Wixom Planning Commission met and discussed Council's directive to review the City's zoning ordinance and to provide recommendations relating to data centers. At that meeting, Benson acknowledged to Planning Commission that "someone could interpret [data centers] as a permitted use in M-1" and that "there may be some plausible cause for use by right." Benson did not mention his prior communications with Wixom One confirming this fact, or his acknowledgment to Council of that fact during the November 18, 2025 meeting. (**Ex 6**, *12/15/25 Planning Commission Minutes*).

29. Planning Commission members were open to reviewing proposed new ordinance language but were largely unconcerned with the issue due to the small number of parcels that could feasibly developed as data centers. One Commissioner noted that she "has visited multiple data centers and they are pretty well done." (**Ex 6**).

30. On January 21, 2026, Wixom One completed revisions to its data center site plan that were based on multiple and ongoing discussions with City staff (including Benson and Passalacqua) and which rendered the site plan in full compliance with Wixom's existing zoning ordinance requirements.

31. At the Planning Commission meeting held that same evening, the City's

planning consultant, Matteo Passalacqua, noted that "there has been a lot of press coverage of data centers in Michigan" and that was driving Council's focus on the issue. He proposed ordinance revisions that would define "data centers" and make them a special land use. (**Ex 7**, *1/21/26 Planning Commission Minutes*).

32. During discussion, commissioners noted potential concerns relating to water use, electrical use, and whether data centers could be in or adjacent to residential property. Benson clarified that the concerns to be addressed in any ordinance revision were utilities, noise, and vibration. Planning Commission then passed a motion to schedule a public hearing regarding data center regulations for February 18, 2026. (**Ex 7**).

33. However, despite having been Wixom One's primary contact point with the City for the past 18 months, Benson did not inform Wixom One that Council was considering zoning ordinance amendments aimed at data centers until February 2, 2026, nearly two weeks later. Benson also communicated the proposed revisions to the City's zoning ordinance, which included the following:

a. Data centers would be classified as special land uses in the M-1, M-2 and IRO (Industrial Research Office) zoning districts;

b. Applicants would be required to submit utility capacity and demand studies, noise impact studies, backup power and fuel storage plans, traffic analysis, security plans, and decommissioning plans;

c. Standards would be included for siting and parking, along with a preference for closed loop cooling systems to reduce water usage;

d. Data center buildings or infrastructure could not be built within 1,000

feet from the lot lines of any residential or residentially used property; and

e. Existing ordinance language relating to noise, landscaping, screening, and other performance standards would remain unchanged.

34. On February 13, 2026, Dennis Griffin of Wixom One sent a letter to Planning Commission noting, *inter alia*, that the proposed 1,000-foot separation from any parcel that could possibly have a residential use is not reasonable in light of the proposed restrictive noise standards, and that the proposed revisions would allow another industrial use to operate at a substantially higher noise level in between the Property and the closest residential receptor. Griffin also pointed out that the proposed revisions would result in substantially different treatment of what are currently by-right permitted industrial uses, and that the growing interest in data center restriction appeared to be fueled by controversies that involve drastically different types of projects for which the real estate and infrastructure does not appear to exist within the City. (**Ex 8**, *2/13/26 Letter to Planning Commission*).

35. Wixom One attorney Richard Rassel also sent a letter to Planning Commission noting that in the M-1 Light Industrial district, data centers are a permitted use due to the presence of a recognized public need for that use per MCL § 125.3207. Rassel further noted that the proposed 1,000-foot residential separation requirement would exclude Midwinds Park and potentially exclude any data center development on any M-1 or M-2 properties within the City. (**Ex 9**, *Rassel Letter*

*2/13/26*).

36. For reference, the City only requires an 800-foot setback from residential property lines for blast furnaces, metal smelting plants, manufacture of corrosive acid, or petroleum production and refining, among other things—which uses are permitted in the M-1 district with special land use approval. (**Ex 1**, *Zoning Ordinance Excerpt*, § 18.09.040(A)(2)). Commercial composting facilities, which are not even permitted in M-1 districts at all, may engage in active composting 500 feet from the lot line of any land zoned or used for residential purposes. (**Ex 1**, § 18.09.040(C)(4)). Moreover, refrigerated warehouses, commercial kennels, and electrical transformer stations and substations, all of which are permitted uses in M-1 districts, may be built immediately adjacent to residential properties and are permitted to produce noise at the level of 70 decibels between six a.m. and ten p.m., and 65 decibels between ten p.m. and six a.m. (**Ex 1**, § 18.12.130(E)(2)).

37. At the February 18, 2026 Planning Commission meeting, which included a public hearing regarding potential revisions to the zoning ordinance related to data centers, Passalacqua outlined the proposed revisions and confirmed that three letters had been submitted for public hearing, including letters from Griffin and Wixom One's attorneys. One resident made public comments and expressed concern about utility issues, water use, and noise impacts, but acknowledged that data centers can bring jobs and economic benefits. (**Ex 10**, *2/18/26 Planning*

*Commission Minutes*).

38. Griffin provided public comment in keeping with his February 13, 2026 letter and requested that Planning Commission reconsider the proposed 1,000-foot residential separation requirement. Wixom One attorney John Gaber provided similar public comments and noted that changing data centers from a permitted use to a special land use would be unlawful in that it would effectively exclude such use from the City by adding an unlawful discretion-based decision process. Wixom One designer Peter Kilty clarified that the Midwinds Park project was designed to use a closed-loop cooling system that would not require substantial water consumption. (**Ex 10**).

39. During discussion with Commissioners, Passalacqua clarified that the proposed 1,000-foot residential separation requirement was intended to be an alternative to adjusting existing noise standards. Several Commissioners discussed the need for actual research on noise and setback standards to ensure a science-based approach. Ultimately, Planning Commission voted to table the proposed ordinance amendments to conduct further research, which would primarily focus on noise standards and the interplay with the proposed residential separation requirement. (**Ex 10**).

40. Planning Commission revisited the proposed ordinance amendments on March 16, 2026. At that meeting, Passalacqua presented research on noise impacts

associated with data centers and informed the commissioners that the proposed ordinance amendments had been revised to remove the larger residential separation requirement and replace it with a more restrictive noise standard for data centers, with limits of 55 decibels during the day and 45 decibels at night. (**Ex 11**, *3/16/26 Planning Commission Minutes*).

41. The proposed revisions were generally well received, though one Commissioner expressed concerns about the lack of any residential separation requirement. Passalacqua acknowledged that distance alone does not consistently determine noise impact and that a fixed setback distance may not always effectively address the issue. Benson pointed out that blast furnaces only required an 800-foot residential separation and acknowledged that arbitrary large numbers without a clear basis could be legally challenged and could limit development options on potential sites. (**Ex 11**).

42. During subsequent discussion, while several Commissioners expressed support for a tandem approach that combined minimum setbacks with noise restrictions, Passalacqua confirmed that research showed clearer data for noise than for setbacks. Commissioners requested a map showing all potential data center locations to help evaluate whether a minimum residential separation would be appropriate, and after additional discussion, Planning Commission again voted to table pending further research. (**Ex 11**).

