# EXHIBIT 10

**APPROVED**
**MARCH 2, 2026**

**CITY OF WIXOM**
**49045 PONTIAC TRAIL**
**PLANNING COMMISSION MEETING**
**WEDNESDAY, FEBRUARY 18, 2026**

This meeting was called to order by Chairman Day of the Planning Commission at 7:00 p.m. at which time allegiance was pledged to the American flag.

**PRESENT:** William Day (Chairman), Cheryl Tacy (Vice Chairperson), Commissioners: Todd Buck; Michael Dornan; Sandro Grossi

**ABSENT:** Excused: Mark Lada, Vanessa Willett

**OTHERS:** Elizabeth Kudla Saarela, City Attorney, Rosati, Schultz, Joppich, Amtsbuechler; Matteo Passalacqua (Carlisle Wortman Associates), Drew Benson, Assistant City Manager; and Mona Freiburger (Recording Secretary)

**Determination of a Quorum:**

A quorum of the Planning Commission was present for this meeting.

**Changes or Additions to the Agenda:**

None

**Approval of Minutes:**

**MOTION** made and seconded by Commissioner Grossi and Vice Chair Tacy to approve the January 21, 2026, Planning Commission Meeting Minutes, as submitted.

**VOTE:** **MOTION CARRIED**

**Correspondence:**

1. City Manager Report – February 10, 2026
2. Drone Delivery Services Correspondence

**Call to the Public:** (Limited to 5 minutes per speakers, addressing Agenda items on Agenda only)

No public comments.

**Unfinished Business:**

None

**New Business:**

1. **FINAL SITE PLAN APPROVAL SPR25-006: 4038 WEST MAPLE ROAD, WIXOM, MI. 48393.** The applicant is requesting final site plan approval for a site condominium proposed as a clustered housing development pursuant to Chapter 18.03.070. The project is proposing 18 single family detached condominium units. The development as proposed would require the combination of the two lots consisting of approximately 9.35 gross acres. The Parcel Identification Numbers are 17-31-151-046 and 17-31-151-047.

The applicant is requesting final site plan approval for a site condominium proposed as a clustered housing development pursuant to Chapter 18.030.070. The project is proposing 18 single family detached condominium units. The development as proposed would require the combination of the two lots consisting of approximately 9.35 gross acres. The Parcel Identification Numbers are 17-31-151-046 and 17-31-151-047.

On October 20, 2025 a public hearing was held by the Planning Commission. After public comment and deliberation, the Planning Commission recommended conditional approval of the development to City Council. On November 18, 2025, the City Council granted conditional preliminary site plan approval for the development.

The final site plan is reviewed by the Planning commission at a regular meeting in which it will recommend approval, conditional approval, or denial of the project to City Council.

Staff report to the Planning Commission dated February 18, 2026 regarding SPR25-006 is included in the packet; as well as Final Site Plan/ Site Condominium/Clustered Housing Review for City of Wixom, Michigan dated February 5, 2026 from Carlisle Wortman Associates.

Mr. Passalacqua indicated the Planning Commission is reviewing the final site plan for a clustered housing development and condominium association consisting of 18 single-family homes. A public hearing was held on October 20, 2025, after which the Planning Commission recommended conditional approval to the City Council. On November 18, 2025, the City Council granted conditional preliminary site plan approval.

The site plan has not changed substantially since the preliminary review. Minor elective revisions were made in response to comments from nearby residents. These include increasing the number of trees and shrubs around the detention pond, preserving one additional tree identified in the tree survey, and adding 15 trees along the eastern and southeastern borders adjacent to existing single-family homes. The sidewalk along West Maple has also been reoriented to better align with the neighboring driveway to the east.

Overall, the plan remains largely consistent with the preliminary version, and there are no significant differences between the preliminary and final submissions. Staff recommends approval subject to the following conditions:

1. Any issues cited by the City Engineer; and
2. Any issues cited by Public Safety; and
3. Open space protection in the form of deed restrictions, covenants that run with the land, or conservation easements shall be agreed upon, executed and recorded with Oakland County per the approval of City Administration; and
4. Lots will need to be combined as a condition of site lan approval and building permits being issued.

