# EXHIBIT 11

APPROVED
APRIL 6, 2026

# CITY OF WIXOM
## 49045 PONTIAC TRAIL
## PLANNING COMMISSION MEETING
## MONDAY, MARCH 16, 2026

This meeting was called to order by Vice Chairperson Tacy of the Planning Commission at 7:00 p.m. at which time allegiance was pledged to the American flag.

**PRESENT:** Cheryl Tacy (Vice Chairperson), Commissioners: Todd Buck; Michael Dornan; Sandro Grossi; Mark Lada; Vanessa Willett

**ABSENT:** Excused: William Day

**OTHERS:** Matteo Passalacqua (Carlisle Wortman Associates), Drew Benson, Assistant City Manager; and Mona Freiburger (Recording Secretary)

**Determination of a Quorum:**

A quorum of the Planning Commission was present for this meeting.

**Changes or Additions to the Agenda:**

None

**Approval of Minutes:**

**MOTION** made and seconded by Commissioner Willett and Commissioner Lada to approve the March 2, 2026, Planning Commission Meeting Minutes, as amended.

**VOTE:** **MOTION CARRIED**

**Correspondence:**

1. City Manager Report – March 10, 2026

**Call to the Public:** (Limited to 5 minutes per speakers, addressing Agenda items on Agenda only)

No public comments.

**Unfinished Business:**

1. Consideration of Draft Zoning Ordinance Text Amendments to Address Data Center Definitions, Permissibility, and Performance Standards

Staff Report to the Planning Commission from Carlisle Wortman Associates dated March 16, 2026 is included in the packet.

On February 18, a public hearing was held regarding proposed text amendments to the zoning ordinance related to data centers, including definitions, their designation as special land uses, and associated regulations. Following public feedback and internal deliberations, Mr. Passalacqua stated they were directed to conduct additional research on issues such as noise, setbacks, and other related impacts of data centers.

Mr. Passalacqua indicated additional research to better understand how data centers differ from other industrial uses in the community. The findings identified two primary distinguishing factors: noise and their continuous 24/7, year-round operations. This constant operation is driven by ongoing market demand for services such as AI, requiring uninterrupted availability for both individuals and businesses.

Mr. Passalacqua presented research on noise impacts associated with data centers, explaining that these facilities house extensive server equipment that must be maintained within a strict temperature range year-round, requiring significant heating and cooling capacity. Comparisons with similarly sized retail and warehouse buildings showed that data centers demand substantially more HVAC equipment, much of which is installed for redundancy and does not operate continuously. The operation of HVAC units can generate noise levels of approximately 70 to 80 decibels at the source. Additional noise is produced by backup diesel generators, which are necessary to support uninterrupted operations. Due to high energy demands, a 200,000 square foot data center may require 10 to 30 generators, also with built-in redundancy, and these generators can produce noise levels of approximately 110 to 120 decibels at the source.

Mr. Passalacqua indicated that while various regulations were reviewed, noise emerged as the primary concern, leading to revisions in the proposed ordinance language to strengthen noise standards. The updated approach removes larger setback requirements while maintaining the prohibition against locating data centers directly adjacent to residential districts, instead focusing on regulating noise at its source. The ordinance requires compliance with general noise standards, along with specific limits at the nearest residential property line of 55 decibels during the day and 45 decibels at night. Applicants must submit a sound study demonstrating compliance at the time of application, and a follow-up study is required after construction but prior to issuance of a certificate of occupancy, with the City retaining the right to independently verify results. The ordinance

also outlines various noise mitigation strategies, including site design, building orientation, and the use of sound barriers or walls, with allowances for increased wall height only as necessary to achieve compliance, thereby avoiding the need for additional approvals.

Mr. Passalacqua indicated technology related to data centers, including HVAC systems, generators, and server equipment, is continually evolving. Based on current information and available technology, he expressed confidence in the proposed approach moving forward.

