# EXHIBIT 15

APPROVED
APRIL 20, 2026

# CITY OF WIXOM
# 49045 PONTIAC TRAIL
# PLANNING COMMISSION MEETING
# MONDAY, APRIL 6, 2026

This meeting was called to order by Chairman Day of the Planning Commission at 7:00 p.m. at which time allegiance was pledged to the American flag.

**PRESENT:** William Day (Chairman), Cheryl Tacy (Vice Chairperson), Commissioners: Todd Buck (left at 8:16 p.m.); Michael Dornan; Sandro Grossi; Mark Lada; Vanessa Willett

**ABSENT:** None

**OTHERS:** Matteo Passalacqua (Carlisle Wortman Associates); and Mona Freiburger (Recording Secretary)

**Determination of a Quorum:**

A quorum of the Planning Commission was present for this meeting.

**Changes or Additions to the Agenda:**

None

**Approval of Minutes:**

**MOTION** made and seconded by Commissioner Willett and Commissioner Lada to approve the March 16, 2026, Planning Commission Meeting Minutes, as amended.

**VOTE:** **MOTION CARRIED**

**Correspondence:**

1. City Manager Report – March 24, 2026
2. Notice of 63 Day Review and Comment Period for Milford Charter Township Master Plan

**Call to the Public:** (Limited to 5 minutes per speakers, addressing Agenda items on Agenda only)

Mr. Dennis Griffin, Wixom Industrial One, owns approximately 40 acres at the former UPS property on Wixom Road behind Acromag, along with an additional 15 acres purchased from Acromag last year. The company's intention is to develop a data center on the site in the future. Mr. Griffin shared thoughts on the process surrounding proposed ordinance amendments, noting that their origins appear to stem from feedback from other municipalities and external news coverage, which may not fully reflect the local context.

Mr. Griffin acknowledged the current moratorium as part of the process and emphasized a cooperative approach, reiterating that the company has been transparent from the beginning regarding its plans and understanding of permitted uses. He noted that they became aware of the proposed amendments in late January and February and were surprised but responded promptly.

Mr. Griffin reviewed the evolving drafts of the ordinance, observing that it has changed significantly since mid-February. He expressed concern that some provisions in the current version could prevent them from presenting their development plan. The stated goal is to reach a point where their proposal can be evaluated based on its specific merits, with concern that the direction of the ordinance may limit that opportunity due to technical constraints.

Mr. Griffin handed additional notes and a handout to the Commission, noting it includes a legal disclaimer as well as suggestions for maintaining constructive dialogue with neighboring stakeholders.

Mr. Griffin referenced a prior meeting in May regarding a rezoning request, where approximately 10 acres were changed from R-3 to M-1 to support a larger development. This occurred alongside a conditional rezoning of a nearby condo property located between Pontiac Trail and Gibson, which now serves as a receptor property. Mr. Griffin emphasized that both their site and the condo property are almost entirely surrounded by existing industrial uses.

Mr. Griffin raised about the feasibility of meeting current noise ordinance requirements. He indicated uncertainty about whether compliance is achievable or appropriate given existing ambient noise levels in the area. To better understand conditions, they conducted informal measurements, observing noise levels of 80–90 decibels along Pontiac Trail, 50–60 decibels near Gibson House, and 70–80 decibels from idling trucks on Gibson Road. These readings were compared to the required limits of 55 and 45 decibels, prompting questions about the practicality and fairness of those standards.

Mr. Griffin referred to the most recent draft of the ordinance, noting that during the prior discussion the Commission had requested consideration of setbacks, screening walls, and fuel storage. However, the updated draft introduced additional elements such as tonality and perception, which were not specifically requested. He expressed concern about the evolving nature of the draft, describing it as "drafting creep," and emphasized

that continuous changes make it difficult to understand requirements and proceed effectively.

Mr. Griffin reiterated their goal of presenting a development plan for evaluation, expressing confidence that it would be well received. Based on observations of similar situations in other municipalities, he believes their site is appropriately sized and located within a fully industrial area, with nearby properties already exposed to significant ambient noise. Mr. Griffin suggested that future nearby residential occupants would be aware of the industrial context and that their project would not be the primary source of disruption.

Mr. Griffin acknowledged that the special land use process was initially a concern but stated confidence in their ability to demonstrate the project's merits. He expressed concern that current technical requirements could prevent them from even submitting a plan for consideration. He also emphasized that the Commission's role should be to review and evaluate the proposal based on its unique characteristics and suitability for the site.

Mr. Griffin highlighted that the site is surrounded by industrial uses, without adjacent legacy homes or sensitive rural properties, and described it as well-suited for the proposed development. He also noted that discussions with DTE confirmed sufficient power availability and that neighboring stakeholders are supportive. Mr. Griffin raised concerns about being expected to meet noise standards for a future, not-yet-built residential area.

As a path forward, Mr. Griffin proposed resetting both parties' approach by returning to the February 18 draft ordinance, with reconsideration of the 1,000-foot setback requirement, which they view as arbitrary and inconsistent with other standards they have reviewed. He expressed general acceptance of the earlier draft's provisions, noting that it already provides significant project transparency beyond what is typically required for other industrial developments.

Mr. Griffin proposed using a 300-foot setback, based on available data, as a reasonable standard and suggested returning to that as a foundation for moving the project forward. He referenced City Council discussions, acknowledging the need for a thoughtful process, but expressed concern that the moratorium is impacting their business and limiting progress.

