# EXHIBIT 17

APPROVED
MAY 4, 2026

# CITY OF WIXOM
# 49045 PONTIAC TRAIL
# PLANNING COMMISSION MEETING
# MONDAY, APRIL 20, 2026

This meeting was called to order by Chairman Day of the Planning Commission at 7:02 p.m. at which time allegiance was pledged to the American flag.

**PRESENT:** William Day (Chairman), Cheryl Tacy (Vice Chairperson), Commissioners: Michael Dornan; Sandro Grossi; Mark Lada; Vanessa Willett

**ABSENT:** Excused: Todd Buck

**OTHERS:** Matteo Passalacqua (Carlisle Wortman Associates), Drew Benson, Assistant City Manager; and Mona Freiburger (Recording Secretary)

## Determination of a Quorum:

A quorum of the Planning Commission was present for this meeting.

## Changes or Additions to the Agenda:

None

## Approval of Minutes:

**MOTION** made and seconded by Vice Chair Tacy and Commissioner Willett to approve the April 6, 2026, Planning Commission Meeting Minutes, as amended.

**VOTE:** **MOTION CARRIED**

## Correspondence:

None

**Call to the Public:** (Limited to 5 minutes per speakers, addressing Agenda items on Agenda only)

Mr. Dennis Griffin, 2300 Burdette, Ferndale, MI on behalf of Wixom Industrial One, acknowledged that the Zoning Ordinance Text Amendments for data centers process is stressful for everyone involved and emphasized that all parties are human. He expressed

a genuine understanding of the pressure he is experiencing and recognized that the City is facing similar challenges. He noted his respect for the work being done, particularly as the broader impacts continue to be understood. He shared that he is learning as the process unfolds and, while some aspects he initially thought would be simple have proven more complex, he is confident they can be resolved.

Mr. Griffin stated his commitment to maintaining a respectful tone in public forums and in business interactions and expressed confidence that others would do the same. He encouraged City officials and staff to be mindful that their words carry significant weight, especially when documented, and emphasized the importance of mutual respect between businesses and residents. He observed that much of the current dialogue around data centers has been reactive and negative but highlighted that data centers represent an important and evolving sector. He drew a parallel to past developments that were once new and required careful consideration.

Mr. Griffin encouraged all parties to consider the potential benefits that could emerge if the project moves forward. He committed to keeping an open mind and asked others to do the same, stressing the importance of maintaining a balanced and constructive public narrative for both residents and businesses. He noted that he has been in Wixom for three years and chose to invest in the community because of its pro-business environment. He added that being pro-business does not mean avoiding change but rather working through it thoughtfully.

Mr. Griffin emphasized that the process must function as intended, regardless of whether the outcome benefits all, some, or none, and affirmed his commitment to remaining engaged throughout. He concluded by stating that he is participating in good faith, and that this reflects both his personal values and those of his partners.

Mr. Griffin noted that several aspects of the draft documents were confusing to him and that he had raised these concerns previously. Recognizing the need for additional expertise, he engaged Darren Brown from K&S Engineers to review the materials. He acknowledged that he did not agree with all the feedback provided, as some of it did not fully align with his perspective, but emphasized that Darren Brown brings experience representing both businesses and communities.

Mr. Griffin stated that, rather than speaking on his behalf, he would like Darren Brown to present his own observations and conclusions. He added that while Darren Brown was engaged by his team, his balanced background and extensive experience could offer value to all parties involved. He described him as a seasoned professional who has worked with both developers and municipalities and suggested that this perspective could be beneficial for the group as a whole. He concluded by inviting him to speak and thanking everyone.

Mr. Darren Brown of K&S Engineers, P.O. Box 960066, Wixom, Michigan, introduced himself and explained that the firm specializes in acoustics, noise, and vibration

consulting. He noted that he has personally been working in this field for 28 years and has experience supporting both municipalities and businesses. He described the firm's role as helping communities understand noise, address noise-related challenges, and shape communities in ways that align with their goals.

Mr. Brown explained that K&S Engineers is a professional engineering firm with certification through the Institute of Noise Control Engineering, indicating that its members have met professional standards similar to other licensed engineering disciplines. He emphasized that the firm's expertise is grounded in both technical knowledge and practical experience.

Mr. Brown stated that much of their work focuses on community noise, including active projects with municipalities such as Lyon Township, Washington Township, and Chesterfield Township, as well as past work involving renewable energy sound impacts. He noted that data centers are becoming more prominent in Michigan and represent critical infrastructure. He emphasized the importance of approaching their development in a way that supports both the surrounding communities and the businesses that rely on these facilities.

Mr. Brown stated that regardless of whether he is working for municipalities or developers, his primary responsibility is to the community. As a professional engineer, he emphasized that he is guided by an obligation to do no harm, to help people, and to ensure that infrastructure projects do not negatively impact quality of life. He noted that this principle informs all of his work, regardless of who retains his services.

Mr. Brown explained that Mr. Griffin approached him about a proposed data center project in Wixom and asked whether it was feasible. He responded that the project is doable, though it presents certain challenges. He was then asked to review the City's proposed ordinance related to data centers. After evaluating the draft, he identified several technical concerns from an acoustics and noise-control perspective, noting that some elements may be difficult to implement not only for developers but also for the City. He referenced his written comments dated April 20, 2026, which had been distributed, and indicated that he is available to answer questions and provide further clarification, particularly on areas that would benefit from detailed acoustic and noise-control review.