**City Council's Moratorium and Ongoing Planning Commission Efforts**

43. Council met on March 24, 2026. The published agenda for the March 24th meeting did not include any mention of data centers, ordinance amendments, or any similar legislative action. (**Ex 12**, *Council Agenda 3/24/26*).

44. Nevertheless, during the March 24th meeting, Deputy Mayor Keenan Gottschall added a new item to the agenda—specifically, a recommendation to adopt a resolution approving a moratorium on "data centers". (**Ex 13**, *3/24/26 Council Minutes*).

45. Deputy Mayor Gottschall told Council that the Moratorium was needed because Planning Commission was "taking longer than he anticipated" to evaluate proposed ordinance amendments relating to data centers and moved for adoption of his proposed resolution. Council member Peter Behrmann supported the motion, though he took pains to note that he "didn't want this moratorium to give the appearance that the City was prohibiting data centers because that was not the case." Council unanimously voted to adopt the resolution approving the Moratorium. (**Ex 13**).

46. Highlighting the complete lack of any advance notice to the public, the sole public commentor at the meeting noted that he "wasn't aware of Wixom having an interest in data centers as they haven't seen any public information on the matter." **Ex 13**).

47. The Moratorium as described in the resolution prohibits "the establishment and use of data centers, including without limitation, approval of such use within the City, pending further study and enactment of City regulation addressing the same." There is no definition for "data center" and the resolution provides that the Moratorium "shall take effect immediately." (**Ex 14**, *Authorizing Resolution 2026-06*).

48. Griffin attended the next Planning Commission meeting, which was held on April 6, 2026. In his public comments, Griffin pointed out that the proposed noise limits were well below the actual measured noise level in the industrial districts, raising questions as to the fairness of the substantially lower noise restrictions proposed for data centers. Griffin also noted that the newest version of the proposed ordinance revision included items that had not been previously discussed by Planning Commission, and that the ongoing revisions felt like "drafting creep" which made it difficult to understand what was happening. He reiterated Wixom One's willingness to work with the City to ensure a thoughtful and appropriate design for Midwinds Park but expressed concern that the City's evolving restrictions were becoming increasingly difficult to meet. (**Ex 15**, *4/6/26 Planning Commission Minutes*).

49. Griffin distributed a memo to commissioners on behalf of Wixom One urging adoption of a 300-foot setback from the nearest residential property and

noting that the proposed text amendments appeared to be increasingly arbitrary and potentially unenforceable. (**Ex 16**, *Wixom One Memo 4/6/26*).

50. Passalacqua then presented new proposed text amendment language to Planning Commission. During a lengthy discussion of the setback requirements and noise issues, Passalacqua confirmed that Fairfax, Virginia, home to numerous data centers, has adopted a 300-foot residential separation requirement. He also confirmed that a 1,320-foot setback that had been discussed previously with Planning Commission appeared to have no scientific basis or justification, and that the residential separation in the current proposed text amendments was 300 feet based on research from institutions and other jurisdictions. (**Ex 15**, *4/6/26 Planning Commission Minutes*).

51. Commissioners raised various questions during subsequent discussion and emphasized the need for clearly presented reasoning to support policy decisions. Passalacqua indicated that the initial proposed 1,000-foot residential separation was based on limited early-stage research and was ultimately not supported by broader adoption trends or site-specific variability. Planning Commission again directed City staff to perform further research as to residential separation distance, appropriate districts, water use and decommissioning. (**Ex 15**).

**<u>Planning Commission Focuses In on Noise Restrictions</u>**

52. Griffin again appeared for Wixom One at the April 20, 2026 Planning Commission meeting along with Darren Brown, an experienced sound engineer, and supplied additional sound research relevant to the new noise restrictions included in the most recent version of the proposed text amendments. Brown provided written comments evaluating the proposals. (**Ex 17**, *4/20/26 Planning Commission Minutes*; **Ex 18**, *K&S Engineers Letter 4/20/26*). Brown's comments highlight the incongruity of requiring noise limits below the ambient sound levels of receptor locations as well as the subjectivity of the "tonal" noise penalty.

53. Commissioners then discussed the "buffer" maps prepared by Passalacqua to demonstrate the impact of different proposed residential separation distances and acknowledged that even the lower proposed distances of 300 or 500 feet would significantly limit feasible locations. Assistant City Manager Benson noted that the proposed ordinance amendments were becoming increasingly complex and that the City may not be able to resolve every possible variable in advance. Multiple commissioners expressed concerns that a 1,000-foot residential separation may be excessive. After an extensive discussion of noise issues and sound testing, Planning Commission requested even more research with specific attention to noise issues and tentatively proposed a 500-foot setback from residential property. (**Ex 17**, *4/20/26 Planning Commission Minutes*).

54. Thereafter, in advance of the June 1, 2026 Planning Commission meeting, the City circulated new proposed text amendment language that included alternative noise limits of 60 dBA daytime/50 dBA nighttime or 55 dBA daytime/45 dBA nighttime. The new language also added a "tonal penalty" that would reduce the noise limit by 10 dBA if anyone claimed to hear a "tone" – i.e., any sound that "can be heard as a single pitch or combination of pitches." (**Ex 19**, *6/1/26 Proposed Text Amendments*).

55. Whether the noise from a data center includes a "tone" is entirely subjective and neither provable nor disprovable.

56. Planning Commission discussed this proposed limit and "tonal penalty" at its June 1, 2026 meeting, which Griffin attended. In his public comments, Griffin noted, among other things, that the "tonal penalty" could never realistically be met; that it was impossible to reconcile the limit when compared to the much higher limit for other industrial uses; and that the draft revised ordinance provides no ability for meaningful review of standards. (**Ex 20**, *6/1/26 Planning Commission Minutes-Draft Version*).[3] Griffin also pointed out that a 10 dBA "tonal penalty" required an actual reduction in sound level of 50-90%.

[3] The City has not posted a "final" or approved version of the June 1, 2026 Planning Commission Minutes; only the "draft" version is available.

57. Planning Commission then heard from its sound engineer, Nathan Sevener, who acknowledged that the 10 dBA "tonal penalty" is not common and that a 55 dBA noise level is compatible with a suburban residential environment consisting of single-family homes with extensive outdoor use. After some discussion, Planning Commission moved to recommend a public hearing on the proposed ordinance for July 20, 2026, and the motion passed. (**Ex 20**).

**Wixom One Submits its Application for Site Plan Review**

58. The next day, on June 2, 2026, Wixom One submitted an application for site plan review for Midwinds Park. Wixom One's Midwinds Park proposal complies with the City's existing zoning ordinance; it does not require any variances or special land use approvals; the application includes all information required under the City's zoning ordinance; and the proposal meets all requirements for site plan approval and issuance of a building permit.