Chairperson Day commented that the changes made to the plan appear to be improvements, particularly with respect to landscaping and responsiveness to neighboring residents' concerns. Mr. Passalacqua agreed, noting that the revisions were elective and resulted from public comment rather than being required as part of the conditional approval. Commissioner Dornan expressed appreciation to the developers for listening to residents and incorporating their feedback into the plan.

Mr. Mike Noles, Umlor Group, 49287 West Road, Wixom, addressed the Commission and thanked Mr. Passalacqua for the summary. He noted that he and the development team met with a nearby resident, Mr. Bizon, at his property to discuss specific concerns, including tree placement and relocation of a water line. As a result of that engagement, the developer also implemented similar improvements for other residents along Maple Road, even if they had not specifically requested them. These efforts led to adjustments in the stormwater location, additional screening, and realignment of the sidewalk. Mr. Noles stated that the team was pleased to make the changes and requested the Commission's continued support.

Chairperson Day noted that the project had already received prior approval and that no significant changes had been made other than improvements, stating there was no reason not to proceed with final approval.

**MOTION** made and seconded by Vice Chair Tacy and Commissioner Grossi to recommend approval of the **FINAL SITE PLAN APPROVAL SPR25-006: 4038 WEST MAPLE ROAD, WIXOM, MI. 48393.** The applicant is requesting final site plan approval for a site condominium proposed as a clustered housing development pursuant to Chapter 18.03.070. The project is proposing 18 single family detached condominium

units. The development as proposed would require the combination of the two lots consisting of approximately 9.35 gross acres. The Parcel Identification Numbers are 17-31-151-046 and 17-31-151-047; with the following conditions:

1. Any issues cited by the City Engineer; and
2. Any issues cited by Public Safety; and
3. Open space protection in the form of deed restrictions, covenants that run with the land, or conservation easements shall be agreed upon, executed and recorded with Oakland County per the approval of City Administration; and
4. Lots will need to be combined as a condition of site lan approval and building permits being issued.

**VOTE:** **MOTION CARRIED**

2. **PUBLIC HEARING NOTICE – REVISION OF ZONING ORDINANCE TEXT RELATED TO DATA CENTER DEFINITIONS, PERMISSIBILITY, AND PERFORMANCE STANDARDS:** Public hearing is to consider an Ordinance to Amend the Wixom Code of Ordinances, Title 18, Zoning, Chapter 18.08 – Office and Research Districts, Section 18.08.020 – Schedule of Uses to Address the Permissibility of Data Centers in the IRO and OS-1 Zoning Districts; Amend Section 18.08.040 – Standards Applicable to Specific Uses to Provide Specific Standards for Data Center Uses in the IRO Zoning District; Amend section 18.09 – Industrial Districts, Section 18.09.020 – Schedule of Uses to Address the Permissibility of Data Centers in the M-1 and M-2 Zoning Districts; Amend Section 18.09.040 – Standards Applicable to Specific Uses to Provide Specific Standards for Data Center Uses in the M-1 and M-2 Zoning Districts; and Amend Section 18.24.030 to Provide Definitions for Data Centers.

Staff Report to the Planning Commission from Carlisle Wortman Associates dated February 18, 2026 is enclosed in the packet.

In November, the City Council asked the Planning Commission to review regulations related to data centers. In December, the Planning Commission directed staff to develop proposed regulations, including a formal definition of data centers. A public hearing is being held to gather feedback from the Commission and the public on the draft foundational regulations and to help determine next steps for potential ordinance revisions.

The proposal would classify data centers as special land uses in the M1, M2, and IRO zoning districts, and, based on the structure of the GPUD ordinance, they would also be

treated as special land uses within GPUD districts. Under Michigan law, special land uses are those that may not be fully compatible with other uses in a zoning district but may be permitted under discretionary and specific conditions to mitigate potential impacts. Such uses require Planning Commission review, a public hearing, and approval.