Vice Chair Tacy asked for clarification on the approach, confirming that instead of applying a fixed setback requirement, proposals would be evaluated on a case-by-case basis using sound studies and project-specific details to determine compliance. Mr. Passalacqua confirmed this approach, explaining that setbacks alone may not adequately address impacts, and that applicants would instead be required to design their sites to meet established noise standards using appropriate mitigation measures.

Commissioner Dornan expressed concern about allowing data centers in the Industrial Research Office (IRO) district in addition to M-1 and M-2 zones, noting that the character of IRO did not seem consistent with data center uses. He also indicated that a map of M-1 properties would have been helpful for context. Assistant City Manager Benson responded that IRO properties were included because they contain larger parcels that could accommodate such developments and are generally located farther from residential areas, reducing potential conflicts. Assistant City Manager Benson also noted that the regulations are intended to apply broadly to data centers of varying sizes, from smaller facilities to very large developments.

Commissioner Dornan reiterated a preference for maintaining IRO areas for signature-type businesses, particularly near the expressway. It was also discussed that noise mitigation could include physical barriers such as walls or tree plantings. Mr. Passalacqua stated that the ordinance is designed to remain flexible, allowing applicants to determine the most effective mitigation methods, provided they can demonstrate compliance with established noise standards. Additional landscaping, such as dense tree plantings, was noted as a potential strategy to reduce noise impacts on nearby residential properties.

Commissioner Lada expressed concerns about the lack of a minimum setback requirement, noting that previously discussed distances such as 700 to 1,000 feet had been considered and that eliminating even a 500-foot minimum was troubling. Commissioner Lada referenced research suggesting typical setbacks between 1,000 and 1,500 feet from residential areas based on noise impacts and emphasized that the ordinance should reflect current conditions rather than potential future technological improvements.

Additional concerns were raised regarding the allowance for sound barriers to exceed standard height limits as needed for compliance, as well as the storage of large quantities

of diesel fuel required for backup generators. Commissioner Lada suggested that alternatives such as natural gas might be preferable to reduce on-site fuel storage.

Mr. Passalacqua responded that the ordinance still prohibits data centers from being directly adjacent to residentially zoned properties, which can inherently create some separation. It was also noted that parcel configurations may naturally result in larger setbacks in certain cases. However, Mr. Passalacqua acknowledged that distance alone does not consistently determine noise impact, as sound dissipation can vary depending on conditions, meaning a fixed setback distance may not always effectively address the issue.

Commissioner Lada explained that relying solely on sound testing as a metric can be problematic, noting that results vary depending on weather and environmental conditions. He gave examples such as differences in sound travel on foggy versus clear nights and compared it to traffic studies conducted on holidays versus regular weekdays.

Mr. Passalacqua acknowledged the difficulty of establishing a perfect, standardized method for measuring sound. He noted that ambient noise during the day may mask data center operations, but at night, when surroundings are quieter, noise from data centers could become more noticeable. He suggested that, under the right conditions, sound could be measured at least at some point, even if not perfectly standardized.

Commissioner Lada clarified that he was not suggesting eliminating sound testing but emphasized that a minimum distance should be considered relative to the size and intensity of the facility. He used the example of a 200,000-square-foot data center with numerous air conditioners and generators, noting that 500 feet might be insufficient, and that relying on walls and tree buffers on adjacent commercial property may not adequately protect nearby residential areas.

Assistant City Manager Benson noted that if a minimum setback provision were added, it would need to be carefully justified and defensible, similar to standards used for blast furnaces, which require an 800-foot separation. He emphasized that any setback would need a clear health, safety, or welfare rationale to withstand legal scrutiny and that overly large, one-size-fits-all distances could unintentionally restrict suitable uses, particularly for smaller or existing facilities.

Commissioner Lada questioned whether any of the current setbacks are truly defensible. Mr. Passalacqua replied that standard measurements, such as a 25-foot side setback, are straightforward. Assistant City Manager Benson elaborated that larger arbitrary numbers like 1,000 or 1,500 feet could be legally challenged without a clear basis and noted that many existing or potential sites may not accommodate such distances without limiting development options.