Mr. Griffin emphasized the company's intention to collaborate and present a project that meets community expectations, noting that their company is committed to responsible development. He addressed perceptions around data centers, stating that their partners are thoughtful and responsive, and that the project has already evolved based on feedback. Revisions have included relocating generators within the site, reorienting buildings, and preserving 8 to 10 acres of wetlands and greenspace to better integrate with the environment.

Mr. Griffin expressed hope that the process will allow them the opportunity to formally present their plan for consideration.

Public comments closed.

**Unfinished Business:**

1. **Consideration of Draft Zoning Ordinance Text Amendments to Address Data Center Definitions, Permissibility, and Performance Standards.**

Staff Report to the Planning Commission from Carlisle Wortman Associates dated April 6, 2026 is included in the packet.

Mr. Matteo Passalacqua of Carlisle Wortman Associates, serving as planning consultants for the City, introduced the agenda item regarding continued discussion of the data center ordinance. He noted that the meeting materials included a staff report and a redlined version of the latest draft ordinance, with the report explaining the recent changes.

Mr. Passalacqua provided a recap of prior discussions, stating that on March 26 the Planning Commission reviewed an earlier draft and offered feedback focused on setbacks, fuel storage, and noise barrier specifications. He also noted that on March 24, City Council adopted a moratorium on data centers to allow additional time for review and research, and that a copy of the moratorium was included in the meeting materials.

Mr. Passalacqua explained that revisions were made to sound barrier standards. For rooftop equipment such as HVAC cooling units, which are typically 7.5 to 8.5 feet tall, the ordinance allows sound barriers up to 15 feet to ensure effectiveness. These rooftop barriers would not count toward the overall building height limit, which is consistent with common ordinance practices.

For ground-mounted equipment such as industrial generators, which are generally 12 to 15 feet tall, sound barriers are permitted up to 25 feet in height to meet noise mitigation needs. This allows flexibility for sound engineers to design effective solutions. Mr. Passalacqua added that these barriers must follow existing ordinance standards for screening walls, meaning they must incorporate aesthetic considerations in materials and design rather than being simple flat concrete walls. The ordinance also allows the Planning Commission discretion to apply additional design standards based on the specific configuration and appearance of the barriers.

Mr. Passalacqua explained that the updated ordinance also includes provisions addressing low-frequency noise, which is measured in hertz rather than decibels. He noted that research identifies certain sound wave frequencies and bandwidths that can be perceived as disruptive or harmful, and the ordinance incorporates a standard range

of 20 to 200 hertz to address these concerns. This addition is intended to regulate the type of persistent low hum commonly associated with data center operations.

Mr. Passalacqua described updates to the ordinance related to fuel capacity and storage, noting that new language allows the fire department to require additional information or mitigation measures if necessary. He explained that staff consulted with the fire department regarding large industrial generators, which are typically designed with integrated fuel tanks that form part of the unit's structural base, with the diesel engine mounted above. These systems often include dual containment as part of their design.

Mr. Passalacqua stated that above-ground, integrated fuel systems are generally preferred from an inspection and maintenance standpoint, as they allow for easier routine monitoring and quicker detection of leaks. He also noted that decommissioning is more straightforward, as entire units can be removed without the need to extract underground tanks. In contrast, underground systems can involve more complex regulatory review and removal processes at the state level.

Mr. Passalacqua added that the fire department indicated familiarity with alternative systems such as battery backup power but did not express strong support for that approach. They also did not indicate a preference for above-ground versus below-ground fuel storage, provided all applicable regulations are met. He indicated that integrated, above-ground fuel containment within generator units reflects common industry practice, particularly when considering long-term maintenance and decommissioning.

Mr. Passalacqua explained that the ordinance now includes restrictions on generator testing hours, limiting operation to between 9:00 a.m. and 5:00 p.m., Monday through Friday, excluding holidays. This reflects the need for periodic testing of generators, typically on a weekly or monthly basis, to ensure proper maintenance and functionality, while minimizing potential disruption.

He noted that additional language was incorporated after the previous Planning Commission meeting based on further input received by the Planning Department. This includes encouraging the use of renewable energy, such as rooftop solar panels, which could be considered a positive factor during special land use review. Clarifications were also added to specify that applicants are responsible for both on-site and off-site infrastructure improvements.

The ordinance now also allows the City to require third-party audits for sound and utility usage. These audits could be initiated by the City at reasonable intervals, must be conducted by an independent third party, and would be funded by the applicant.

Regarding setbacks from residential areas, Mr. Passalacqua stated that this remained a key topic of discussion. In response to Planning Commission direction, additional research was conducted on setback standards used in other jurisdictions. He emphasized

that while setbacks can help mitigate impacts, they are generally not a standalone solution and are most effective when combined with other regulatory measures.

Mr. Passalacqua explained that the staff report includes a table summarizing research from academic institutions and other municipalities developing data center ordinances. This includes input from the University of Illinois and the University of Michigan, as well as examples of both adopted and draft ordinances, with their status noted in the materials provided to the Commission.

He highlighted that Fairfax, Virginia, a well-established data center hub, has adopted a 300-foot setback requirement for mechanical equipment from residential property lines. Other jurisdictions, such as Prince William County, Virginia, are considering larger setbacks, though those standards remain in draft form.

Mr. Passalacqua addressed the origin of the previously discussed 1,320-foot setback, noting that staff could not identify a clear or well-supported basis for that figure. The only plausible explanation identified was that it represents a quarter-mile distance, but no definitive source or justification was found to support its inclusion.