Overall, Mr. Brown expressed the opinion that the proposed project is feasible and could provide benefits to both Wixom and surrounding communities, provided that reasonable and balanced ordinance standards are adopted. He noted that the proposed site appears favorable, particularly because there are no residences directly adjacent to the property. Drawing on his experience with projects located near existing homes, he explained that such situations often require significant mitigation efforts and can generate valid concerns from residents. Mr. Brown observed that the approximate 2,000-foot buffer between the site and nearby residences offers a meaningful separation, making this a more suitable location. He concluded that, given these conditions, the project is well-positioned to fit within the area and could be a positive addition if managed appropriately.

**Unfinished Business:**

1. Consideration of Draft Zoning Ordinance Text Amendments to Address Data Center Definitions, Permissibility, and Performance Standards

Mr. Passalacqua provided an update on the continued development of the data center ordinance, noting that at the previous Planning Commission meeting there had been discussion around sound barrier heights, backup power systems including batteries and diesel generators, and residential setback requirements.

He explained that, following direction from the Planning Commission, a memo from the Fire Department had been included in the current meeting packet outlining their requirements for projects considering onsite battery backup systems. He noted that while the Fire Department does not consider it ideal for an entire data center to rely solely on battery backup, they are not opposed to it. Instead, they emphasized the importance of meeting specific safety requirements and engaging the Fire Department early in the planning process.

Mr. Passalacqua also reviewed the materials related to residential setbacks, including maps provided in the meeting packet that illustrate the impact of different buffer distances—300 feet, 500 feet, and 1,000 feet—across M-1, M-2, and IRO zoning districts. He explained that areas marked in red represent parcels adjacent to residential zoning and would be excluded from data center development. Additional shaded areas indicate portions of parcels affected by the respective buffer distances, meaning that while those sections could not be used for data center infrastructure, the remainder of the parcel could still be considered for development.

Mr. Passalacqua stated that, following direction from the Planning Commission at the previous meeting, he provided additional information on setback standards from three Michigan communities. He noted that these were draft ordinances and were included to show how other municipalities are approaching data center regulation, including their setback requirements, placement standards, and the reasoning behind those standards. He emphasized that the range of setbacks varies across communities and is not based on a single uniform performance standard but rather is intended to complement other technical regulations.

Mr. Passalacqua also explained that an additional mapping layer, shown as a blue outline, had been incorporated following discussion at the prior City Council meeting on April 14. He noted that a council member had raised concerns about permitting data centers north of Pontiac Trail, and he included that consideration in the memo and accompanying maps. He clarified that the maps illustrate M-1 industrial parcels north of Pontiac Trail, with red indicating areas adjacent to residential zoning, blue identifying industrial areas north of Pontiac Trail, and shading reflecting applicable buffer impacts. He stated that this represents another potential policy consideration for the Commission regarding whether such a restriction should be included in the ordinance.

Mr. Passalacqua acknowledged Commissioner Dornan's observation that there was a significant amount of information to review. Mr. Passalacqua then added context, noting that approximately 25 Michigan communities have adopted moratoriums on data centers to allow time to study and develop appropriate regulations. He also referenced ongoing discussions at the State level regarding potential permitting limitations while local and state frameworks are being evaluated. He emphasized that there is currently no model ordinance guiding these regulations and that communities are largely working independently based on available information and emerging practices.

Mr. Passalacqua indicated that the intent of the memo was to contextualize the City's efforts and affirm that the process being followed is appropriate, even if complex. He indicated that a decision is needed on key ordinance components, including the buffer distance and whether to include a restriction on parcels north of Pontiac Trail. He added that if the Commission wishes to revisit other elements of the ordinance, he was prepared to walk through the current draft in detail and continue refining it based on direction.

Commissioner Willett reviewed the 300-foot and 500-foot buffer maps, noting the formatting and questioning the practical difference between the two standards. She observed that, based on her review, the shaded areas where data center infrastructure would be restricted appear to significantly limit feasible locations, and asked for clarification on whether the remaining buildable areas would realistically support such development.

Mr. Passalacqua clarified that parcels shown in red are entirely excluded from consideration, while parcels with shading indicate areas where only portions of the site would be restricted from data center infrastructure. He explained that the unshaded portions of those parcels could still potentially accommodate development if they meet all other requirements.

Commissioner Willett responded that, within the M-1 districts, there appear to be only limited areas that are undeveloped or suitable for such use. She stated that, in her view, there is not a substantial difference between the 300-foot and 500-foot buffer options, though she noted that both are generally consistent with standards used in other nearby communities. She cautioned against making the ordinance overly restrictive, emphasizing the need to establish reasonable boundaries without creating unnecessary barriers, while acknowledging the importance of setting appropriate limits.

Commissioner Willett added that, in her perspective, there are already relatively few viable sites for data centers in the City and that, regardless of personal preference, these types of developments are likely to occur. She stated that while she is not necessarily in favor of data centers, she recognizes their role and necessity in modern infrastructure and industry.