59. Wixom One's application included a letter from Wixom One's attorneys requesting a waiver under Section 3 of the Moratorium "so that the Project may proceed through the site plan approval process in the ordinary course and without undue delay." In the letter, attorney Rassel indicated that Wixom One sought review of the Midwinds Park site plan as a "by right" use under the current ordinance; noted that the site plan complies with all ordinance requirements without the need for any variances; argued that the Moratorium is in fact a tacit amendment of the ordinance

that was improperly adopted; and noted that the City was at risk of violating MCL § 125.3207 by totally prohibiting data centers as a land use. (**Ex 21**, *Rassel Letter 6/2/26*).

60. The City accepted Wixom One's application without any objection, along with the Rassel letter requesting a waiver from the Moratorium.

61. Although the next Planning Commission meetings were scheduled for June 15, 2026 and June 29, 2026, the City did not add Wixom One's application for site plan review to the agenda for either of the upcoming meetings. Instead, the City cancelled the June 15, 2026 Planning Commission meeting.

62. Moreover, upon information and belief, the City's Planning Commission and/or Council determined to override the motion passed on June 1, 2026, which set the public hearing date for further consideration of the proposed text amendments to the zoning ordinance for July 20, 2026. On June 3, 2026, the City announced a public hearing on proposed text amendments to the zoning ordinance to restrict data centers which was scheduled for June 29, 2026. (**Ex 22**, *6/3/26 Notice of Public Hearing*). This date was nearly a month earlier than the date proposed and passed via motion at the Planning Commission meeting held on June 1, 2026.

63. The City has never explained this acceleration of the timeline for review of the new revised text amendments from July 20, 2026 to June 29, 2026, which

appears to have been in direct response to Wixom One's application for site plan approval for Midwinds Park.

64. The proposed text amendments as described in the version dated June 3, 2026 include the 55 dBA daytime/45 dBA nighttime noise limits, with the 10 dB "tonal penalty." (**Ex 23**, *6/3/26 Proposed Text Amendments*). No other industrial use in the City is required to meet even a 55 dBA daytime/45 dBA nighttime limit, let alone a 45 dBA daytime/35 dBA nighttime limit.

65. A 10 dBA reduction of sound is roughly a 50-90% reduction in the volume of that sound.

66. A 35 dBA noise level is comparable to rustling leaves in a gentle breeze, a soft whisper in a quiet room, or a rural nighttime environment with minimal background noise. Essentially, it is a barely noticeable sound in a completely silent space.

67. Achieving a 35 dBA noise level is a practical impossibility for any industrial use and the obstacles associated with this restriction would render any data center anywhere in the City non-feasible.

**The June 29, 2026 Planning Commission Meeting**

68. The June 29, 2026 Planning Commission meeting was well attended and several individuals, both residents and non-residents, provided public comment. Unsurprisingly, most of the comments were virulently opposed to data center

construction of any kind and failed to differentiate between more modestly scaled projects like Midwinds Park and the massive, controversial data centers with their own dedicated power plants that are being built around the U.S. by tech giants like Meta or Google. (**Ex 24**, *6/29/26 Planning Commission Minutes*).

69. After the initial call to the audience, Assistant City Manager Benson explained the purpose of the public hearing and told the audience that the City had "not received applications for data centers" and that the proposed text amendments would "not regulate individual proposals." He acknowledged that the City cannot adopt an ordinance that would totally prohibit lawful land uses. (**Ex 24**).

70. Passalacqua then explained the proposed text amendments in detail. With respect to the residential separation distance, Benson explained that the proposed 500-foot distance "may be more than enough" in some cases, and noted that applicants would be subject to both the separation distance and the noise standards. Passalacqua then provided further explanation as to the residential separation measurement, and City sound consultant Severen gave a detailed explanation of the proposed noise limits and tonal penalty. (**Ex 24**).

71. Follow-up public comments were largely in the same vein as initial comments, with speakers demanding substantial increases in the residential separation distance; reiterating concerns that all data centers will use millions of gallons of water; and repeatedly referencing the Hyperscale Data Dowagiac facility

(which would not be permitted under any of the various versions of the proposed text amendment that were considered prior to the public hearing). One resident indicated that she had recently visited the Hyperscale Data Dowagiac facility herself, along with Commissioner Grossi of Planning Commission and Councilmember Behrmann. Most speakers insisted that any developer building a data center would lie, pollute local waterways, cut corners, and violate any applicable laws or agreements. (**Ex 24**).

72. After the close of the public hearing, Planning Commission passed a motion to request a six-month extension of the Moratorium. Commissioner Grossi then acknowledged his visit to the Hyperscale Data Dowagiac facility and played videos from his smartphone to demonstrate the sound. Upon information and belief, Councilmember Behrmann was sending text messages to Commissioner Dornan during the meeting, including videos from Hyperscale Data Dowagiac similar to the one that Commissioner Grossi played for the audience, in an effort to stir up further political pressure and to cause Planning Commission to increase the residential separation distance without any meaningful analysis or justification. (**Ex 25**, *Behrmann Text Messages 6/29/26*).

73. Ultimately, that is exactly what happened. Commissioner Grossi and Commissioner Dornan proposed significantly increasing the residential separation distance from 500 feet to 1,500 feet and applying it to commercial properties as well

as residential properties. The primary "basis" for this decision was Commissioner Grossi's performance with the Hyperscale Data Dowagiac videos, and there was no discussion regarding the significant differences between that facility and the Midwinds Park proposal or the fact that the proposed text amendments under discussion would already bar the construction of anything like Hyperscale Data Dowagiac. Other commissioners similarly adopted a far more militant attitude against data center development in light of the public scrutiny and negative comments. (**Ex 24**, *6/29/26 Planning Commission Minutes*).

74. Further discussion included an explanation by the City attorney of the risks posed by a potential legal challenge to the Moratorium and the fact that an application had been submitted for a data center project, contrary to Benson's initial comments. Planning Commission then passed motions to restrict data centers to special land uses in the M-1 and M-2 districts only, and to triple the proposed residential separation from 500 feet to 1,500 feet.

75. The motion to triple the proposed residential separation distance involved no discussion or analysis as to why Planning Commission's prior 500-foot proposal—which was the product of significant study and discussion over multiple meetings—was no longer appropriate. To the contrary, Commissioner Dornan arbitrarily suggested an even larger separation of 2,000 feet in an apparent attempt to ingratiate himself with the audience, which responded with applause. (**Ex 24**).

Planning Commission's implementation of any cautionary advice that City staff or the City attorney had previously given regarding the need to avoid arbitrary or unsupported distance requirements seemingly evaporated in the face of political pressure.

76. Planning Commission then discussed methods to penalize developers. The City Attorney cautioned that the City is required to comply with the Michigan Zoning Enabling Act, which does not authorize penalties, and that the City would be limited to assessing civil infractions or seeking injunctive relief in circuit court. Planning Commission passed a motion to change the term "may" to "shall" in the proposed text amendment. (**Ex 24**).