The draft regulations would require applicants to submit utility capacity and demand studies, noise impact studies, backup power and fuel storage plans, traffic analyses, security plans, and decommissioning plans. Proposed standards address placement, parking, and cooling systems, with a preference for looped systems to reduce water usage. Existing ordinance language related to noise, landscaping, screening, and other performance standards would remain unchanged. Additional language is included to address infrastructure requirements if offsite improvements are necessary to support a data center.

Mr. Passalacqua indicated that feedback received during the public hearing would guide refinement of the proposed language. It was also noted that three letters were received after distribution of the agenda packet, and physical copies were provided to the Commission for consideration as part of the public hearing process.

Chairman Day indicated for the record that the three letters submitted for the public hearing were dated February 13, 2026 from Mr. Dennis Griffin, February 18, 2026 from Mr. David Wolfe, and February 13, 2026 from Richard E. Rassel.

Commissioner Dornan stated that he had not yet had the opportunity to fully review the submitted letters but had briefly looked at the letter from Acromag. He noted that her initial review indicated the company had concerns related to distance setbacks and related standards.

Assistant City Manager Benson recommended that, for purposes of discussion, the Commission consider incorporating the written comments received along with any comments presented during the public hearing and address them collectively as part of a single discussion.

Open public hearing.

Mr. John Bizon, a resident of Cameron Court in Wixom, addressed the Commission and shared his professional background working with data centers and computer equipment prior to retirement. He raised several concerns regarding the potential impacts of data centers on the City's infrastructure.

Mr. Bizon questioned whether the City is evaluating the capacity of DTE's electrical infrastructure and the potential impact on the broader community. He referenced a large data center planned near an airport with a capacity of one gigawatt, noting that such usage is comparable to the energy demand of approximately 800,000 homes. While

acknowledging that a facility of that scale is unlikely in Wixom, he emphasized that even smaller facilities require substantial energy.

Mr. Bizon also expressed concerns about water usage, stating that hyperscale data centers can require millions of gallons of water per day for cooling. He asked how increased demand might affect Wixom's water system and rates, referencing prior upgrades such as the installation of the water tower used to manage costs. Additionally, he questioned whether the City's wastewater treatment plant could handle the volume of discharge generated by such facilities.

Mr. Bizon further noted potential noise impacts from outdoor cooling equipment and backup generators, particularly during power outages, and encouraged the Commission to carefully consider size limitations and overall community impact. While acknowledging that data centers can bring jobs and economic benefits, he emphasized the importance of determining what scale and level of impact would be appropriate for the City.

Mr. Dennis Griffin stated that he owns industrial property between South Wixom Road and Oak Creek Drive, including land near the former UPS parcel, and has also acquired a portion of Dave Wolfe's property. He explained that he and his partners have spent approximately three and a half years assembling the parcel with the intention of developing a Class A business park designed to be attractive, functional, and adaptable to changing economic conditions.

Mr. Griffin indicated that a potential data center use was recently presented to them and that, after extensive research, they are comfortable with the concept. He acknowledged that data centers are currently a sensitive topic and emphasized a desire to approach the issue thoughtfully and avoid controversy. He noted that the type of large-scale, gigawatt facilities seen in other communities would not physically fit on their property and stated that any proposal in Wixom would be more appropriately scaled.

Mr. Griffin stated that he had reviewed the proposed ordinance amendments and found some elements reasonable, particularly the enhanced performance standards related to noise, fuel storage, decommissioning, and screening. He observed that data centers are currently permitted uses in the M1 and M2 districts and that existing noise standards would remain unchanged. He questioned whether adding both enhanced performance standards and a special land use requirement would create what he viewed as duplicative regulation.

Mr. Griffin expressed significant concern regarding the proposed 1,000-foot residential buffer. He noted that current setbacks in the M1 district from residential properties are 50 feet, and that certain heavy industrial uses considered more intensive require 800 feet of separation. He argued that a 1,000-foot setback for data centers appears disproportionate, particularly given existing performance standards. In his specific case, he stated that the proposed buffer would extend across intervening M1 properties that could potentially host more intensive uses, effectively eliminating his site as a viable

option. He indicated that Mr. Wolfe shares similar concerns about preserving future flexibility for his property.