Commissioner Lada suggested that maps showing the likelihood of conflicts with residential areas, as Commissioner Dornan had mentioned, would be helpful. He

proposed that data centers, like other businesses, should have a minimum setback, with additional distance determined by noise levels verified through decibel studies. Mr. Passalacqua confirmed that the ordinance is structured to provide this flexibility: engineers would model sound for each site to ensure compliance with the required noise levels at the nearest residential property, with independent verification required.

When asked about specific noise limits, Mr. Passalacqua clarified that the standards are 55 decibels during the day and 45 decibels at night, noting that 40–45 decibels are roughly equivalent to a refrigerator hum and 50–55 decibels are similar to light rain.

Assistant City Manager Benson explained that the proposed setback standard for data centers differs from traditional setbacks, which are typically measured from a property's own boundaries. In this case, the setback is measured in relation to another property, specifically the nearest residentially zoned property, adding a layer of consideration beyond standard requirements.

Commissioner Lada asked if similar requirements apply to other businesses, and Assistant City Manager Benson noted that this approach is used for certain heavy industrial uses, such as blast furnaces. Commissioner Lada also referenced gravel operations near the CSX line, asking if they were required to conduct sound studies, and Assistant City Manager Benson confirmed they were, though they also directly buffered residentially zoned properties.

Assistant City Manager Benson further explained that existing industrial noise standards still apply, limiting operations to 70 decibels at their own property lines during the day. The new standards layer additional limits on top of this, requiring data centers to maintain 55 decibels during the day and 45 decibels at night at the nearest residential property line. This combination of traditional and additional standards determines the appropriate buffer for each specific use.

Commissioner Dornan asked whether the ordinance establishes a minimum setback of 1,000, 800, or 500 feet, noting that he could not find such a provision. Vice Chair Tacy confirmed that the previous version had set it at 1,000 feet, but it was removed in favor of using sound measurements instead. She expressed agreement with Commissioner Lada that a tandem approach would be preferable, combining a minimum setback with required noise compliance. Commissioner Dornan also supported this approach.

Commissioner Willett questioned whether a set distance would make much difference if noise standards were enforced, noting that many data centers are retrofitted from existing buildings. She asked how these existing facilities would be handled under the new requirements and emphasized that the noise ordinance would address most concerns.

Mr. Passalacqua explained that research showed clearer data for noise than for setbacks, and while additional setback requirements could be explored further, the decision to pivot toward noise standards was based on the available information. Commissioner Willett

added that in practice, noise is often not actively monitored during the day unless complaints are received.

Commissioner Lada noted that at the time of construction approval, the business is expected to comply with the noise limits, but enforcement depends on the operators following those standards. Assistant City Manager Benson added that the ordinance provides leverage, allowing the City to measure compliance and enforce standards if the facility exceeds them. Vice Chair Tacy indicated that similar challenges exist with other approvals, such as signage, where discrepancies between what is approved and what is installed can create enforcement difficulties.

Commissioner Lada suggested that noise testing should be conducted at the facility's loudest point. Mr. Passalacqua confirmed that the current language already requires a comprehensive sound and vibration study covering all operational scenarios, including normal operations, maintenance, and power outages, ensuring that the facility meets the 45-decibel nighttime standard even under maximum operational conditions.

Vice Chair Tacy added that, as Commissioner Dornan requested, a map showing all potential locations for data centers in relation to residential areas would help evaluate whether a minimum setback, such as 500 feet, is appropriate. She noted that larger or louder facilities might still require additional distance beyond any minimum.

Mr. Passalacqua stated that the map could incorporate the existing rule that facilities cannot be adjacent to residential properties while also modeling various distances to assess how different setbacks would function. He offered to research further and provide more information on potential setback options.

Assistant City Manager Benson noted that many communities are rapidly adopting ordinances for data centers, with setback distances ranging widely from 250 to 1,500 feet. He emphasized that the key question is understanding the reasoning behind any chosen number and suggested mapping potential sites to inform that decision.