He explained that the staff packet included maps illustrating the impacts of different setback scenarios, specifically 300-foot, 500-foot, and 1,000-foot buffers. Mr. Passalacqua noted that a pending lot split or modification of Mr. Griffin's property was reflected in the mapping and, while still under review, would likely represent the final recorded lot line at the time the ordinance is implemented.

Mr. Passalacqua clarified how the buffer maps should be interpreted. Parcels outlined in red indicate properties adjacent to residential uses and therefore not eligible for data center consideration. Where a parcel is partially within a buffer, only the shaded portion would be restricted from data center use, while unshaded portions could still potentially be developed if feasible.

He stated that, based on research from institutions and other jurisdictions, staff retained the 300-foot setback in the draft ordinance. He referenced Virginia as a notable example of a jurisdiction with an established data center industry, noting that its 300-foot standard was adopted in 2024 after years of experience regulating such facilities.

Mr. Passalacqua indicated he would answer questions and provide additional visual materials if needed.

Commissioner Willett raised concerns about the clarity of the maps included in the packet, noting that the 8.5 by 11 format is difficult to read and requesting larger-scale maps for future review. She also asked about the noise analysis, specifically whether exposure calculations assume continuous eight-hour periods without hearing protection and how intermittent generator noise would be assessed in that context.

Mr. Passalacqua responded that OSHA standards primarily apply to workplace environments at the data center itself and could not speak to how those standards would apply to external impacts such as nearby residents. Commissioner Willett also questioned whether outdoor generators would be subject to the same considerations.

Commissioner Willett then asked about the feasibility of the proposed solar panel language, questioning whether sufficient megawatt capacity could realistically be generated given the required surface area. Mr. Passalacqua responded that the language was intended as an incentive rather than a requirement.

Chairman Day asked whether data centers generate noise beyond generators. Mr. Passalacqua explained that servers do produce internal noise, but the ordinance is primarily concerned with external noise sources, including rooftop HVAC units and generators. He noted that data centers require significantly more cooling and backup power than comparable commercial buildings, resulting in substantially higher numbers of HVAC units and generators, which can operate at high noise levels at the source. He also emphasized that data centers operate continuously year-round to maintain strict internal temperature ranges.

Chairman Day commented that generators would primarily operate during power outages or testing. Mr. Passalacqua confirmed this, noting that testing could potentially be staggered and that some generators would otherwise remain inactive except during outages or maintenance events.

Commissioner Dornan commented that both the Planning Commission and the applicant are working through a new and complex development category, noting that the project is evolving and that this represents a third draft of the ordinance under review. He referenced the prior rezoning in May of the previous year, when the proposal was described as an industrial park concept, and acknowledged that the process has continued to develop since that time.

Commissioner Dornan characterized data center regulation as a challenging and rapidly evolving issue nationally, and noted familiarity with Fairfax, Virginia, which he described as a significant data center hub. He referenced concerns about heat island effects associated with dense data center development and its potential environmental impacts.

Commissioner Dornan also raised the idea of considering battery storage or backup systems as an alternative or supplement to traditional generator fuel systems, suggesting it as a possible way to reduce community impacts. He asked for clarification on the size of the property under discussion, and Mr. Passalacqua responded that it is approximately 55 acres.

Commissioner Lada expressed concern that the comparative setback analysis did not include any proposed or adopted ordinances from within Michigan, questioning why the research relied heavily on examples from states such as Virginia, Arizona, and

Pennsylvania. He stated a preference for understanding standards from nearby jurisdictions with similar demographics and regulatory environments.

Mr. Passalacqua responded that while they conducted broad research, including known examples and jurisdictions in various stages of drafting, there are limited clear or finalized data center ordinances available locally. He noted that some Michigan communities, such as Howell, have discussed larger setback figures, but those proposals are still in draft form and lack clearly documented justification.

Commissioner Lada emphasized that, based on the chart provided, most examples appear to fall below 300 feet, with only a few exceptions in draft form. He reiterated that he is seeking more relevant regional comparisons and expressed concern that the current dataset may not provide a sufficient basis for informed decision-making.

Mr. Passalacqua responded that the intent was to compile available examples from both adopted and draft ordinances as well as supporting research, and acknowledged that additional local examples could be explored, particularly within Michigan, Ohio, and Illinois. He noted that obtaining consistent and well-documented comparisons can be challenging due to the evolving nature of data center regulations.

Commissioner Lada reiterated that a larger and more locally relevant sample size is needed, and that understanding both the range of setback standards and the reasoning behind them is important for evaluating the ordinance. He stated that if meaningful variation exists, it should be clearly presented to support policy decisions.

Commissioner Dornan stated that he does not object to continued revision, redrafting, and additional research on the ordinance, and expressed support for the goal of developing a strong and leading regulatory framework. He asked a question regarding the origin of the 1,000-foot setback in earlier drafts, noting that the rationale has been difficult to recall and remains influential in the discussion. Commissioner Dornan also commented that communities such as Fairfax County are beginning to reconsider earlier data center decisions.