Mr. Passalacqua responded that the maps are intended to accurately reflect constraints, noting that irregular parcel shapes and existing R-3 residential pockets within M-1 districts

add additional layers of restriction. He clarified that some areas are legally conforming and therefore subject to the setback rules. He also agreed that the difference between 300 and 500 feet is relatively modest, while noting that the 1,000-foot buffer represents a significantly larger impact.

Assistant City Manager Benson agreed that, fundamentally, there is not a significant difference between the 300-foot and 500-foot buffer options, particularly given that the draft ordinance already excludes parcels adjacent to residential zoning. He added an important clarification that the ordinance would also apply to existing structures, noting that future scenarios could include large existing buildings, potentially around 80,000 square feet, being repurposed as data centers, and that the ordinance is designed to address those possibilities as well.

Commissioner Willett noted that such developments are already occurring.

Commissioner Dornan then commented on the Fire Chief's letter, stating that he found it informative and viewed it as a positive indication that battery backup systems could be feasible if properly designed, inspected, and installed. He also noted the broader national context, stating that data center development is progressing quickly across the country and that there have been discussions at the federal level regarding a potential moratorium. He referenced the City Council's earlier decision to initiate the study process in November and stated that the Planning Commission is still in a fact-finding phase, with additional time provided to develop a well-informed ordinance. He expressed the view that more information is still needed before moving forward to a public hearing and stated his opposition to advancing the ordinance at this time.

Commissioner Dornan added that setback standards vary widely depending on the source and distributed additional reference material indicating setbacks ranging from 1,000 to 1,500 feet in some cases, noting that he believes a minimum setback in that range should be considered. He referenced a prior discussion involving a 1,250-foot setback, equating to roughly a quarter mile.

Mr. Passalacqua clarified that the examples provided were intended to reflect a range of existing and proposed standards, noting that the larger setbacks are more commonly found in draft or under-review ordinances rather than fully adopted regulations. He emphasized that the intent was to present context rather than suggest a definitive standard.

Commissioner Dornan acknowledged the clarification and concluded his comments.

Commissioner Willett responded by noting that while she appreciates the research provided, she believes some of the information referenced was based on AI-generated summaries or limited sampling and should be viewed in that context. She stated that, in her opinion, setbacks of 1,000 to 1,500 feet are not realistic for this type of development. She added that discussions should not be driven solely by negative perceptions of data

centers and shared a personal example, noting that her father lives near a major data center project in Lyon Township and that she is professionally involved with similar developments.

Commissioner Willett emphasized that while concerns exist, they may not fully reflect the range of impacts compared to other industrial uses. She stated that the Commission cannot expect to reach the same level of technical expertise as the engineers and professionals directly involved in designing and building these facilities and therefore must rely on the best available information.

Commissioner Willett expressed appreciation for the input from staff, including noise engineering expertise, and noted that such contributions are helpful in understanding the issues. She encouraged moving forward in the process, stating that continued discussion alone is unlikely to resolve all questions. She emphasized the importance of ultimately hearing from residents and businesses, moving toward a decision, and remaining open to revisiting the ordinance as additional information becomes available.

Chairman Day clarified that there should be a distinction between the topics being discussed, noting that Commissioner Dornan was specifically referring to setbacks from residential properties, rather than setbacks in general.

Commissioner Lada stated that he observed the same practical similarities between the 300-foot and 500-foot buffer maps previously noted by Commissioner Willett, which led him to lean in favor of the 500-foot option over 300 feet. He added that if a developer were intent on a particular area in the southwest quadrant, they would have the option to acquire residential parcels and pursue a rezoning request, but he believes there are still sufficient opportunities elsewhere in the City for such development. He stated that, in his view, a 500-foot buffer would not significantly change the available development areas.

Commissioner Willett further explained that she had initially supported a 1,000-foot setback at the beginning of the process, based on standards typically associated with heavy industrial uses. While acknowledging that technology may evolve and noise mitigation methods may improve over time, she expressed concern about reducing the setback to 300 feet. She stated she does not see sufficient data to justify such a reduction and believes that if heavy industrial uses require a 1,000-foot buffer due to noise considerations, then similar logic should apply to data centers, which can generate comparable noise impacts. She concluded that reducing the setback to one-third of that distance would be, in her view, inappropriate.

Chairman Day then asked whether different setback standards could be considered depending on adjacent uses, such as residential versus industrial or research office zoning.

Assistant City Manager Benson responded that this distinction is already reflected in the draft ordinance, explaining that the section under discussion applies specifically to

residential adjacency. He clarified that there are no unique setback requirements being proposed between industrial, commercial, or IRO-zoned parcels, beyond existing standards.

Mr. Passalacqua added that existing zoning setbacks would remain in effect for all other adjacent uses, including industrial-to-industrial, industrial-to-commercial, and industrial-to-IRO relationships. He reiterated that the draft focuses primarily on residential setbacks and associated noise standards at residential property lines. He emphasized that data centers would still be required to comply with existing noise regulations when adjacent to non-residential properties, and that the primary policy emphasis of the ordinance is managing impacts on residential areas.

Vice Chair Tacy stated that, in her view, the ordinance already provides adequate protections and expressed support for the 500-foot setback option. She explained that at 500 feet from a residential area, a facility would still be required to meet the established noise standards, and if it cannot meet those standards at that distance, then the project design would need to be revised or adjusted. She further noted that setbacks across different zoning districts are not the sole controlling factor but instead work in combination with the requirement to comply with applicable noise limits.