77. Chairman Day recommended moving the proposed amendments to Council quickly "because it is clear there is an existing site plan that has been proposed" and it wasn't clear whether the Moratorium would be upheld. He acknowledged that "if the applicant is correct that he already has a right under the City's current Ordinance to put in a data center, then they do not have any of this protection." (**Ex 24**).

78. Commissioner Dornan then proposed requiring a punitive performance bond of $450,000 for data center development, which the City Attorney noted was not authorized under the Michigan Zoning Enabling Act. Commissioner Dornan stated that he "is taking a nuclear approach." Planning Commission then passed a

motion to send the proposed text amendments to Council for review, and, during final public comment, Griffin noted that the proposed changes to the text amendments were very substantial and likely required a new public hearing. At the close of the meeting, Commissioner Grossi "implore[d] everyone to drive out to Dowagiac," thereby suggesting falsely that any data center built in Wixom would be comparable to a legacy bitcoin mining facility that is across the street from residential properties. (**Ex 24**).

79. Put simply, during the course of the June 29, 2026 meeting, when faced with political pressure from residents (and non-residents) and smartphone video footage from a facility that could never be built in the City, Planning Commission members in general substantially altered their opinions, positions, and beliefs that were previously developed over multiple meetings and based on significant study and research. As a result, the proposed text amendments that were sent to Council for its review were materially different from the versions noticed for public hearing, and Planning Commission's efforts over the previous six months were apparently meaningless and futile to a large extent.

80. Planning Commission's actions at the June 29, 2026 meeting were arbitrary, capricious, and inconsistent with Planning Commission's own prior analyses and conclusions.

**The July 14, 2026 City Council Meeting**

81. The City's display of antagonism towards Wixom One at the June 29, 2026 Planning Commission meeting was repeated at the July 14, 2026 City Council meeting, at which Council scheduled a first reading of the proposed text amendments relating to data centers; this against the backdrop of the fact that since June 2, 2026, Wixom One's lawful and accepted but unprocessed application for site plan approval had been held hostage by the City through effect of the Moratorium, enacted for just that purpose, to freeze out Wixom One and Midwinds Park for as long as necessary for the City to effect total and permanent project and use exclusion in violation of MCL § 125.3207.

82. The meeting began with a lengthy series of public comments that echoed concerns raised at the June 29, 2026 Planning Commission meeting. Common themes raised included accusations that Wixom One intended to violate the City's ordinances governing noise levels and water use; insistence that the Midwinds Park project would be identical to Hyperscale Data Dowagiac; insistence that Wixom One intended to consume millions of gallons of water and pollute the City's watershed; and exhortations to Council to deny Wixom One's waiver request and prevent Midwinds Park from ever being approved or built. Multiple residents encouraged Council to revise the text amendments to include highly punitive costs and fines that would not apply to any other type of industrial use, regardless of the

intensity. (**Ex 26**, *7/14/26 City Council Meeting Transcript - Excerpt*; **Ex 27**, *7/14/26 City Council Minutes*).

83. After Assistant City Manager Benson presented Planning Commission's recommendations for the proposed text amendments, Councilmembers quickly began to suggest even greater restrictions. Councilmember Kennedy requested that the daytime noise limit be lowered to 40 dBA "to better match existing ambient noise levels," though the M-1 district standard allows for 70 dBA during daytime hours for all other industrial uses, and requested extension of the residential separation to 2,000 feet. (**Ex 26**).

84. Deputy Mayor Gottschall then proposed a series of additional highly restrictive revisions including but not limited to the following:

a. Increasing the residential separation distance from 1,500 feet to 0.5 miles (2,640 feet) and adding schools, places of worship, parks, and hotels/motels as receptors;

b. Requiring data center developers and original operators (but not developers or original operators of any other industrial use) to be responsible for complete site and environmental cleanup and remediation upon cessation of the use;

c. Requiring data center operators (but not operators of any other industrial use) to immediately stop "drawing from the City's infrastructure" if there is a water main break in the City or anywhere else in the City's regional-partner water system that has any possibility of impacting any of the City's water users;

d. Requiring data center developers (but not developers of any other industrial use) to pay for any utility customer rate increases for electric, water, or gas infrastructure that allegedly result from the development or operation of the data center for a 10-year period;

e. Requiring data center developers (but not developers of any other industrial use) to provide "continuous monitoring" of noise levels at the nearest receptor property of any listed classification within 0.5 miles of the facility; and

f. Requiring data center developers (but not developers of any other industrial use) to sign a Community Benefit Agreement with the City outlining specific guarantees as to local hiring, energy and water caps, a community investment fund, and a residential property value protection program.

(**Ex 26**).

85. These new restrictions, which are proposed to selectively apply to data center development only and not to any other industrial use regardless of its intensity, are clearly designed to exclude data center development entirely as a viable possibility within the City. Councilmembers' enthusiastic and immediate endorsement of these proposals further demonstrates that the City's and Council's goal is not to reasonably regulate data centers, but to entirely exclude them.

86. Councilmember Behrmann noted that Council needed to see whether the proposed setback requirements allowed for any property at all to be technically available for data center development because "I don't want us to get in a situation where we're making something not viable and be challenged that way," and suggested that Council should consider limiting any data center development to M-2 General Industrial districts.

87. Any of the proposals suggested by Gotschall or Behrmann would necessarily kill the Midwinds Park development, which, as Council was well aware,

is the sole applicant for site plan review and approval within the City.

88. Council then passed a motion to direct City staff to review the proposed text amendments and incorporate the proposals raised by Gottschall, Behrmann, and other councilmembers, and to explore alternative approaches to achieve the same objectives if the proposals are not feasible. (**Ex 27**).

89. Councilmember Behrmann then moved to bring Wixom One's waiver request up for discussion. Benson gave a brief description of the proposed Midwinds Park development and noted that Wixom One believed the development was a permitted use by right, but further noted, for the first time, that "a formal use interpretation by the Zoning Board of Appeals may ultimately be required to determine the appropriate zoning classification." (**Ex 27**). Benson did not mention that he and other City staff, along with the City's outside planning consultants at Carlisle Wortman, had already confirmed on numerous occasions that the Midwinds Park development is a permitted, by-right use under the current zoning ordinance.

90. Wixom One attorney Richard Rassel gave a succinct presentation as to the procedural posture and legal basis for the waiver request, noting that the Midwinds Park application is for a permitted use, requires no variances, and satisfies the waiver criteria included in the Moratorium. Rassel requested that Wixom One be given the same treatment as any other similarly situated industrial or commercial developments. (**Ex 26**).

91. After attorney Rassel's presentation, Griffin, on behalf of Wixom One, gave a lengthier presentation and explanation regarding Wixom One's waiver request, which is described below. After Griffin's presentation, Councilmember Behrmann quickly moved to deny the waiver request, in keeping with his pre-meeting communications with Gottschall, without any response or rebuttal to Griffin's explanation as to how Wixom One had satisfied the stated waiver criteria. (**Ex 26**).