Mr. Griffin stated that he believes data centers can be appropriate and compatible uses if properly regulated. He requested that the City focus on clear technical submittal requirements, including utility capacity, water usage, noise, fuel storage, security, and decommissioning plans, and reconsider whether both enhanced performance standards and special land use approval are necessary. He also asked that the proposed 1,000-foot residential separation requirement be reconsidered where intervening industrial uses are present. He encouraged the Commission to review the submitted letters as part of the public comment process and stated that his goal is a fair and balanced regulatory approach.

Mr. John Gaber, attorney for Mr. Griffin and the developer, addressed the Commission and reiterated points made by Mr. Griffin. He stated that the proposed performance standards are generally acceptable, but he requested reconsideration of the proposed 1,000-foot residential separation, noting that the other performance standards sufficiently address potential impacts.

Mr. Gaber emphasized that data centers are currently permitted as principal uses, and the amendment to classify them as special land uses raises legal concerns. He explained that converting a permitted use into a discretionary special land use could effectively allow the City to prohibit data centers, which he argued would conflict with the Michigan Zoning Enabling Act.

Mr. Gaber noted that the objective performance standards, if applied, can adequately protect residents and neighboring properties from adverse impacts. Additionally, he explained that the site plan process allows for negotiation of specific conditions for each development, providing a mechanism to address potential impacts on a case-by-case basis. Mr. Gaber thanked the Commission for their careful consideration, acknowledging the complexity of the issues and the importance of a balanced approach.

Mr. Peter Kilty, speaking on behalf of Dennis Griffin and his M1-zoned property, addressed the Commission regarding a prospective data center on the site. He stated that the development team has no issue complying with the proposed performance standards and emphasized the importance of collaboration and public input during the review process. He noted that noise, generator operation, and mechanical equipment are carefully studied and designed to meet property line standards, both before and after project completion.

Mr. Kilty highlighted water usage as a common concern with data centers. He explained that their project would not rely on large water consumption, instead using closed-loop cooling systems supplemented by offsite water delivery, avoiding the high-water demand typical of hyperscale facilities. He referenced examples of data centers operating quietly

and efficiently in urban areas, illustrating that they can coexist with neighboring properties without disruption.

Mr. Kilty emphasized the team's commitment to being responsible stewards of the property and adhering to all applicable zoning regulations, including height and lot coverage limits. The primary concern raised for the site is the proposed 1,000-foot residential setback, which he noted is unnecessary since the property is entirely surrounded by M1 zoning. He requested that the Commission consider this context when reviewing the amendment and evaluating its impact on potential development.

Public hearing closed.

Mr. Passalacqua provided clarification regarding M1 setbacks, noting that the front yard setback is 50 feet and the side and rear setbacks are 20 feet. He explained that while the property under discussion is bordered by M1 zoning on all sides, the proposed 1,000-foot residential setback would still affect the site because there is residentially zoned property nearby, effectively excluding the entire parcel from development. He clarified that this comment was not intended to delineate developable versus undevelopable areas based on topography or wetlands.

Assistant City Manager Benson added that the proposed standard includes two components: a data center cannot be located adjacent to residentially used or zoned property, and no principal structure or mechanical equipment, including generators, may be within 1,000 feet of residential zoning. He noted that even if the property is surrounded by M1 zoning, nearby residential parcels could still trigger this restriction.

Mr. Passalacqua confirmed that the intent of the clarification was to address the misconception about being entirely surrounded by residential properties. He also noted that the existing ordinance performance standards remain unchanged, and that the reference to "enhanced standards" by Mr. Griffin primarily relates to the special land use requirement in addition to the existing standards. Mr. Griffin confirmed that these points were specific to data center considerations.