Vice Chair Tacy raised the issue of fuel storage, asking whether existing regulations address it. Mr. Passalacqua responded that guidance would primarily come from the fire department, which had not expressed concerns so far, but they could be consulted further. Assistant City Manager Benson suggested a potential standard prohibiting above-ground fuel storage, requiring either buried tanks or natural gas, and Vice Chair Tacy recommended involving the fire department proactively to identify and address any safety issues. Mr. Passalacqua agreed to coordinate with the fire department to clarify preferences and requirements for fuel storage.

Commissioner Lada highlighted that with 30 generators at 350 gallons each, over 10,000 gallons of fuel could be stored onsite. Commissioner Willett noted that fuel is likely to be delivered as needed via large tankers rather than stored continuously and emphasized that operators have a strong incentive to comply with noise standards to avoid operational

disruptions. Mr. Passalacqua added that data centers would find ways to meet the established standards.

Mr. Passalacqua outlined next steps, including creating visuals to show the adjacency rule and potential setback options, reviewing fuel storage requirements, and examining screen wall size standards to determine whether a height limit can be established. He asked if the Planning Commission was comfortable allowing walls to exceed current standards as long as a limit is set.

Commissioner Lada agreed, emphasizing he did not want to see excessively tall walls or buildings, giving an example of a 60-foot building with an 80-foot wall. Mr. Passalacqua noted that utility verification is also required: applicants must provide letters from DTE or DPW confirming that electricity and water can be supplied, including any needed infrastructure improvements, though this is informational rather than a criteria for Planning Commission approval. Commissioner Lada confirmed that the Commission cannot mandate closed or open loop systems, and Mr. Passalacqua added that preference points are given for higher-efficiency systems.

Commissioner Dornan asked whether job creation should be part of the review. Assistant City Manager Benson clarified that job numbers cannot be used as a deciding criterion for land use approval but can be used for incentives. He also highlighted that because data centers are proposed as a special land use, the Commission retains discretion to consider site-specific context, which provides flexibility compared to a use permitted by right.

Commissioner Lada noted that data centers are relatively new, less than a decade old, and Mr. Passalacqua agreed they are newer in Michigan, though not entirely new. Assistant City Manager Benson added that centers of this size and scale are uncommon in the region.

**MOTION** made and seconded by Commissioner Willett and Commissioner Lada to further research or revise the proposed zoning ordinance, text amendments based on the comments made during this meeting including the setbacks, fuel storage, visuals and the adjacent properties, and the wall height and size limit.

**VOTE:** **MOTION CARRIED**

2. Draft Master Plan Review and Recommendation to City Council

Staff Report to the Planning Commission dated March 16, 2026 from Carlisle Wortman Associates regarding Draft Master Plan Review and Recommendation to Council is enclosed in the packet.

Mr. Passalacqua recapped the Planning Commission's previous discussion about the Total Sports site during the Master Plan review. The public had suggested a mix of commercial recreation and residential uses, which the Commission expressed interest in. At that time, the existing future land use map did not fully support that concept. The Commission requested that staff provide options to allow more flexibility.

In response, Mr. Passalacqua indicated the future land use map was revised so that the front half of the Total Sports site along Wixom Road remains general corridor, the back half remains light industrial, and a commercial-residential mixed-use overlay is added to provide flexibility. The designation descriptions were also adjusted to encourage diverse uses while discouraging large-scale retail that might compete with the downtown area. Mr. Passalacqua noted that the revised language provides flexibility for the site while limiting undesirable outcomes.

Mr. Passalacqua also mentioned minor changes to the document, including adding titles for individuals on page three. Commissioner Dornan suggested simplifying the listing by including only Chairperson and Vice Chairperson for the Planning Commission and listing the rest under "Commission," with the same approach for City Council members. He also raised the question of whether CWA should be named. Mr. Passalacqua indicated that including staff names is not necessarily standard practice but acknowledged it could be the Commission's decision.

Vice Chair Tacy asked the Commission for their feedback on the revised Total Sports complex designation, which changes part of the site from industrial-commercial mixed use to commercial-residential mixed use.