Commissioner Lada suggested that the 1,000-foot figure may have originated from setback standards used in other heavy industrial zoning contexts. Mr. Passalacqua responded that the initial 1,000-foot proposal was based on early comparisons of available zoning districts and preliminary observations about noise attenuation over distance, combined with limited early-stage research and the need to establish a working starting point. He explained that as additional information was gathered, the focus shifted toward more detailed noise-based regulations rather than relying solely on large setback distances, and that the 1,000-foot figure was ultimately not supported by broader adoption trends or site-specific variability. He noted that setbacks can vary significantly depending on site conditions such as vegetation, buildings, and topography, and that updated research has led to reconsideration of that standard.

Chairman Day noted that if additional research is desired, staff direction should be provided through a formal motion. Commissioner Dornan agreed with further research and introduced additional comments regarding zoning districts permitted for data centers. Commissioner stated that he believes data centers should be prohibited in IRO districts and M-1 districts due to their intended use classifications and suggested that they may be more appropriate in M-2 districts. He further suggested that data centers in M-2 districts could potentially be permitted by right rather than as a special land use.

Mr. Passalacqua responded that zoning interpretations must also consider site-specific constraints, noting that portions of the referenced MHP area consist of significant wetlands and may present limited development feasibility.

Commissioner Willett stated that the latest staff report addressed the items previously requested by the Planning Commission and suggested that further input should be gathered from business owners and residents through public engagement. She noted that additional research from other jurisdictions would likely still be necessary and expressed support for obtaining public feedback through a public hearing, acknowledging she may be in the minority in that view.

Mr. Passalacqua agreed that additional research and policy direction were still needed and requested feedback from the Commission on proposed zoning district permissions and whether data centers should be treated as special land uses or permitted uses. He emphasized the importance of balancing zoning decisions with State law requirements regarding reasonable use of land and noted the evolving nature of data center demand, including AI-related uses. He also stated that while a public hearing could be scheduled at various stages of the drafting process, his preference would be to complete additional drafting before proceeding, though a public hearing at this stage would not be inappropriate if directed.

Chairman Day stated that he had no objection to allowing data centers in IRO and M-1 districts, viewing them as industrial uses. Vice Chair Tacy expressed support for keeping data centers as special land uses so that proposals would come before the Planning Commission for review and oversight. Chairman Day agreed with maintaining the special land use designation.

Mr. Passalacqua asked whether there were additional points or direction from the Planning Commission for further research or materials to be presented at a public hearing or future meeting, particularly related to setbacks and other ordinance considerations.

Commissioner Dornan suggested additional requirements related to cooling and water use, stating that looped systems should be required for flexibility within the ordinance. He also recommended exploring a performance bond requirement tied to the commissioning plan to ensure proper decommissioning and removal of equipment.

Chairman Day referenced earlier discussion about battery backup systems and requested further information regarding the fire department's concerns or reservations about battery-based backup power. Mr. Passalacqua confirmed the request for clarification regarding the fire department's position on battery backup systems.

**MOTION** made and seconded by Vice Chair Tacy, and Commissioner Lada to direct staff to further research and revise the proposed Zoning Ordinance Text Amendments to Address Data Center Definitions, Permissibility, and Performance Standards based on comments made during this evening's meeting.

**VOTE:** **MOTION CARRIED**

**New Business:**

1. **SITE PLAN REVIEW SPR26-003: QUALITY ENGINEERING, 29837 S. WIXOM ROAD, WIXOM, MI. 48393:** The applicant is seeking site plan approval to develop a new 85,500 square foot headquarters and operations facility with 7,094 square feet of office space and 78,406 square feet of warehouse space on an 8.28-acre property. This site plan represents an amendment to the previously approved GPUD Plan for the Wixom Logistics Park on the site that was previously known as "Building E". The subject site is zoned GPUD and the Parcel Identification Number is 22-06-400-030.

Staff Report to the Planning Commission regarding GPUD Amended Site Plan Review dated April 6, 2026 is included in the packet; and Gateway Planned Unit Development Amendment Review for City of Wixom, Michigan from Carlisle Wortman Associates dated March 24, 2026 is included in the packet.

Mr. Passalacqua indicated that the applicant, Quality Engineering, is proposing a new headquarters and operations facility on the last developable portion of the GPUD district known as Site E, which is part of the approved Wixom Logistics Development. The company is currently located across the street and is seeking to expand.

The proposed building is approximately 85,500 square feet, consisting of about 7,000 square feet of office space and 81,000 square feet of warehouse space. The plan also includes a potential future 23,000 square foot expansion, which would be subject to a separate amended site plan approval. If built out, the total building size would increase to approximately 110,000 square feet.

Mr. Passalacqua noted that the site will utilize two existing access points on Wixom Road that were established under the original GPUD approval, and that cross-access to the southern portion of the overall development remains as previously approved.

He clarified that this proposal is an amendment to the previously approved GPUD site plan for Site E and Building E, originally approved around 2017. Mr. Passalacqua emphasized that the Commission's role is not to evaluate the project under standard zoning district requirements, but rather to assess how the proposed changes compare to and potentially deviate from the original GPUD approval and its intent.

Mr. Passalacqua added that if the Commission finds the proposal consistent with the original intent, it may approve or deny the site plan. If it is found to be inconsistent, the project would need to restart the GPUD process beginning with preliminary approvals from the Planning Commission and City Council before returning for final site plan review.

Mr. Passalacqua indicated that the applicant has provided a clear comparison of the changes, and he would proceed to review those differences in detail.

The staff report compared the previously approved GPUD site plan for Site E with the applicant's proposed changes. It noted that the applicant provided documentation outlining deviations in setbacks, site layout, and architectural design, including comparisons between original and proposed elevations.