Mr. Passalacqua agreed, explaining that the intent of the ordinance was to preserve flexibility in how applicants demonstrate compliance with noise standards. He reiterated that setbacks are intended to complement, not replace, those standards, and that if a project cannot meet noise requirements at 500 feet, then design modifications would be necessary.

Commissioner Willett asked for clarification on how noise standards would be measured and enforced, specifically questioning whether compliance would be based on short-term spikes or sustained levels over time, and how the City would distinguish between noise generated by the data center versus surrounding industrial or ambient activity.

Mr. Passalacqua responded that ambient noise presents challenges in measurement and attribution but explained that the ordinance framework is intended to focus on overall compliance during lower-activity periods, such as nighttime hours, when background noise is reduced and readings are clearer. He noted that data centers operate continuously due to operational demands, not preference, and that quieter periods in surrounding activity may provide more reliable conditions for measurement. He acknowledged that isolating specific noise sources is complex and would require professional sound analysis and stated that continuous or periodic monitoring could be used for compliance verification or in response to complaints.

Commissioner Willett suggested that nighttime measurements may provide more consistent results due to lower background noise and reduced external activity.

Mr. Passalacqua agreed that nighttime conditions may simplify measurement but emphasized that he is not a technical sound expert and that specialized engineering methods are used to separate and analyze noise sources. He noted that the standards being considered are based on examples from other communities, including those that have established residential noise limits prior to data center development.

Chairman Day questioned why data center noise emissions would differ between day and night, aside from backup generator use.

Mr. Passalacqua responded that he did not believe operational noise would inherently differ between day and night.

Commissioner Lada added that environmental conditions, such as higher daytime temperatures, could cause cooling systems like air conditioning to operate more frequently, potentially increasing noise output during the day.

Vice Chair Tacy then asked Mr. Passalacqua to comment on the letter submitted by K&S Engineers and whether any of its observations should influence revisions to the draft ordinance.

Mr. Passalacqua responded that he had reviewed the letter and found several fair and valid points, including references to measurement approaches not currently specified in the ordinance. He stated that while not all suggestions may be fully incorporated, some items warrant further review and could lead to additional clarifications or revisions.

Vice Chair Tacy stated that, given the remaining questions and new information, she would support sending the draft back for further refinement before proceeding to a public hearing. She emphasized that the Commission should be fully confident in the ordinance language before presenting it to the public, so that feedback can be properly evaluated in context.

Mr. Passalacqua agreed that the K&S Engineers letter raised reasonable points and acknowledged that some aspects may benefit from additional research and potential edits before finalization.

Assistant City Manager Benson indicated that the increasing specificity of the draft ordinance is what is making the process more complex, noting that this level of detail is greater than what is typically addressed in other zoning regulations. He explained that staff has discussed internally how such an ordinance would function in practice and emphasized that in real-world application the City would likely need to rely on a third-party sound engineer, similar to how traffic studies are reviewed. He stated that despite efforts to refine the ordinance language, the true test of its effectiveness would come at the application stage when specific proposals are reviewed and evaluated.

Assistant City Manager Benson added that while he is not discouraging continued refinement of technical standards, there are limitations to how precisely every element can be defined in advance. He referenced learning about specialized acoustic measurement concepts during this process and noted that the Planning Commission's discretion in reviewing special land use applications provides an additional layer of flexibility. He suggested that while continued refinement of technical details is appropriate, the ordinance may not need to resolve every possible variable in advance. He also stated that if the Commission wishes to engage a dedicated noise engineering consultant to further evaluate the ordinance, that direction could be pursued.

Chairman Day stated that, given the complexity and limited internal expertise in acoustics, he would feel more comfortable having a professional noise engineer review the ordinance and provide an independent assessment. He supported sending the draft back for further drafting and refinement prior to a public hearing and reiterated his support for the 500-foot setback option.

Commissioner Grossi agreed with Vice Chair Tacy's position on setbacks and expressed concern that a 1,000-foot setback may be excessive. He noted that in the area west of Wixom and south of Maple, residential adjacency appears to be the primary constraint on where such facilities could be located.

Mr. Passalacqua responded that properties adjacent to residential zoning already eliminate a significant portion of potential sites, particularly near M-2 districts.

Commissioner Grossi then raised the issue of parcels north of Pontiac Trail, noting that some of those areas are also near residential uses.

Assistant City Manager Benson responded that those parcels are among the most unique considerations in the ordinance discussion and referenced that certain areas, such as Landrow, are already prohibited under existing parameters.

Vice Chair Tacy asked whether existing large facilities in the area, such as catering or similar operations, would fall under the proposed regulations.

Mr. Passalacqua sought clarification on whether her question related to support for or concern about the regulations.

Commissioner Grossi clarified that he does not support restricting data centers in the areas north of Pontiac Trail.

Mr. Passalacqua acknowledged the clarification and confirmed that Commissioner Grossi was expressing support for allowing data centers in those areas.

Mr. Passalacqua explained that the City's zoning approach is intended to avoid being exclusionary while still setting limits. He noted that Wixom has a relatively large amount

of industrially zoned land compared to many communities, meaning there are more potential sites for data centers as long as they meet setback and noise requirements. He said the proposed rules are mainly designed to protect nearby residential areas, while still leaving a meaningful amount of M-1, M-2, and IRO land available for consideration. He also stated that, in his view, excluding areas north of Pontiac Trail would not be overly restrictive given the amount of other industrial land available.