92. For the reasons set forth below, however, the Moratorium was and always has been ineffective and unenforceable, and Council's predetermined and prearranged denial of the waiver request was a baseless and bad faith strategy to continue delaying any site plan review of Midwinds Park while the City works to kill the proposed development, devalue Wixom One's property, and entirely exclude data centers as a viable use within the City.

**The Moratorium Was Not Properly Adopted and is Ineffective**

93. The Moratorium ostensibly adopted by Council on March 24, 2026 was not the product of any meaningful research, analysis, or study by City staff, Planning Commission, or the City's outside consultants.

94. The purported Moratorium was not included on the published agenda for the March 24, 2026 City Council meeting, and City residents therefore had no

advance notice that a moratorium was even under consideration, let alone proposed for adoption via City Council resolution.

95. Council's purported adoption of the Moratorium therefore did not comply with the City's own requirements for enacting or amending City ordinances as set forth in Chapter 7 of the City's Charter.

96. Accordingly, the Moratorium is not effective as a City ordinance or ordinance amendment.

97. In addition, Council did not comply with the notice, public hearing, and other requirements set forth in the Michigan Zoning Enabling Act in its purported adoption of the Moratorium.

98. MCL § 125.3202(1) provides that "the legislative body of a local unit of government may provide by ordinance for the manner in which the regulations and boundaries of districts or zones shall be determined and enforced or amended or supplemented."

99. The Moratorium purports to determine, enforce, and/or supplement the regulations of districts or zones within the City and should therefore have been adopted as a city ordinance rather than a resolution of Council.

100. The only basis provided or discussed for the purported adoption of the Moratorium was the fact that Planning Commission had not yet created a proposed data center ordinance.

101. Council did not address or analyze any issues relating to public health, safety, general welfare, land suitability, public service capacity or infrastructure when discussing and purportedly adopting the Moratorium.

102. The Moratorium purports to enact a "blanket prohibition on the establishment and use of data centers, including without limitation, approval of such use within the City, pending further study and enactment of City regulation addressing same."

103. However, the Moratorium does not include any definition for "data center" and is therefore vague and ambiguous as to what, specifically, is being prohibited.

104. Further, while the Moratorium purports to allow an applicant the opportunity to request a waiver, Council's predetermined actions at the July 14, 2026 meeting demonstrate that the City and Council never intended to allow any applicant to obtain a waiver.

105. The Moratorium was not adopted as a ministerial function for short-term purposes. Rather, it was adopted to establish a permanent impact on the community and landowner's use of their property through zoning legislation.

106. The Moratorium was used as a means to prevent (and target) Wixom One in particular from implementing a permitted, by-right use on the Property so that the City could develop and adopt text amendments designed to strip Wixom One

of its right to implement that permitted use.

107. Councilmember Behrmann even publicly acknowledged to Griffin that the Moratorium was adopted in response to, and directly targeted, the Midwinds Park project:

> "…And the first that council learned that there was even a potential of data center use was when you went to the planning commission meeting and said that and we read it in the planning commission minutes and at that point we as council decided that we had to do the moratorium."

(**Ex 26**).

**Council's Waiver Rejection Was Pretextual and Unsupported**

108. Even assuming that the purported Moratorium was properly adopted and became effective, City Council did not meaningfully consider Wixom One's request for a waiver under section 3 of the Moratorium.

109. At the July 14, 2026 Council meeting, the outcome of Wixom One's waiver request was predetermined regardless of the evidence or argument that Wixom One provided in support of its request.

110. Councilmember Behrmann told Deputy Mayor Gottschall as much on June 28, 2026, when he sent Gottschall a text message stating "I would not grant the waiver and will not vote to approve the current draft when it comes to us without revisions." (**Ex 28**, *Behrmann Text 6/28/26*). In short, Behrmann was clear that his mind was already made up.

111. Griffin, on behalf of Wixom One, provided a detailed explanation as to how the Midwinds Park proposal addressed all of the health, safety and welfare impacts that Council and City residents had raised. Among other things, Griffin pointed out the following:

a. At the time Wixom One acquired the Property, City staff confirmed that data centers were a permitted use and worked with Wixom One to market the property for data center development. CBRE, at the suggestion of City staff, noted that Wixom was a redevelopment ready, pro-business community.

b. The power generation and cooling systems are designed to satisfy noise concerns, with specially oriented motors and exhaust fans surrounded by soundwalls.

c. The Hyperscale Data Dowagiac facility is the equivalent of a Mack truck, while Midwinds Park is a well-designed Tesla. There are residential properties across the street in Dowagiac, but Midwinds Park would be surrounded by industrial properties.

d. The property that the City considers to be the closest residential receptor ("Receptor D") is located between Pontiac Trail road and a truckyard and is routinely subject to noise levels well above 70 dBA. Midwinds Park will be considerably under the current permitted noise level of 70 dBA daytime/65 dBA nighttime at its property line, which will still apply even if the ordinance is amended.

e. The closest actual residential uses are more than 2,000 feet away from Midwinds Park, and the only proposed residential development for Receptor D has failed to break ground and lost its approval and building permit.

f. The actual calculated noise level from Midwinds Park at the nearest existing single-family residential property would be no more than 30.5 dBA, which is equivalent to wooded residential according to the City's sound consultant. The noise level at the nearest apartments would be 31 dBA. Even if residential property were built at Receptor D, the calculated noise level from Midwinds Park would not exceed 45 dBA,

which is equivalent to agricultural crop land according to the City's sound consultant. All of these levels are well below ANSI averages for the relevant housing types.

g. Properties adjacent to Receptor D can deliver noise levels of 64 dBA at the property line, and the noise from adjacent Pontiac Trail Road is frequently even louder.

h. The building layout for the Midwinds Park structures is designed to create an "acoustic canyon" for further sound mitigation. All generators are located within the acoustic canyon, and all rooftop HVAC units will be variable frequency drive units screened with mechanical shields.

i. The building design also intentionally allows for easy adaptive re-use as multi-tenant industrial, and the generator courts are designed to be repurposed as truck loading courts. Further, the design preserves a substantial amount of greenspace. These factors make decommissioning a simple process.

j. The strain on public utilities will be minimal as Midwinds Park will use a closed-loop cooling system that does not require a constant and substantial water supply. The electrical power required is considerably lower than other Michigan data centers, and the property will have its own substation. DTE has already approved it and Michigan law prevents DTE from raising rates based on the development.

k. Generator testing will be limited to daytime hours and generators will be tested in small batches rather than all at once.

l. The City has not identified any issues relating to public health, safety, and welfare and the proposed use is permitted by right. The project does not require any variances.

m. Other data centers in the area are not comparable—South Lyon is much bigger, and Hyperscale Data Dowagiac is a completely different type of facility that is not comparable and would not be permitted under the City's existing zoning ordinance.

(**Ex 26**, *7/14/26 Council Meeting Transcript – Excerpt*).