Chairperson Day asked if the proposed 1,000-foot residential setback for data centers is greater than setbacks for any other M1 use, and Mr. Passalacqua confirmed that it is. Chairperson Day then asked why that distance was chosen. Mr. Passalacqua explained that the ordinance was drafted to address noise concerns, which are a primary issue for data centers because they operate 24/7 and require extensive mechanical equipment for cooling. Rather than adjusting noise standards, staff considered distance from sensitive receptors, particularly residential properties. He noted that setback practices for data centers vary widely nationwide, ranging from 200 to 1,500 feet, and the 1,000-foot figure was chosen as an initial reference.

Assistant City Manager Benson added that Planning Commission input is important in determining an appropriate distance. The 1,000-foot number was proposed as a starting

point, and the Commission could recommend modifications based on comfort level or additional analysis. Pass further clarified that feedback is also welcomed on whether other performance standards, such as noise limits, should be adjusted specifically for data centers.

Assistant City Manager Benson explained that designating data centers as special land uses provides additional public notification requirements, including sending notice to all properties within 300 feet. This ensures transparency for new construction or conversions of existing buildings to data center use, giving the Commission discretion while addressing concerns about lack of notice in other communities.

Commissioner Dornan began by asking for clarification on who the proponent and developer are. Mr. Dennis Griffin explained that he is the landowner and a partner with the development team. The project began as a business park plan, and through connections with Peter Kilty and the Sansone Group via Peter Rogers at CDRE, it evolved into a data center project. John Gaber noted that Richard Rassel is one of his partners.

Commissioner Dornan expressed curiosity about why the developer brought an attorney, noting that the Commission handles matters efficiently and that the speed of the ordinance process concerned her. He thanked them for the zoning overview but indicated that legal guidance was not necessary at the meeting. John Gaber acknowledged his comments and stated they were present to respond as needed.

Commissioner Dornan reiterated concerns about the rapid timeline, as well as potential noise and water impacts, echoing points raised by Mr. Bizon. Mr. Bizon added that cooling systems vary, emphasizing the importance of using closed-loop water systems to mitigate water use and temperature impacts on the sewer system, while noting the high-power demands of data centers.

Commissioner Dornan stated that he is new to data centers but is concerned about noise, citing complaints about the existing Korex plant, and emphasized that any additional facility should not create similar sound impacts. He also noted concerns about electricity usage, water consumption even with looped systems, and fuel storage. Commissioner Dornan praised the inclusion of decommissioning language in the ordinance but expressed that the process had moved too quickly. Commissioner Dornan suggested incorporating a provision for impact fees within the ordinance to address potential costs associated with the operation, rather than creating a separate ordinance.

Vice Chair Tacy asked whether the proposed 1,000-foot residential setback could be reconsidered, noting that the City's most intensive uses currently require 800 feet and questioning whether data centers truly warrant a greater distance. Mr. Passalacqua explained that the 1,000-foot figure was informed by the consistent noise generated by data centers, which operate 24/7 and require mechanical systems for cooling, producing decibels even during off-peak hours. He noted that inverse square law calculations were

used to generalize noise dissipation but acknowledged that additional research on noise and setback standards could help ensure a science-based determination.

Vice Chair Tacy expressed support for reviewing the standard, emphasizing the need for a technical basis to justify any adjustment. Assistant City Manager Benson suggested that noise and vibration studies, which are required as part of any application, could provide the data needed. He proposed that the ordinance could set a standard distance (e.g., 1,000 feet) while allowing the Planning Commission discretion to modify it based on verified applicant information. Vice Chair Tacy confirmed that this approach would provide flexibility to reduce the setback if quieter systems were used. Assistant City Manager Benson added that this flexibility would also help with potential re-occupancy of existing buildings in the future, allowing the Commission to balance standards with practical reuse considerations. Pass agreed, noting the importance of having a technical baseline from which the Commission could deviate if appropriate, and Vice Chair Tacy agreed.