Commissioner Lada indicated he did not attend the prior meeting and confirmed that this change would not interfere with the light industrial portion of the site. Mr. Passalacqua clarified that the adjustment does not affect current or future light industrial uses.

Commissioner Willett asked whether any development would still require site plan approval. Assistant City Manager Benson explained that under the current light industrial zoning, the proposed uses would not be allowed, so any development would require a conditional rezoning or planned unit development along with site plan approval. He indicated that the text and designation are intended to guide development toward acceptable uses, such as commercial recreation, while discouraging large-scale retail.

**MOTION** made and seconded by Commissioner Dornan and Commissioner Lada to approval the proposed changes of the future land use map, Total Sports complex site description, and Commission-Board titles, as presented in this evening's packet.

**VOTE:** **MOTION CARRIED**

**MOTION** made and seconded by Commissioner Willett and Commissioner Lada to send the Master Plan draft to the City Council for consideration at their next available meeting with the names and titles on page 3, as discussed and adjusted.

**VOTE:** **MOTION CARRIED**

**New Business:**

None

**Call to the Public:**

No public comments.

**Staff Comments:**

Assistant City Manager Benson thanked those who attended the City Council public hearing on the Wixom Elementary School, noting the room was unusually full and expressing that the community turnout sent a strong message to the school district. While no firm commitments have been made regarding changes to the site plan, Assistant City Manager Benson noted that the school district has been responsive, which is encouraging.

He reminded the Commission to mark their calendars for the next meeting on April 6, 2026, and mentioned that the Mobile Food Vendor ordinance will soon be coming into effect.

**Planning Commission Comments:**

Commissioner Willett noted that she missed the meeting on the Renton property but reviewed the Minutes regarding parking and street traffic. She suggested exploring on-site parking or pedestrian refuges to help slow traffic on Wixom Road.

Assistant City Manager Benson explained that the City received a DDA grant to install pedestrian refuges on Pontiac Trail at the eastern and western edges of downtown to improve safe crossings, one near the Gibson House and another near the post office. He added that while the Road Commission initially did not recommend on-street parking or maintenance for these features, they can be persuaded if the City assumes responsibility. Assistant City Manager Benson said discussions with the DDA and the developer are ongoing, with plans to take a draft purchase agreement to City Council likely in April.

Vice Chair Tacy confirmed that the Renton project would require a waiver for the top story of the four-story building not to have a setback, and Assistant City Manager Benson confirmed that was correct.

Commissioner Grossi apologized for being late and asked about responsibility for the road leading into the Total Sports site. Assistant City Manager Benson explained that it is a private road, so the property owner is responsible. Commissioner Grossi asked if the City has any influence over its condition, noting it is in poor shape. Mr. Passalacqua responded that the City could address it if a rezoning for a large project is proposed. Commissioner Grossi emphasized the road's poor condition, suggesting others drive by to see it, as he had recently.

Commissioner Lada mentioned that the Wixom Community Foundation will be hosting a family-friendly road rally on the last Saturday of July and encouraged everyone to join, noting it's a lot of fun. He also gave two updates: first, that Burger King has started construction on their through road. He also inquired when Amazon will have signage.

Vice Chair Tacy raised the idea that, now that the noise study for data centers has been completed, the City might consider updating other ordinances to include noise provisions.

Assistant City Manager Benson suggested that instead of creating separate rules for each ordinance, it would be better to strengthen the City's general noise standard using similar language to what was developed for data centers.

Mr. Passalacqua explained that the data mostly focused on the continuous drone noise generated by data centers, noting that prior ordinances were designed around intermittent noise—people can tolerate occasional 80-decibel spikes, but not a constant 80-decibel level.

Assistant City Manager Benson added that, in nearly five years, he's only seen noise complaints from one industrial business adjacent to residential areas, suggesting that while updating language could be considered, it isn't a widespread issue.

**ADJOURNMENT:**

This meeting of the Planning Commission was motioned and adjourned at 7:55 p.m.

Mona Freiburger
Recording Secretary