Mr. Passalacqua identified several changes from the original approval, including an increase in building size from approximately 81,000 square feet to 85,500 square feet, with a potential future expansion to 110,000 square feet that is not part of the current request. The building architecture has been revised, and truck circulation and rear/west-side parking areas have been modified. Setbacks have been adjusted, with the most notable change occurring at the rear of the site, largely related to building orientation and potential future expansion.

The proposal also extends slightly into an area previously designated for banked parking, though staff noted that sufficient area remains if banked parking is needed in the future. It was also noted that the City has not received any parking-related complaints for this site during staff tenure.

From a natural resources' standpoint, no significant features are present on the site, as it was previously cleared in anticipation of development. Existing landscaping and detention facilities will continue to be utilized if the project is approved.

Regarding traffic, the applicant's study concluded that the development would not trigger additional infrastructure improvements under the existing GPUD development agreement. This was reviewed and concurred with by HRC, although Mr. Passalacqua noted that future expansion or increased traffic could require additional review and potential mitigation if thresholds are exceeded.

Parking requirements are met as proposed. Conditional approval language was included requiring coordination with the fire department prior to pre-construction or engineering approvals.

Landscaping compliance is generally met, with the exception of a required substitution of red maple trees. Lighting is compliant with ordinance standards, and the applicant intends to use fixtures consistent with the broader development.

Architecturally, Mr. Passalacqua noted that the proposed façade introduces visual variation compared to existing buildings within the development. While it differs significantly from existing structures, he characterized it as appropriate to the development along Wixom Road.

The applicant provided a comparison of the approved GPUD façade design with the proposed design for the Quality Engineering building, including materials and the percentage of window openings. The proposed front façade includes approximately 22% window coverage, and the applicant confirmed that all rooftop mechanical equipment will be fully screened.

Mr. Passalacqua compared the proposed building to what Site E would have looked like under the original final GPUD site plan, noting differences between the approved and proposed conditions.

Regarding site standards, Mr. Passalacqua found that setbacks between the previously approved Building E and the proposed building are generally similar, with only minor variations primarily related to building size and configuration. Without considering the future expansion, the proposed structure remains largely consistent with the original intent. He indicated that the proposal aligns with the intent of the GPUD district for industrial and logistics development and fits appropriately within the site. He also noted that the building is located in essentially the same area originally designated for Building E and that circulation patterns remain similar to those approved in 2017.

Mr. Passalacqua stated that, overall, the proposal is consistent with the intent of the GPUD and does not raise significant concerns regarding placement or site functionality. The next step for the Planning Commission is to determine whether the plan meets the intent of the GPUD; if it does, the Commission may approve or deny the site plan. If it does not, the project would need to restart the GPUD approval process beginning with preliminary review by the Planning Commission and City Council before returning for final consideration.

Mr. Passalacqua outlined potential conditions of approval, including compliance with engineering and public safety requirements, fire department approval of emergency vehicle circulation, final approval of hydrant locations and a looped water system in civil engineering drawings, substitution of red maple trees in the landscape plan, and consistency of lighting fixtures and pole types with the broader GPUD development to the south.

Vice Chair Tacy asked for clarification regarding condition number 6 related to lighting fixture and pole types, noting that while consistency with the broader GPUD development

was required, she did not see confirmation on the drawings regarding whether building-mounted light fixtures would also be included in addition to pole lighting. Mr. Passalacqua responded that the specifications were included and confirmed that the intent is for the same fixtures to be used, with allowance for comparable alternatives if exact fixtures are not available. He added that he was not certain whether building-mounted lighting was proposed for this project and suggested the applicant could confirm that detail.

Vice Chair Tacy stated that, in her view, the proposal meets the intent of the GPUD.

Commissioner Dornan expressed strong support for the project, stating that the proposal exceeds expectations and represents a high-quality development that the City should be proud to welcome. He also raised the issue of acceleration and deceleration lanes.

Chairman Day noted that those items would be addressed during site plan review and that the Commission first needed to make a motion determining whether the proposal meets the intent of the final GPUD site plan.

**MOTION** made and seconded by Vice Chair Tacy and Commissioner Lada to determine that the site plan for 29837 S. Wixom Road referred to as “site E” of the previously approved GPUD site plan, parcel ID 22-06-400-030 meets the intent of the final GPUD site plan and may be reviewed and approved by the Planning Commission.

**VOTE:** **MOTION CARRIED**

Site plan review.

Commissioner Dornan revisited the discussion of acceleration and deceleration lanes, referencing prior developments such as Assembly Park and asking whether such improvements were part of earlier traffic threshold discussions with the Commission and Council. He asked for clarification on whether the threshold requirements include acceleration lanes.

Chairman Day responded that improvements would be triggered when appropriate traffic thresholds are met.

Mr. Passalacqua stated he would need to confirm whether HRC specifically identified any required site access or circulation improvements and noted that the traffic review was finalized late in the packet preparation process. He suggested that the Commission’s motion could broadly require compliance with any items identified through engineering review, including potential traffic-related improvements.

Vice Chair Tacy suggested incorporating a general condition requiring compliance with all city engineering review findings, including traffic study review outcomes. Mr.

Passalacqua agreed and clarified that this would include any circulation improvements required by the city engineer.

Chairman Day commented positively on the revised architectural design, stating it represents a welcome improvement over previous site development patterns.