Assistant City Manager Benson suggested a simple way to write the rule, stating it could say that data centers cannot be located next to residential areas or on properties north of Pontiac Trail due to proximity concerns.

Mr. Passalacqua added that the setback rules are fundamentally based on protecting residential areas.

Vice Chair Tacy pointed out that this could be complicated because townhomes are planned south of Pontiac Trail, meaning residential uses exist on both sides.

Assistant City Manager Benson responded that the setback requirements would still apply regardless of location.

Commissioner Lada said that if the setback and noise standards are properly designed and enforced, it should not matter whether a data center is north or south of Pontiac Trail. He emphasized that both sides of the road include residential uses and that all residents are part of the same community. He stressed the importance of getting the standards correct from the start, especially because enforcement is often difficult once violations occur. He expressed concern that if the rules are not strong enough, nearby homeowners could be negatively affected long-term, including potential impacts on property values.

Commissioner Willett added that beyond property values, there are also safety considerations involved.

Commissioner Lada stated that he would not support reducing the setback below 500 feet unless there was strong supporting data to justify it.

Mr. Passalacqua acknowledged his concern, stating that compliance and enforcement are critical issues. He noted that if noise issues arise after approval, the City could require changes such as revised site plans, additional engineering, or sound mitigation measures like barriers or equipment relocation. He clarified that while enforcement tools exist, addressing problems after construction is more difficult than getting the standards right initially.

Assistant City Manager Benson said the ordinance does include penalties for non-compliance, such as fines and other enforcement actions, but noted that in practice these issues often end up being resolved through the courts. He added that once a use is established, it is typically difficult to reverse, regardless of the type of complaint.

Commissioner Lada stated that he is not opposed to data centers in general and understands their importance to modern technology.

Commissioner Dornan said that after reviewing the K&S Engineers letter, his first thought was to bring in an additional expert for review, although he also noted he is comfortable with the credentials of the professionals already involved. He explained that his main concerns relate to environmental impacts, vibration, and especially ambient noise, including low-frequency sound. He referenced personal experiences with traffic-related low-frequency noise and said he is sensitive to how such sounds travel and affect residents.

Commissioner Dornan stated that he believes the ordinance still needs additional work before being finalized, including adding sections such as decommissioning requirements, which he suggested reviewing from examples like Green Oak Township. He emphasized the need to produce a strong and complete ordinance rather than a partial or incomplete one.

Commissioner Willett made a brief technical correction, noting that a reference in the noise evaluation should be updated to reflect Oakland County rather than Washtenaw County. She also asked why the construction waste management requirement is set at a minimum of 50 percent and suggested it may need to be higher.

Mr. Passalacqua responded that the reference was carried over from source documents used in the draft ordinances provided for comparison.

Commissioner Willett confirmed she was referring to one of the draft examples included in the packet.

Mr. Passalacqua clarified that the draft ordinances were included only to provide reference examples of setback standards, not necessarily language to be copied directly. He apologized for any confusion and noted that the Green Oak example represented the most current publicly available draft at the time.

Mr. Passalacqua then stated that he would like to obtain clearer direction on certain key items so portions of the ordinance can be finalized. He said there appears to be general agreement, though not full consensus, around the 500-foot setback option.

Commissioner Dornan immediately disagreed that there was consensus.

Commissioner Willett asked the noise expert, Mr. Brown, whether there is a meaningful difference between 300- and 500-foot setbacks in terms of noise impact, particularly when considering IRO and M-1 zoning areas with existing background noise.

Mr. Brown explained that the question does not have a simple answer. He said that greater distance does allow sound to dissipate, but setbacks alone do not control noise

impacts. He emphasized that enforceable noise limits are the primary protection for residents. If those limits are met, the difference between 300 and 500 feet may be minimal in practice. He added that setbacks are still useful because they can reduce exposure and help ensure compliance, but they are not the controlling factor compared to the noise standards themselves.

Commissioner Dornan asked how noise measurements are actually taken.

Mr. Brown explained that noise can be measured in several ways, including on-site spot measurements and longer-term monitoring using instruments placed in the field. He noted that measurements must account for ambient sounds such as wind, wildlife, and traffic, and that professional analysis is often needed to separate background noise from the source being studied. He added that data collection can include unattended monitoring over multiple days, with audio triggers used to help identify specific noise sources. He emphasized that the process is technical and complex.

Vice Chair Tacy stated that it may be necessary to measure existing ambient noise levels before construction begins and then again after operations start in order to properly evaluate the actual impact of a facility.

Chairman Day stated that, based on the discussion, a majority of the Commission appears to support the 500-foot setback.

Assistant City Manager Benson clarified that the draft ordinance already requires a site-specific sound and vibration study as part of any application. He explained that this study must evaluate pre- and post-construction noise conditions, including all mechanical equipment and backup generators, meaning the Commission would still have detailed data available when reviewing any proposal.

Vice Chair Tacy responded that this would help establish baseline ambient noise levels in surrounding areas.