112. After Griffin's presentation, no Councilmembers raised any questions

or responded in any way other than Councilmember Behrmann, who asked Griffin to provide an example of a "Tesla" data center as opposed to the "Mack truck" analogy used for Hyperscale Data Dowagiac. Griffin did not have an example on hand to offer, but pointed out that under the City's currently existing ordinance, Midwinds Park already has to be a "Tesla" data center. (**Ex 26**).

113. Behrmann responded that Council never knew Midwinds Park was being marketed as a data center until Griffin appeared at the Planning Commission meeting immediately before Council purported to adopt the Moratorium. He then stated that it was "reasonable for the health and safety of this municipality that we finish our ordinance before we grant you a waiver and we only got two months left on the moratorium," and moved to deny the waiver request "based upon the reasonableness of the health and safety for the residents and the City at this point in time." When Griffin pointed out that CBRE had been marketing Midwinds Park as a data center since April 2025 and would not have done so without confirming that it was a permitted use, Behrmann said "we're not going to debate it this evening. I mean, what staff says is not what Council says, and Council speaks for the City." (**Ex 26**).

114. Without any further discussion, and without the introduction of any countervailing evidence, Council then unanimously passed Behrmann's motion to deny the waiver request.

115. Behrmann's suggestion that the City was justified in considering Hyperscale Data Dowagiac—the "Mack truck"—as a basis to deny the waiver was particularly disingenuous considering that Behrmann had previously admitted in June that Midwinds Park and Hyperscale Data Dowagiac were "not apples to apples" in a text message to Benson. (**Ex 29**, *Behrmann Text 6/24/26*).

116. In short, though Behrmann admittedly knew that Midwinds Park is not equivalent to Hyperscale Data Dowagiac, he intentionally misled Planning Commission and inflamed City residents by surreptitiously sending video of Hyperscale Data Dowagiac to Commissioner Dornan during a Planning Commission meeting, and then encouraged Council to base the July 14, 2026 waiver decision on a comparison that he knew to be invalid.

117. Behrmann's actions, in coordination with Gottschall, Dornan, Grossi, Benson, and likely with other City officials, are replete with bad faith. Behrmann planned to deny Wixom One's waiver request long before the July 14, 2026 meeting, and he conspired with and manipulated Planning Commission, City staff and Council to make sure that the waiver request would fail.

118. Moreover, Behrmann's statement that the City needs to "finish our ordinance before granting [Wixom One] a waiver" demonstrates that the waiver language in the Moratorium is and always has been illusory and specifically targeted at Wixom One. Once the ordinance is granted, the Moratorium "shall terminate and

be of no further effect" automatically pursuant to Section 2 of Authorizing Resolution 2026-06. (**Ex 14**, *Authorizing Resolution 2026-06*).

## COUNT I – VIOLATION OF MICHIGAN ZONING ENABLING ACT

119. Wixom One realleges all preceding paragraphs as set forth herein.

120. Under Michigan law, moratoria are disfavored and are appropriate only under a narrow set of circumstances.

121. Specifically, moratoria are temporary measures "used to maintain the status quo until a permanent zoning change has been enacted." 8 McQuillin Mun Corp § 25:68 (3d ed).

122. Consistent with the general rule, Michigan law generally permits moratoria only where they are used to allow a municipality time to implement a new zoning ordinance to consider uses or community changes that have not been previously addressed under a current zoning ordinance.

123. Defendants are not in the process of developing an entirely new zoning ordinance related to the regulation of industrial uses including data processing. Indeed, the City has existing ordinance language which, as City officials and the City's outside consultants admit, allows the construction and operation of data centers as a permitted, by-right use in multiple zoning districts, including the M-1 Light Industrial district.

124. In addition, under Michigan law, a zoning ordinance may not be

suspended or amended by resolution.

125. The Michigan Court of Appeals has explained: "An ordinance . . . cannot be amended, repealed, or suspended by another act by a council of less dignity than the ordinance . . . itself." *McCarthy v. Village of Marcellus*, 189 N.W.2d 80, 85 (Mich. Ct. App. 1971).

126. Moreover, the Michigan Zoning Enabling Act ("ZEA") states: "Amendments or supplements to the zoning ordinance shall be adopted in the same manner as provided under this act for the adoption of the original ordinance." MCL § 125.3202(1).

127. The City's purported Moratorium prohibiting the establishment or approval of what is a currently permitted use, which the City is interpreting as a prohibition on any site plan approval or issuance of building permits for any project that the City believes may fit into its as-yet undefined category of a "data center," constitutes a suspension or amendment of the City's zoning ordinance.

128. Because the zoning ordinance was created by legislation, under the doctrine of legislative equivalency, the Moratorium may not be adopted by resolution. While the City styles the Moratorium as a police power resolution, the Moratorium is not a proper exercise of the City's police power under Michigan law. The City is clearly trying to regulate the use of land (as set forth in the ordinance), not activities. Land use regulations must be enacted through legislation pursuant to

the procedures set forth under the ZEA.

129. Accordingly, the Moratorium, or any later extension of the Moratorium by the City, is unlawful and should be declared void.

**COUNT II – VIOLATION OF EQUAL PROTECTION**

130. Wixom One realleges all preceding paragraphs as set forth herein.

131. The United States Constitution guarantees that no person shall be denied equal protection under the law. U.S. Const. amend. XIV.

132. The Michigan Constitution also guarantees that no person shall be denied equal protection under the law. Mich. Const. art. 1, § 2.

133. The Equal Protection Clause requires all persons who are similarly situated, including corporations and other business entities, to be treated alike by their government.

134. Discrimination in an ordinance between two similarly situated persons or groups violates the Equal Protection Clause unless such discrimination bears a rational relationship to a legitimate government interest, is not arbitrary or invidious, and is not motivated by an illegal animus.

135. Council's decision to enact the Moratorium and to deny Wixom One's requested waiver for the Midwinds Park development is discriminatory because, among other things, the City and Council are blocking Wixom One from conducting or developing a permitted use on its property while the City works to adopt standards

applicable to data center uses only that are substantially more restrictive than those applied to other industrial uses, including but not limited to high-intensity uses like blast furnaces and industrial composting.

136. Moreover, the City and Council have acknowledged that their efforts are specifically intended (targeted) to prevent Midwinds Park from being built, and the actions of Planning Commission and Council demonstrate that such efforts are based on public pressure and a willful disregard for evidence or facts.

137. Indeed, after purporting to adopt the Moratorium and refusing to allow site plan review for Midwinds Park, the City proceeded with site plan review for multiple other industrial uses that did not involve data processing or data centers on properties owned or controlled by developers similarly situated to Wixom One, including an automotive research and development facility with two test tracks, an 85,000 square foot warehouse with office space, and a large warehousing/logistics center on a parcel adjacent to residential property.

138. Since June 2, 2026, Wixom One's lawful and accepted but unprocessed application for site plan approval had been held hostage by the City through effect of the Moratorium, enacted for just that purpose, to freeze out Wixom One.