Mr. Dennis Griffin returned to address the Commission, emphasizing the importance of considering existing and intermittent uses when evaluating data center impacts. He noted that across Gibson Drive there is a 24/7 truck parking yard, with idling trucks generating higher decibel levels than a data center. He argued that requiring data centers to be quieter than other equally or more intensive uses, like cold storage facilities—which have similar cooling and mechanical requirements—creates an imbalance. Mr. Griffin stressed that data centers are currently being treated as the “bogeyman,” even though other permitted uses can generate comparable noise and operational impacts. He expressed a desire for a fair and balanced approach that treats data centers consistently with other industrial uses and explained why legal representation was necessary given the rapid development of the ordinance.

Chairperson Day raised a concern referenced in Mr. Rassel’s letter regarding Michigan law, noting that lawful land uses generally cannot be prohibited and are protected unless discretionary special use approval or zoning regulations allow restrictions. Chairperson Day suggested this is a legal question that may need further review to determine whether data centers can be designated as a special land use in all districts.

City Attorney Elizabeth Kudla Saarela noted that she had drafted a letter addressing the legal question about whether data centers must remain a permitted use. Assistant City Manager Benson clarified that the letter was distributed after the packet. Ms. Saarela explained that under the Michigan Zoning Enabling Act, there is no requirement to maintain a specific use as permitted; designating a use as special land use is legally allowable, and the claim that it must remain permitted is inaccurate.

Chairperson Day suggested that, given the legal and technical issues raised, it would be appropriate to postpone action for additional research. Vice Chair Tacy made a motion to table the proposed zoning ordinance amendments and direct City staff and consultants to conduct further research or revisions based on the discussion. Assistant City Manager

Benson clarified that the main areas to review would include noise standards, location standards related to noise and vibration, and any other points of concern.

Commissioner Dornan requested additional review of water and electrical usage, including verification of city resources required by a data center, so impacts could be compared to other land uses and possibly incorporated into a host fee or impact fee provision. Assistant City Manager Benson noted that the ordinance already includes infrastructure mitigation language requiring offsite utility improvements, development agreements, or applicant-funded improvements proportional to the facility's impacts. Mr. Passalacqua confirmed the language is in place but said it could be further reviewed if needed. Commissioner Dornan indicated he was satisfied if the current provisions addressed his concerns.

**MOTION** made and seconded by Vice Chair Tacy and Commissioner Buck to table **REVISION OF ZONING ORDINANCE TEXT RELATED TO DATA CENTER DEFINITIONS, PERMISSIBILITY, AND PERFORMANCE STANDARDS:** Public hearing is to consider an Ordinance to Amend the Wixom Code of Ordinances, Title 18, Zoning, Chapter 18.08 – Office and Research Districts, Section 18.08.020 – Schedule of Uses to Address the Permissibility of Data Centers in the IRO and OS-1 Zoning Districts; Amend Section 18.08.040 – Standards Applicable to Specific Uses to Provide Specific Standards for Data Center Uses in the IRO Zoning District; Amend section 18.09 – Industrial Districts, Section 18.09.020 – Schedule of Uses to Address the Permissibility of Data Centers in the M-1 and M-2 Zoning Districts; Amend Section 18.09.040 – Standards Applicable to Specific Uses to Provide Specific Standards for Data Center Uses in the M-1 and M-2 Zoning Districts; and Amend Section 18.24.030 to Provide Definitions for Data Centers; and as follows: direct City staff and consultants to conduct additional research and/or revisions based on the information that we have discussed this evening including but not limited to noise standard component and the location standard as it relates to noise and vibration.

**VOTE:** **MOTION CARRIED**

Assistant City Manager Benson explained the anticipated next steps, noting that staff will likely present revised ordinance language at an upcoming Planning Commission meeting without holding a public hearing initially. If the Commission is satisfied with the proposed revisions, a public hearing would then be scheduled. This approach is intended to streamline the process and avoid delaying the review by an additional month, while ensuring transparency for both the Commissioners and the public. Assistant City Manager Benson invited the Commission to communicate with staff during this interim period.