Commissioner Dornan asked about the rationale for substituting red maple trees in the landscaping plan, joking that both design and landscaping choices appeared highly deliberate. Pass explained that tree substitutions are typically based on factors such as invasiveness or susceptibility to breakage at maturity and noted that revisions would likely be addressed in future updates.

Commissioner Buck asked whether a City walk was included in front of the site. Mr. Passalacqua confirmed that a safety path already exists along the frontage, which was installed as part of the original site's landscaping and detention improvements.

Mr. Mike Brown, representing J.B. Donaldson, a design-build firm acting on behalf of Quality Engineering, noted the presence of the architect and civil engineer at the meeting and asked if there were any additional questions. He had no further comments beyond what Mr. Passalacqua had stated previously. He confirmed that the wall packs would be matched to those used on the south side and noted that the building already includes similar fixtures at the rear.

In response to a question from Chairman Day, Mr. Brown agreed to substitute the red maples with acceptable tree species in accordance with requirements. When asked if there were any further questions from the applicant, Commissioner Lada responded that everything looked good. Mr. Brown concluded by thanking the Commissioner and expressing enthusiasm about building in the community.

**MOTION** made and seconded by Commissioner Lada and Vice Chair Tacy to approve the site plan for 29837 S. Wixom Road referred to as "site E" of the previously approved GPUD site plan, parcel ID 22-06-400-030 with the condition that the following items be addressed and administratively approved by the City.

1. Any items cited by the City Engineering including but not limited to circulation patterns; and
2. City Fire Chief approval of overall circulation pattern for emergency vehicle access; and
3. The approval of the proposed site plan does not include the proposed building expansion which will require an amended site plan be submitted to the City for review and approval from the Planning Commission; and
4. Final approval for the hydrant location and looped water plan must be provided in the civil engineering drawings and submitted to the city for review and approval from the Fire Department; and
5. Substitute Red Maple trees for an acceptable species; and

6. Lighting fixtures and pole types should be consistent between this site and the remainder of the GPUD site to the south.

**VOTE:** **MOTION CARRIED**

2. **MOBILE FOOD VENDOR REVIEW TLU25-001: 10400 ASSEMBLY PARK DRIVE, WIXOM, MI. 48393:** The applicant is seeking approval for a new temporary use for a mobile food trailer to be located in the parking lot serving the Menards building at 10400 Assembly Park Drive. Per Section 18.12.160.B.2, mobile food operations seeking to operate for more than seven days required review and approval by the Planning Commission. The subject site is zoned GPUD, Gateway Planned Unit Development and the Property Identification Number is 22-07-200-020.

Staff report to the Planning Commission from Carlisle Wortman Associates dated April 6, 2026 is included in the packet.

The applicant has applied for a temporary use of a food trailer to be located in the parking lot serving the Menards building at 10400 Assembly Park Drive. The subject site is zoned GPUD, Gateway Planned Unit Development. Per Section 19.12.160.B.2, mobile food operations seeking to operate for more than seven days are permitted in all non-residential PUDs.

Food sale operations are proposed to commence shortly after Planning Commission approval for the duration of one (1) year. The application states the purpose of the trailer is to sell food to employees and customers of the site during lunch time. Emails with the applicant indicate they do not intend to operate outside of the ordinance limited hours of 7 a.m. to 10 p.m. daily. For reference, Menards is open between 6 a.m. and 10 p.m., Monday through Saturday and 8 a.m. until 8 p.m., Sunday.

Mr. Passalacqua noted that the final items for review were three food truck applications, and he clarified that a procedural technicality had been missed in the agenda, as these items require public hearings. He stated that proper notice had been sent and all requirements met and explained the intended process of opening the public hearing, taking comments, closing it, and then making determinations for all three applications. He apologized for the oversight and confirmed that approval, if granted, would be valid for one year, with up to two one-year administrative extensions possible provided there are no violations or changes to the site plan.

Mr. Passalacqua introduced the first application at 10400 Assembly Park Drive in the Menard's parking lot, describing it as a temporary food trailer proposed to serve employees and customers primarily during lunch hours. He noted the applicant's stated intent to operate within ordinance hours of 7 a.m. to 10 p.m., consistent with Menards'

operating hours. The site is zoned GPUD Gateway Planned Unit Development. The trailer would not include ovens, fryers, or hood/fire suppression systems and would be powered by a gas or electric generator mounted to the trailer. The trailer would remain on site when not operating, and staff did not identify major concerns with the proposal. He added that the Department of Public Works requested clarification on grease disposal to ensure storm drains are not impacted, and that any approval should include a condition requiring DPW approval of the grease handling plan prior to operation. He confirmed the applicant was present and available to answer questions.

Mr. Jake Gross, owner of Sup Dogs LLC, stated that he has eight years of food truck experience and recently completed construction of a second truck. He indicated he is seeking a regular operating location and primarily conducts catering and vending work, including business lunches in the area. He previously operated his first truck at the Tanger Outlet Mall in Howell for several years. He described the menu as simple, consisting of items such as hot dogs, sausages, coneys, and nachos. He stated that the operation does not generate grease waste, as food is prepared using a steam table system, and that the only waste generated at the end of the day is water.

Chairman Day asked whether he had a prior regular location, and Mr. Gross confirmed the Tanger Outlet Mall site. Commissioner Willett commented she liked the business name and stated there appeared to be no reason not to approve the application, while also referencing the need for documentation confirming no grease generation.

No public comments.