Mr. Passalacqua clarified that he was seeking direction from the Commission on specific items so staff could refine the draft ordinance. He emphasized that this meeting was not a public hearing or final decision point, but rather an opportunity to provide guidance so revisions could be tracked and incorporated into the next version of the draft. He also asked for clarification on whether the Commission supported including restrictions for parcels north of Pontiac Trail, based on earlier Council comments.

Vice Chair Tacy stated she did not support treating those parcels differently and believed they should be evaluated under the same standards as other properties.

Chairman Day agreed, stating that the ordinance and setbacks should be based on what is appropriate overall, not location-specific exclusions.

Commissioner Willett also agreed with that approach.

Commissioner Dornan stated that he believes it is reasonable to include a restriction on data centers north of Pontiac Trail.

Mr. Passalacqua acknowledged the difficulty of the topic and reminded the Commission that the City is operating under a six-month moratorium. He explained that the process still includes several steps, including potential public hearings and City Council review, and that while there is time to continue refining the ordinance, it is not unlimited.

Chairman Day asked if the Commission was ready to make a motion.

Commissioner Dornan said he was not ready and raised concerns about allowing data centers in the IRO district. He stated he does not believe data centers are appropriate in IRO zoning and argued there is sufficient industrial land elsewhere. He said he would support allowing them in M-1 only as a special land use and in M-2 by right. He also raised the issue of mobile home park (MHP) land, noting its large acreage and suggesting that the ordinance could include provisions allowing data centers near those areas with appropriate setbacks.

Mr. Passalacqua restated Dornan's position for clarity: not permitted in IRO, special land use in M-1, and permitted by right in M-2.

Commissioner Dornan confirmed and reiterated his suggestion that the ordinance be structured to allow minimal setbacks near MHP areas.

Assistant City Manager Benson pushed back, stating that mobile home parks are residential zoning districts and should not be treated differently from other residential areas. He said that any discussion about rezoning or special treatment for MHP properties should be handled separately and not incorporated into this ordinance. He advised against including such an exception in the draft. Commissioner Dornan responded that he expected that position.

Chairman Day said he disagreed with Commissioner Dornan regarding the IRO zoning district. He stated that he believes data centers are appropriate in IRO because it is an industrial research office designation and aligns well with that type of use. He supported allowing data centers in IRO as a special land use and expressed general support for treating them consistently as a special land use option where applicable. He also noted that, under state law, the City is required to have mobile home park zoning and reiterated that such areas are residential and must be treated the same as other residential properties in terms of setbacks.

Commissioner Grossi stated that noise impacts vary significantly depending on location, surrounding uses, and parcel characteristics. He emphasized that there is no single

consistent outcome because noise can travel differently based on site conditions and neighboring development.

Assistant City Manager Benson agreed and added that the way an applicant designs a site, including placement of generators, cooling equipment, and building orientation, can significantly affect noise impacts. He noted that since no specific application is currently before the Commission, each future proposal would need to be evaluated based on its individual design and conditions, which adds complexity to establishing rigid standards in advance.

Mr. Griffin added that each site has unique characteristics and that overly strict technical standards in the ordinance could unintentionally prevent applicants from even presenting projects for consideration. He explained that surrounding developments already have their own "noise profile," and that existing conditions may influence how impacts are perceived. He stated that new developments should be evaluated in context rather than solely through fixed assumptions in the ordinance. He also emphasized the importance of allowing applicants to present specific project designs so the Commission can evaluate them on a case-by-case basis, rather than having overly restrictive rules prevent proposals from moving forward.

**MOTION** made and seconded by Vice Chair Tacy and Commissioner Lada to direct staff to further research and revise the proposed zoning ordinance text amendments based on comments made during this evening's meeting including a 500 foot residential buffer and not differentiating north or south Pontiac Trail; including the reviewing the information received from K&S Engineering; and to further research the noise ordinance as it is written as well as potentially consult with an expert on what we have drafted and/or additional regulations as appropriate.

**Roll call vote:** **Ayes – Day, Grossi, Lada, Tacy, Willett**
**Nays - Dornan**

**Motion passed 5 - 1**

**VOTE: MOTION CARRIED**

Commissioner Dornan asked whether the Planning Commission and staff felt satisfied with all sections of the draft ordinance, including areas such as decommissioning requirements and bonding provisions.

Commissioner Lada responded that while he believes some sections could be improved, he feels the priority should be on establishing the key standards first, particularly noise and setback requirements, before refining other sections in more detail.

Commissioner Dornan stated that he wants to ensure the ordinance is complete and not missing important components such as cooling systems, backup battery requirements, and decommissioning standards.

Assistant City Manager Benson suggested a process improvement, offering that if Commissioners have specific concerns or proposed changes to particular sections of the ordinance, they could submit them directly to staff. He explained that they could then review those items, incorporate them into a memo, and bring them back for structured discussion in a future meeting. He emphasized that this would allow more efficient and focused review of specific ordinance sections.

Commissioner Dornan expressed concern about not wanting to appear as the sole author or driver of ordinance language.

Vice Chair Tacy suggested that if proposed changes are included in the meeting packet, the full Commission can review and discuss them together.

Mr. Passalacqua added a timing consideration, noting that the next meeting is in two weeks and the agenda packet is finalized one week in advance. He encouraged Commissioners to submit any significant input early so staff has sufficient time to review and incorporate it before public distribution.

Commissioner Lada asked when the six-month moratorium would expire. Assistant City Manager Benson responded that it expires in October.