139. This discrimination between data center uses and other industrial land uses, and against Wixom One specifically, bears no rational relationship to a legitimate government interest, fails to reasonably advance a legitimate

governmental interest, is arbitrary and capricious, and is motivated by an illegal animus towards Wixom One and Griffin that is unconnected with any Council members' official duties, as well as a desire to score political points at Wixom One's expense.

140. The City's and Council's actions deny Wixom One equal protection under the law as an industrial developer working in the data center industry, which is being totally excluded from the City, in violation of 42 U.S.C. § 1983.

141. Wixom One has been harmed, and will be further harmed, by the City's and Council's violations of its constitutional rights.

142. 42 U.S.C. § 1983 permits Wixom One to seek declaratory and injunctive relief and/or damages for deprivation of its constitutional rights.

143. In order to remediate the City's and Council's deprivation of Wixom One's constitutional rights, the Court should award Wixom One declaratory relief in the form of an order or judgment that the Moratorium is void and that Wixom One is entitled to site plan approval and a building permit; an injunction requiring the City to proceed with site plan review for Midwinds Park applying the zoning ordinance as it existed when Wixom One submitted its application, approve Wixom One's site plan, and issue a building permit for Midwinds Park; and an order or judgment requiring the City to pay appropriate damages to Wixom One including

attorney fees and legal costs; and any other relief that the Court deems appropriate under the circumstances.

**COUNT III – VIOLATION OF PRODEDURAL DUE PROCESS**

144. Wixom One realleges all preceding paragraphs as set forth herein.

145. The United States Constitution provides that no person shall be deprived of life, liberty, or property without due process of law. U.S. Const. amend. V, XIV.

146. The Michigan Constitution likewise states that no person shall be deprived of life, liberty, or property, without due process of law. Mich. Const. art. 1, § 17.

147. Procedural due process protects individuals from arbitrary and capricious government action by requiring fair procedures before the government acts.

148. As described above, Council purported to adopt the Moratorium without following the procedural requirements set forth in the ZEA.

149. This action was arbitrary and capricious.

150. Wixom One has a recognized property interest in having its application for site plan review processed in accordance with the City's zoning ordinance and in site plan approval and issuance of a building permit under MCL § 125.3501. Since June 2, 2026, Wixom One's lawful and accepted but unprocessed application for site

plan approval had been held hostage by the City through effect of the Moratorium, enacted for just that purpose, to freeze out Wixom One, in violation of City procdures and policies applied in the ordinary course.

151. Because Wixom One's application includes all required elements and is fully compliant with the zoning ordinance, and does not require any variances or other special discretionary approvals from the City or Planning Commission, Wixom One has a justifiable expectation in receiving site plan approval and a building permit because the City lacks discretion under the zoning ordinance to deny Wixom One's application.

152. Moreover, as the City and its staff have repeatedly acknowledged, Wixom One's Midwinds Park development is a permitted use under the existing zoning ordinance and the City has no discretion to arbitrarily deny it.

153. The City's and Council's actions deprived Wixom One of its recognized property rights under the due process provisions of the United States Constitution, the Michigan Constitution, and the ZEA.

154. Further, even assuming that the Moratorium is legally enforceable (it is not), Council deprived Wixom One of its property rights without due process of law, as Council failed to afford Wixom One sufficient procedural safeguards in connection with Wixom One's request for a waiver, including but not limited to a meaningful hearing, unbiased decision-makers who had not predetermined their

outcome, and reasonable consideration of Wixom One's arguments and evidence.

155. By ignoring Wixom One's arguments and evidence in support of its waiver request and instead immediately denying the request based on a pre-existing conspiracy to do so without adducing any countervailing arguments or evidence, the City and Council continue to deprive Wixom One of its property rights without due process of the law.

156. Council's purported adoption of the Moratorium pursuant to its police power does not represent a reasonable exercise of discretion granted by state or federal law.

157. Council's failure to comply with the ZEA prior to depriving Wixom One of its property interest violates the due process clauses of the United States Constitution and the Michigan Constitution.

158. These due process violations should be remedied by an award to Wixom One of declaratory relief in the form of an order or judgment that the Moratorium is void and that Wixom One is entitled to site plan approval and a building permit; an injunction requiring the City to proceed with site plan review for Midwinds Park applying the zoning ordinance as it existed when Wixom One submitted its application, approve Wixom One's site plan, and issue a building permit for Midwinds Park; and an order or judgment requiring the City to pay appropriate damages to Wixom One including attorney fees and legal costs; and any other relief

that the Court deems appropriate under the circumstances.

**COUNT IV – VIOLATION OF SUBSTANTIVE DUE PROCESS**

159. Wixom One realleges all preceding paragraphs as set forth herein.

160. The United States Constitution provides that no person shall be deprived of life, liberty, or property without due process of law. U.S. Const. amend. V, XIV.

161. The Michigan Constitution likewise states that no person shall be deprived of life, liberty, or property, without due process of law. Mich. Const. art. 1, § 17.

162. Michigan property owners have a protected property interest in uses that are permitted by right by a zoning classification, particularly where the issuance of the applicable permit(s) is non-discretionary.

163. Here, the City has confirmed that Wixom One's proposed use as exemplified in the Midwinds Park project is a permitted, by-right use in the M-1 Light Industrial district. Further, Wixom One has submitted an application for site plan review that includes all information required under Section 18.17.030 of the City's zoning ordinance.

164. Under Michigan law, "[a] site plan shall be approved if it contains the information required by the zoning ordinance and is in compliance with the conditions imposed under the zoning ordinance, other statutorily authorized and

properly adopted local unit of government planning documents, other applicable ordinances, and state and federal statutes." MCL § 125.3501(5).

165. Wixom One has invested substantial resources and "sunk costs" into the Midwinds Park development, often with the City's knowledge and encouragement.

166. However, the Moratorium prevents Wixom One from having its lawful application for site plan review considered and approved by Planning Commission, which, in turn, prevents Wixom One from receiving a building permit for Midwinds Park.

167. The due process clauses of the United States Constitution and the Michigan Constitution protect the rights of persons, including Wixom One, from deprivation of property at the hands of arbitrary and capricious government action.

168. The Moratorium as applied to Wixom One's application for site plan review for Midwinds Park constitutes an arbitrary exercise of power by entirely stripping Wixom One of its right to have the application processed and approved in accordance with the zoning ordinance and Michigan law.

169. The Moratorium is not reasonably related to public health, safety, welfare, or morals, or any other legitimate government interest, and, as applied to Wixom One's application for site plan review, constitutes an arbitrary and capricious exclusion of a legitimate land use as the Moratorium was adopted without

compliance with the City's charter and further appears to have been enacted for the specific purpose of depriving Wixom One of its property interests in and arising out of the Midwinds Park project.

170. During the July 14, 2026 Council meeting, Wixom One explained in detail how the Midwinds Park project does not implicate the City's stated reason for adopting the Moratorium—i.e., to avoid interference with other land uses and to protect the City's environment, public health, safety, and welfare. The City's sole response was to point to an example of a substantially different type of development than the proposed Midwinds Park project and to immediately deny Wixom One's request for a Moratorium waiver, which was predetermined and arranged prior to the meeting by Councilmember Behrmann and Deputy Mayor Gottschal via text message.