3. **REVIEW AND RECOMMENDATION TO CITY COUNCIL: DRAFT MASTER PLAN**

Per the revisions discussed during the January 21, 2026 regular meeting, comments were made about the need for more color contrast for tables, graphs and other visuals. Those graphics have been updated in the Mater Plan itself; however, the community survey provided in the appendix is a past document and cannot be altered.

Memorandum from Carlisle Wortman Associates to the Planning Commission dated February 18, 2026 regarding Draft Master Plan is enclosed in the packet.

Chairperson Day noted that the topic had been discussed extensively at a previous meeting and had been postponed to allow any Commissioners who were absent at that time to provide input. Since no additional comments had been received from those Commissioners, the discussion had not progressed further.

Assistant City Manager Benson added that a member of the public was present and appeared to wish to speak on agenda items.

Mr. Leo Gonzalez, representing CRS Commercial Real Estate Services, spoke on behalf of Total Sports regarding the property they own in Wixom. He provided a history of the site: Total Sports opened there in 1992, gradually expanding its facilities over time with domes and astro turf baseball fields. The business was later sold to TOKA, which now owns the real estate.

Mr. Gonzalez explained that they are evaluating the potential for future development on parts of the property, including areas currently occupied by domes, baseball fields, and portions of the parking lot. Initially, the focus was on an 8-acre parcel on the northwest corner, of which only about 4 acres are buildable, with a plan for single-family homes.

Mr. Gonzalez indicated the discussion has since expanded to consider additional residential development, particularly with a goal of enhancing walkable access to downtown Wixom. Mr. Gonzalez emphasized that this project is not speculative—they have a committed developer ready to execute—and noted the changing market dynamics for Total Sports, including increased regional competition and the continued significance of the existing building, which regularly hosts around 300 participants per day and evening.

The proposed concept plan for townhouses was designed thoughtfully, with residential units oriented in typical townhouse arrangements (front-to-front or back-to-back) to optimize livability and integration with the existing property and surrounding community. The goal is to gain support from the community, Planning Commission, and City Council while aligning with broader Master Plan objectives.

Assistant City Manager Benson clarified that the discussion with Mr. Gonzalez was strictly conceptual and not a review of any site plan. The Planning Commission is currently focused on the Master Plan, particularly the future land use plan, and the area in question

is currently designated for commercial/industrial mixed use. The point was to allow Mr. Gonzalez to present the idea of residential development conceptually, to gauge whether the Commission sees merit in considering residential here in the future, rather than evaluating a specific project.

Commissioner Grossi noted that the discussion became an informal conceptual review.

Mr. Passalacqua added that under the current future land use map, the proposed residential concept would not be supported. Any formal project would require a rezoning application, and a review letter from staff would likely recommend denial based on the existing designation. The discussion was framed as a forward-looking conversation about whether the Commission might consider adjusting the future land use map to allow residential in that area.

Commissioner Dornan noted that the site has historically been a cornfield and that the current sports facility is a transitional use; its large, high-beam structure could later convert back to light industrial if needed.

Assistant City Manager Benson emphasized that the discussion is conceptual—about whether residential could be considered in the future—not a review of a specific site plan. Any project would still require rezoning or a PUD, guided by the future land use map.

Chairperson Day asked whether the Commission wants to amend the future land use map before sending the draft Master Plan to Council to allow residential. Assistant City Manager Benson responded that discussion could continue and that additional information could be requested before making any decision.

Vice Chair Tacy confirmed that the rear of the property is bounded by railroad tracks, which Mr. Gonzalez compared to similar residential developments adjacent to CSX in Plymouth, illustrating how residential can work next to rail infrastructure. Mr. Gonzalez emphasized the timing is appropriate to discuss potential rezoning so the Master Plan can support future opportunities.

Chairperson Day expressed interest in adding more rooftops downtown, and Commissioner Buck recommended leaving the zoning open to allow the possibility of residential.

Assistant City Manager Benson suggested tabling the Master Plan discussion for one more meeting to provide two alternative future land use maps—one maintaining the current designation and one accommodating residential—so the Commission can make a more informed decision.