**MOTION** made and seconded by Commissioner Willett and Commissioner Lada to approve the temporary land use permit for 10400 Assembly Park Drive, parcel ID 22-07-200-020, to operate a mobile food trailer with the following conditions:

1. The applicant provide written documentation indicating how grease will be disposed of to ensure public drains are not clogged. Methods must be approved by the City Department of Public Works.

**VOTE: MOTION CARRIED**

3. **MOBILE FOOD VENDOR REVIEW TLU26-001: 49200 GRAND RIVER ROAD, WIXOM, MI. 48393:** The applicant is seeking approval for a new temporary use for a mobile food trailer to be located in the parking lot of the Mobile Gas Station located at 49200 Grand River Road. Per Section 18.12.160.B.2, mobile food operations seeking to operate for more than seven days required review and approval by the Planning Cmmission. The subject site is zoned FS, Freeway Service and the Property Identification Number is 22-08-376.021.

Staff Report to the Planning Commission from Carlisle Wortman Associates dated April 6, 2026 is included in the packet.

The applicant has applied for a new temporary use of a food trailer to be located in the parking lot of the Mobile Gas Station located at 49200 Grand River Road.

Mr. Passalacqua noted that the site is zoned Freeway Service with permitted hours of operation from 11 a.m. to 10 p.m., Monday through Friday, with possible reduced hours during the fall months. He stated the trailer will remain on site when not operating and that power would be supplied either by a gas generator or from an adjacent decommissioned car wash. He explained that if power is drawn from the car wash, the motion should include a requirement to review the path of the electrical cord to ensure pedestrian safety. He reiterated that, as with the other applications, DPW has requested information regarding grease disposal.

Mr. Basem Rammaha, also known as “Smiley,” stated he lives in Northville. He explained that the trailer would be parked next to the non-operational car wash and that a barrier would be installed to prevent access between the trailer and the building, ensuring the area is not a safety hazard. He stated that grease is generated in small quantities and is collected and transported in five-gallon buckets for off-site disposal, which he handles personally without the need for a disposal service.

No public comments.

**MOTION** made and seconded by Commissioner Willett and Vice Chair Tacy to approve the temporary land use permit for 49200 Grand River Road, parcel ID 22-08-376-021, to operate a mobile food trailer with the following conditions:

1. The applicant provide written documentation indicating how grease will be disposed of to ensure public drains are not clogged. Methods must be approved by the City Department of Public Works; and

2. The application states power may be provided via the adjacent decommissioned car wash. If via the car wash, the path of electrical supply should be added to the plan to ensure it does not interfere with pedestrian or vehicle traffic.

**VOTE:** **MOTION CARRIED**

Mr. Rammaha added that he is a retired engineer and salesperson with four children and has been on dialysis for 20 years. He stated that he retired three years ago and shared that one of his daughters is a nurse practitioner and the other is a doctor. He also noted that he has two sons currently in pre-med. He explained that his family encouraged him

not to fully retire and to remain active for his grandchildren, and he stated that he is currently doing work he enjoys.

4. **MOBILE FOOD VENDOR REVIEW TLU26-002: 29330 WIXOM ROAD, WIXOM, MI. 48393:** The applicant is seeking approval to continue a previously approved temporary use for a mobile food trailer located in the parking lot of the Marathon Gas Station located at 29330 S. Wixom Road. Per Section 18.12.160.B.2, mobile food operations seeking to operate for more than seven days required review and approval by the Planning Commission. The subject site is zoned M-1, Light Industrial and the Parcel Identification Number is 22-08-100-048.

Staff Report to the Planning Commission from Carlisle Wortman Associates dated April 6, 2026 is included in the packet.

The applicant has applied for a new temporary use of a food trailer to be located in the parking lot of the Marathon Gas Station located at 29300 S. Wixom Road. Dring their March 12, 2024 meeting the Planning Commission approved the temporary land use for the food trailer and the associated site plan. No changes have been proposed from the original site plan.

Mr. Passalacqua stated that in March 2024 the Planning Commission approved a temporary land use and site plan for the food trailer, and that no changes have been made to the original approved site plan; however, the original permit has since expired, and the applicant must now reapply under the current process. He noted that approval, if granted, would be for one year with the possibility of two additional one-year administrative extensions if there are no changes. He described the site as zoned M-1 and identified as a gasoline service center, with proposed hours of operation from 10 a.m. to 7 p.m., Monday through Friday. He stated the trailer would remain on site when not operating and would receive power from the adjacent gas station.

Mr. Passalacqua reported no major issues with the application aside from DPW's request for written documentation regarding grease disposal. He also requested an updated written authorization from the property owner confirming permission for the operation. He added that the application should clarify whether lighting or speakers will be used, as these are not explicitly addressed in the submission, and requested an email confirmation from the applicant regarding any such use. He further stated that the application should be revised to reflect the trailer's current location, noting that while it was originally approved for a location between barriers, it is now positioned in three parking spaces near tables and trash receptacles. He clarified that this relocation does not raise concerns regarding setbacks or parking compliance but should be documented accurately.

Commissioner Lada asked whether the 2024 approval period affected the new approval timeline, specifically whether the applicant would be penalized for the prior period. Mr. Passalacqua responded that there is no retroactive effect and that the new approval period would begin from the current date, allowing for one year plus two potential extensions.

Mr. Allen Rizk, owner of Shawarma Stop, stated that he has been operating in the city for three years and expressed appreciation for the community, noting his desire to remain and continue his business. In response to a question from Chairman Day, he explained that the business is not open on weekends because demand is typically slow, and he also operates at Eastern Market. Commissioner Lada commented about the food, describing the chicken shawarma wrap as a good sandwich.