Commissioner Lada then asked whether the goal would be to bring an initial version to City Council in June or July. Assistant City Manager Benson said July or August would be the latest timeframe.

Commissioner Lada noted that he expects City Council will likely have feedback and may send the ordinance back for revisions.

Commissioner Willett added that a public hearing should also be anticipated. She commented on decommissioning requirements, explaining that they are typically based on long-term project lifespans and must comply with multiple regulations beyond the City's ordinance, including state and federal environmental rules. She stated that while the City should require a standard decommissioning plan, many aspects of site restoration are governed by other agencies and requirements outside local control. She suggested that having a baseline plan in the ordinance may be sufficient.

Assistant City Manager Benson agreed and emphasized that the ordinance is designed to allow flexibility through the special land use process. He explained that Planning Commissioners will still have the ability to ask questions, request additional information, or table applications if needed. He reiterated that the ordinance is not intended to rush decisions, but to provide a framework while still preserving discretion during project

review. He noted that this flexibility is an important part of how future applications will be evaluated.

**New Business:**

1. **SITE PLAN REVIEW SPR26-002: SLIM CHICKENS, 50042 GRAND RIVER AVENUE, WIXOM, MI. 48393:** The applicant is seeking site plan approval to construct a 2,580 square foot fast food restaurant with drive through on the property located at 50042 Grand River Avenue. The parcel contains 1.34 acres and is currently a vacant Meijer out-lot, only having access along the internal Meijer drive. The site is zoned B-3 General Business and the Parcel Identification Number is 22-07-401-049.

Mr. Passalacqua explained that the applicant is proposing a fast-casual restaurant with a drive-through on a vacant Meijer out lot along Grand River Avenue. The site is zoned B-3 General Business and currently consists of excess parking and a greenbelt area. He noted that the development would remove some existing parking and modify the greenbelt to meet landscaping requirements.

He stated that the review found no issues with setbacks, building placement, or compliance with drive-through standards. He also noted no concerns with natural features or utility services, since the site is already developed. Regarding traffic, he explained that no new access points are proposed to Grand River Avenue, and all access would be through existing Meijer driveways. Based on industry trip generation data, the project is estimated to generate approximately 1,300 trips per day and about 120 trips during peak morning hours. However, after reviewing the applicant's own transaction data, staff concluded actual peak activity appears significantly lower, and therefore a full traffic study is not recommended.

Mr. Passalacqua noted that a waiver is being requested for required RV parking spaces, and staff had no objection, as those spaces would likely not be needed in this context.

For landscaping, the only outstanding issue is the lack of irrigation notes on the plans, which would need to be added as a condition of approval.

Regarding lighting, he indicated the plans may slightly exceed allowable light levels at the property line but believes this can be easily corrected through minor adjustments.

He added that signage will be handled administratively, though the applicant will need approval from the Zoning Board of Appeals for an additional wall sign.

Overall, he stated staff does not identify any major issues and supports conditional approval with the noted items addressed.

Chairman Day asked for clarification on the wall signage, noting that the applicant may actually be proposing two wall signs rather than one. Mr. Passalacqua explained that one feature may be a painted mural of the logo, while the other side includes standard "Slim Chickens" lettering. He added that the mural could potentially be considered a wall sign depending on how it meets the ordinance definition, and that if it is classified as a wall sign, it would require ZBA approval. He noted the Planning Commission could also help clarify the classification to ensure the correct approval path is followed.

Chairman Day stated that he does like the logo.

Commissioner Lada shifted the discussion to traffic circulation within the overall Meijer development. He described the site as having multiple uses, including a hotel, coffee shop, tire business, gas station, and the proposed restaurant, all sharing access within the same general area. He expressed concern that there does not appear to be a clear traffic flow plan and suggested that the overall site is experiencing self-created circulation issues.

Mr. Passalacqua responded that each out lot and development within the broader Meijer property is individually site planned and is responsible for its own internal circulation design.

Commissioner Lada asked who is responsible for the sale and development of the out lot, questioning whether it is Meijer or the incoming tenant.

Mr. Passalacqua responded that it is likely Meijer and indicated the applicant could confirm.

Commissioner Lada stated that he believes responsibility for the overall site layout and resulting traffic issues rests with Meijer as the original developer, rather than individual tenants, and expressed concern that dividing responsibility among separate users does not address the broader circulation challenges on the property.

Assistant City Manager Benson explained that part of the circulation issues stem from the fact that the out lots in the Meijer development are not fully built out. He pointed out that what appears to be a curved roadway is actually an access easement granted by Meijer to the out lots, which is intended to guide internal circulation along that edge of the site. He noted that while it may not be obvious on the plan, the intent is for that easement to function as a shared access drive, and that ultimately Meijer is responsible for the overall site layout and coordination.

Commissioner Lada responded that the layout is misleading and not clearly understandable from the plans. Assistant City Manager Benson agreed that the design can function differently in practice than it appears on paper and reiterated that Meijer is responsible for the overall development framework, even though individual out lots contribute to how it functions.

Commissioner Willett added that the internal lanes are designed with a mix of perpendicular and parallel traffic movements, requiring vehicles to yield at certain points where circulation patterns intersect.

Assistant City Manager Benson noted that this type of phased development often results in temporary or partial circulation patterns until all out lots are fully built out and the full design intent is realized.