171. The City's and Council's actions are not rational and are based on reasons unrelated to the pursuit of the City's goals, and, accordingly, such actions are arbitrary and capricious.

172. The Moratorium, as applied to Wixom One's application for site plan review, violates Wixom One's substantive due process rights under the United States Constitution.

173. The Moratorium, as applied to Wixom One's application for site plan review, violates Wixom One's substantive due process rights under the Michigan

constitution.

174. These due process violations should be remedied by an award to Wixom One of declaratory relief in the form of an order or judgment that the Moratorium is void and that Wixom One is entitled to site plan approval and a building permit; an injunction requiring the City to proceed with site plan review for Midwinds Park applying the zoning ordinance as it existed when Wixom One submitted its application, approve Wixom One's site plan, and issue a building permit for Midwinds Park; and an order or judgment requiring the City to pay appropriate damages to Wixom One including attorney fees and legal costs; and any other relief that the Court deems appropriate under the circumstances.

## COUNT V – EXCLUSIONARY ZONING

175. Wixom One realleges all preceding paragraphs as set forth herein.

176. The ZEA bars exclusionary zoning, as follows:

> A zoning ordinance or zoning decision shall not have the effect of totally prohibiting the establishment of a land use within a local unit of government in the presence of a demonstrated need for that land use within either that local unit of government or the surrounding area within the state, unless a location within the local unit of government does not exist where the use may be appropriately located or the use is unlawful.

MCL § 125.3207.

177. There are no data center projects in the City. The Moratorium has the effect of totally prohibiting the establishment of data centers in the City. Since June

2, 2026, Wixom One's lawful and accepted but unprocessed application for site plan approval had been held hostage by the City through effect of the Moratorium, enacted for just that purpose, to freeze out and totally exclude Wixom One and data centers throughout the City.

178. In addition, the restrictions proposed by the City and Council for the establishment of data centers in the City would make it impossible to situate a data center in the City, even if the Moratorium is ever allowed to expire.

179. There is a demonstrated public need for a data center in the City and the surrounding areas.

180. A location exists within the City where a data center would be appropriate. In fact, for the reasons previously described, the Property is an ideal and unique location for a data center, having no or minimal adverse impacts on neighboring lands and utility and road infrastructure.

181. Wixom One's use of the Property would be lawful but for the Moratorium. The City itself has acknowledged that Wixom One's proposed data center is a permitted, lawful by-right use of the Property in the M-1 Light Industrial District and by historically zoning and planning for that use in that zone at the Property has admitted that the use is both lawful, publicly needed and appropriately located.

182. The Moratorium, and the City's proposed discriminatory restrictions on

the location of data centers in the City, have the effect of excluding data centers from the City in general and the Property in particular in violation of MCL § 125.3207 and Wixom One's rights to equal protection substantive and procedural due process.

183. These violations should be remedied by an award to Wixom One of declaratory relief in the form of an order or judgment that the Moratorium is void and that Wixom One is entitled to site plan approval and a building permit; an injunction requiring the City to proceed with site plan review for Midwinds Park applying the zoning ordinance as it existed when Wixom One submitted its application, approve Wixom One's site plan, and issue a building permit for Midwinds Park; and an order or judgment requiring the City to pay appropriate damages to Wixom One including attorney fees and legal costs; and any other relief that the Court deems appropriate under the circumstances.

## COUNT VI – DECLARATORY JUDGMENT

184. Wixom One realleges all preceding paragraphs as set forth herein.

185. There is an actual controversy between the parties to this action that requires judicial determination as to the parties' legal rights and obligations.

186. Wixom One asserts that its application for site plan approval for the Property is fully compliant with the City's zoning ordinance and meets all requirements under that ordinance, and that the City is therefore required to approve the application under MCL § 125.3501.

187. Wixom One further asserts that its application must be reviewed under the City's zoning ordinance as it exists as of the date of site plan review, and that the City cannot delay the application for the purpose of applying a different ordinance that may be adopted in the future.

188. Moreover, Wixom One asserts that the Moratorium violates Michigan law because, *inter alia*, it functions as a de facto amendment of the City's zoning ordinance but was enacted by a resolution instead of legislation in compliance with the Michigan Zoning Enabling Act, and therefore violates the requirements of MCL § 125.3202.

189. Wixom One seeks entry of a declaratory judgment confirming that:

a. The Moratorium on establishing, permitting, consideration, approval, location, construction, and/or installation of any data centers was adopted in violation of the City's charter and Michigan law and is therefore void and unenforceable;

b. In light of the City's bad faith and undue delay, the zoning ordinance that applies to site plan review for Wixom One's application is the zoning ordinance that existed on June 2, 2026 when Wixom One submitted its application and the City accepted it; and

c. Wixom One's application for site plan review meets all requirements under the City's zoning ordinance and therefore must be approved.

## CONCLUSION AND REQUEST FOR RELIEF

WHEREFORE Plaintiff Wixom Industrial One, LLC respectfully requests that this Court:

a. Enter a Declaratory Judgment ruling that the City's moratorium on establishing, permitting, consideration, approval, location,

construction, and/or installation of any data centers was adopted in violation of Michigan law and is therefore void and unenforceable;

b. Enter a Declaratory Judgment ruling that the zoning ordinance to be applied when reviewing Wixom One's proposed site plan for Midwinds Park is the version that existed as of June 2, 2026;

c. Enter a Declaratory Judgment confirming that Wixom One's application for site plan review for Midwinds Park is complete, meets all requirements under the City's zoning ordinance, and complies in every respect with the zoning ordinance;

d. Enter a preliminary and permanent injunction requiring the City and Planning Commission to proceed with site plan review for Midwinds Park applying the zoning ordinance as it existed when Wixom One submitted its application, approve Wixom One's site plan, and issue a building permit for Midwinds Park;

e. Enter a preliminary and permanent injunction prohibiting the City, Planning Commission or Council from tabling or delaying site plan review for Wixom One's proposed site plan for Midwinds Park, and from applying a revised version of its zoning ordinance when administering Wixom One's application for site plan review;

f. Enter an order or judgment requiring the City to pay appropriate damages to Wixom One including attorney fees and legal costs; and

g. Grant Wixom One any other or further relief that the Court deems necessary, equitable, and just under the circumstances.

Respectfully Submitted,

**MANTESE HONIGMAN, PC**
*Attorneys for Plaintiff*

By: /s/ *Ian Williamson*
Ian Williamson (P65056)
iwilliamson@manteselaw.com
1361 E. Big Beaver Road
Troy, MI 48083
(248) 457-9200

**WILLIAMS WILLIAMS**
**RATTNER & PLUNKETT PC**
*Attorneys for Plaintiff*
Richard Rassel (P57540)
John Gaber (P45294)
380 N. Old Woodward Ave, Suite 300
Birmingham, MI 48009
(248) 642-0333

Dated: August 7, 2026