Vice Chair Tacy asked about VCA design standards; Assistant City Manager Benson clarified the parcel is not in a VCA and would need a PUD or rezoning to achieve VCA

densities, at which point design standards would apply. The recommendation was to defer a decision until the Commission can review more detailed options.

Chairperson Day suggested postponing action on the draft Master Plan pending a possible amendment to the future land use map.

Assistant City Manager Benson noted that Mr. Passalacqua had corrected the grammatical errors. Vice Chair Tacy mentioned her packet only went to page 68, while she pointed out errors on pages 76 and 78, including missing references to Pontiac Trail and a crash count on Southfield Road at I-96.

Commissioner Dornan asked about the survey results and public comments. Mr. Passalacqua confirmed they were included but the printing had errors on pages 44, 45, 52, and 53. Commissioner Dornan also suggested recognizing the contributions of the Commission, Boards, chairs, vice chairs, Carlisle Wortman Associates, Megan Masson-Minock, and others who worked on the Master Plan, praising it as an award-winning document.

Commissioner Buck raised a concern that some photos didn't appear to be from Wixom. Mr. Passalacqua clarified that some were general development references and offered to discuss specifics if needed. Vice Chair Tacy emphasized retaining the photo of the brick building on page 20, calling it "beautiful."

Overall, the discussion focused on postponing Master Plan approval to address the future land use map, correcting printing and content errors, and ensuring proper recognition of contributors and relevant visuals.

**MOTION** made and seconded by Commissioner Grossi and Vice Chair Tacy to Postpone the **REVIEW AND RECOMMENDATION TO CITY COUNCIL - THE DRAFT MASTER PLAN.**

**VOTE: MOTION CARRIED**

**<u>Call to the Public:</u>**

No public comments.

**<u>Staff Comments:</u>**

Assistant City Manager Benson noted that the coming weeks would be busy, with the March 2, 2026 meeting approaching and multiple site plans in review, indicating a busy Spring and early Summer for the Planning Commission.

Vice Chair Tacy asked about the status of Landro Drive and Nedrow Refractories. Mr. Passalacqua confirmed they are still in progress, and Assistant City Manager Benson added that the applicants are in the process of submitting and addressing numerous staff comments.

The discussion moved to Building E. Vice Chair Tacy asked if it would match the architectural style of the previous buildings. Mr. Passalacqua explained that under the GPUD standard, the Planning Commission reviews deviations from previously approved designs and determines whether changes are minor or major, including architectural changes.

Vice Chair Tacy expressed concern that when the first two buildings were approved, the Commission had requested more windows and glass, but that design element was not carried forward to the next phase. Mr. Passalacqua noted that the applicant for Building E is not affiliated with the previous developments. Vice Chair Tacy emphasized that the windows had been part of the original approval and felt they should be included consistently.

**Planning Commission Comments:**

Chairperson Day commented that he would not be attending the March 2nd and March 16, 2026 Planning Commission meetings.

Assistant City Manager Benson explained that the work along Wixom Road is a city-wide utility project by Metronet installing fiber optic service for T-Mobile. All work is occurring in the public right-of-way, which covers the placement of utility boxes, like the ones on Pontiac Trail and North Wixom Road near the Trail. He noted the project has been complicated but emphasized that any damage caused—like to grass, sprinklers, or other infrastructure—is the contractor's responsibility to repair, even if the timeline is uncertain. He encouraged residents to report any issues so the City and DPW can coordinate with T-Mobile and Metronet. Assistant City Manager Benson also mentioned that eventually this fiber installation will cover the entire city and will take several years to complete.

Commissioner Dornan added frustration that the Oakland County Road Commission issued permits without notifying the City, which led to some missteps in installation aesthetics. For example, the bollards were originally yellow, and he stressed the importance of consistency, such as matching the green bollards and the need to install bollards across other downtown areas like Rite-Aid, the new box that was installed over there; right in the heart of the downtown, the beautiful Village Center, they messed it up.

**ADJOURNMENT:**

This meeting of the Planning Commission was motioned and adjourned at 8:35 p.m.

Mona Freiburger
Recording Secretary