No public comments.

**MOTION** made and seconded by Commissioner Lada and Commissioner Grossi to approve the temporary land use permit for 29330 S. Wixom Road, parcel ID 22-08-100-048, to operate a mobile food trailer with the following conditions:

1. Operations may continue up to one year after Planning Commission approval. The applicant may apply for extensions per zoning ordinance Section 18.12.1880.C.2.
2. The applicant provide a written documentation indicating how grease will be disposed of to ensure public drains are not clogged. Methods must be approved by the City Department of Public Works; and
3. An updated statement from the owner authorizing operations should be submitted to the City; and
4. The site plan does not indicate whether lights or speakers will be used. Pictures of the trailer imply these devices are not proposed; however, this should be clarified in the application; and
5. Application must be revised to show the correct location of the trailer, tables and chairs.

**VOTE: MOTION CARRIED**

**<u>Call to the Public:</u>**

No public comments.

**<u>Staff Comments:</u>**

Mr. Passalacqua provided a scheduling update, noting he is approximately 90% certain the April 20th meeting will occur and similarly expects the first meeting in May to proceed.

He indicated there may be a potential break at the end of May, though that is not yet confirmed. He requested that the Commissioners keep them informed of their schedules, as he anticipates that the upcoming meetings will take place.

**Planning Commission Comments:**

Commissioner Willett commented that the DDA participated in the Pour Wars event and noted that Volare and Wixom Bar were recognized as winners, referencing the City Manager's report. She stated that there is a special DDA meeting scheduled for April 9th to approve the budget, which was not listed on the agenda. She also noted that she had spoken with Parks and Recreation Director Deanna Magee regarding the PDGA Professional Disc Golf World Tournament being held in Milford at Kensington, with an estimated attendance of approximately 100,000 people. She indicated that this event could have a positive impact on downtown Wixom and expressed interest in coordinating promotional efforts through the DDA.

Vice Chair Tacy raised a concern regarding signage in the VCA downtown area, noting that the new establishment's sign appears very similar to the Let's Brunch sign and questioning whether both meet the intended design standards. She stated that the signs appear nearly flat and that the intended relief or dimensionality is only barely visible unless viewed directly from below. She questioned whether the design standards should be updated to include a minimum required depth or protrusion, such as one to two inches, to better reflect the intent of the guidelines.

Mr. Passalacqua responded that there is some background regarding the Let's Brunch sign, noting that it was approved based on the form submitted, though he clarified that the lighting for that sign is still under review. He explained that the same dimensional guidance used for Let's Brunch was also applied to the Mila sign as a reference standard. He acknowledged that it may be appropriate to consider establishing a minimum dimensional requirement for future approvals. He added that he has not yet personally reviewed the Mila sign on site but will do so to confirm compliance.

Vice Chair Tacy reiterated that the signage appears visually flat and questioned whether Mila is consistent with the approved standards, also noting that the color scheme appears very similar between signs. Mr. Passalacqua responded that any similarity in appearance is coincidental and reiterated that the dimensional specifications used for Let's Brunch were intended as the baseline for Mila's approval. Chairman Day added that they should encourage more creativity in signage design.

Commissioner Lada announced that the Wixom Community Foundation will host an Amazing Race event on the last Saturday in July, featuring locations throughout the Walled Lake, Wixom, and Commerce area.

Commissioner Lada then raised concerns about conditions behind the Amazon facility, stating that signage has not been addressed and describing what he observed as

numerous empty semi-trailers, debris, and unsafe site conditions. He commented seeing active loading and staging activity in the rear of the facility involving high volumes of vehicles and carts, with congestion affecting circulation, including instances of equipment in grassy areas, parking areas, and roadway access on Assembly Drive. He stated he personally moved equipment that was blocking the road and expressed concern that the operations are not consistent with good site management or neighboring business impacts.

Vice Chair Tacy asked whether existing code provisions could be enforced in relation to these conditions. Mr. Passalacqua responded that code enforcement would need to review and document the situation and compare it against the ordinance and approved site plans to determine what is enforceable, noting that it is at least a matter for review and discussion. Commissioner Willett stated that equipment blocking roadways, such as dollies, presents a safety issue and is likely enforceable. Commissioner Lada added further concerns about blocked traffic flow, storage carts, and operational impacts, including potential fire lane obstructions.

Vice Chair Tacy also raised concerns about signage enforcement, asking whether there is a requirement for signage to be installed within a set timeframe after approval. Mr. Passalacqua responded that the primary consequence is typically the need to reapply and pay for a new permit, and that penalties are not highly punitive. Vice Chair Tacy suggested that the ordinance may need to be revised to include stricter timelines and enforcement mechanisms for installation and compliance.

Mr. Passalacqua reiterated that code enforcement can document conditions and coordinate with staff to determine enforceable actions. Vice Chair Tacy further suggested that site plan requirements may need to better address how large facilities manage operations such as trailer staging. Commissioner Lada referenced prior discussions during approval of Renaissance Logistics, noting expectations regarding trailer placement and duration that she believes are not being followed. Commissioner Grossi added that he had previously called regarding the Holiday Inn sign near the expressway.

**ADJOURNMENT:**

This meeting of the Planning Commission was motioned and adjourned at 8:50 p.m.

Mona Freiburger
Recording Secretary