Commissioner Lada expressed concern that the current setup lacks clear traffic control elements such as signage or yield markings and suggested that conditions may become more confusing as additional out lots develop further along the site.

Chairman Day commented that as more out lots are developed, the intended roadway pattern should become more apparent and functional.

Mr. Passalacqua noted that the applicant's plans likely include landscaped buffers and curved access features intended to guide circulation, consistent with the overall site design.

Chairman Day clarified that he does not believe the circulation issues are the responsibility of the current applicant.

Commissioner Lada agreed, stating he was simply raising the concern and not placing blame on the applicant, but reiterated that he believes circulation will become a larger issue over time.

Chairman Day emphasized again that the applicant should not be burdened with resolving broader site-wide circulation design issues.

Mr. Landon Brack, 3400 College Blvd., Leawood, Kansas, explained that the site's access and circulation are governed by a master development agreement with Meijer, including cross-access easements. He stated that Meijer manages the shared driveways and that the development pays an annual fee for maintenance of those drives. He noted that landscaping and green space is being added on both sides of the access drive, and that site improvements to internal islands are being made in coordination with Meijer's requirements to help better define circulation and reduce potential traffic confusion.

Mr. Brack added that as site plans are submitted to the City, they are also submitted to Meijer for review, and in some cases, Meijer has imposed stricter standards than the City to ensure consistent redevelopment across the site. He emphasized that their responsibility is limited to their specific out lot, while broader circulation improvements fall under Meijer's control as the master developer.

Assistant City Manager Benson asked whether any requests had been made for additional traffic control measures such as yield signage.

Mr. Brack responded that he would raise the issue with Meijer, noting that while the current property was purchased through a separate developer, final approval and coordination with Meijer is still required. He stated he would bring forward the Planning Commission's concerns regarding traffic flow and request consideration of additional signage and improvements to help clarify circulation.

Chairman Day added that signage and striping would be important components of improving clarity.

Mr. Passalacqua stated that, based on the staff report, he had prepared an amended motion option depending on the direction the Commission chooses to take.

**MOTION** made and seconded by Commissioner Willett and Commissioner Lada to approve **SITE PLAN REVIEW SPR26-002: SLIM CHICKENS, 50042 GRAND RIVER AVENUE, WIXOM, MI. 48393:** The applicant is seeking site plan approval to construct a 2,580 square foot fast food restaurant with drive through on the property located at 50042 Grand River Avenue. The parcel contains 1.34 acres and is currently a vacant Meijer out-lot, only having access along the internal Meijer drive. The site is zoned B-3 General Business, and the Parcel Identification Number is 22-07-401-049; with the following waivers and conditions:

1. That the Planning Commission waives the requirement for providing parking for two (2) recreational vehicles; and
2. That the Planning Commission determines the traffic study is not needed for the site plan; and
3. That any issues cited by the Fire Department, Engineering are addressed; shrubs shall be removed from the front of the snow storage area so that they will not be damaged by plows; and
4. That the installation of landscaping, irrigation, and illumination levels along the north and west property lines shall be reduced in accordance with the ordnance standards.

**VOTE:** **MOTION CARRIED**

**Call to the Public:**

No public comments.

**Staff Comments:**

Assistant City Manager Benson announced that there is a current need for members to serve on the Zoning Board of Appeals, including opportunities for dual membership, noting that the Board is currently needs additional members. He encouraged anyone interested, or who may know someone interested, to consider applying.

Assistant City Manager Benson also provided an update on upcoming matters, indicating that the next meeting is scheduled for May 4. He noted that the Astemo site plan is expected to come before the group in the near future, likely sooner rather than later.

**Planning Commission Comments:**

Commissioner Grossi raised a concern regarding road conditions, noting that Loon Lake Road was completed last year but a significant portion of the striping has already worn away. He commented that it is unusual to see pavement markings deteriorate so quickly.

Assistant City Manager Benson responded that he would follow up with the Department of Public Works to better understand the situation. He mentioned the possibility that the work may still be under warranty from the contractor and said he would look into that. He also noted that for this type of work, it is not uncommon to receive only one or two bids when projects are put out for bid, though he clarified that this is not his primary area of day-to-day responsibility. He reiterated that he would investigate the issue further.

Commissioner Willett shared that she and Commissioner Tacy recently participated in the Loop walk, noting that there are positive developments planned for the downtown area and around City Hall, with more updates expected in the future. She also expressed appreciation for the Commission's discussion on data centers, acknowledging that it is a complex topic with both positive and negative information circulating. She emphasized that continued conversation and increased understanding are beneficial.

Commissioner Lada stated that he would be remiss if he did not mention that the Wixom Community Foundation will host a road rally for charity on the last Saturday in July to raise scholarship funds for high school students and noted that registration is now open.

Commissioner Willett added that the DDA Derby Day races are scheduled for May 2 and mentioned that she plans to participate again this year.

Commissioner Lada also raised concerns about conditions at the Amazon site, specifically noting the presence of numerous unattached tractor trailers with open doors and scattered carts on the back lot. Benson responded that he had been informed of the situation by Mr. Passalacqua.

**ADJOURNMENT:**

This meeting of the Planning Commission was motioned and adjourned at 8:45 p.m.

Mona Freiburger
Recording Secretary