# EXHIBIT 20

**DRAFT**

**CITY OF WIXOM**
**49045 PONTIAC TRAIL**
**PLANNING COMMISSION MEETING**
**MONDAY, JUNE 1, 2026**

The meeting was called to order by Chairman Day of the Planning Commission at 7:00 p.m. at which time allegiance was pledged to the American flag.

**PRESENT:** William Day (Chairman), Cheryl Tacy, Michael Dornan, Todd Buck, Sandro Grossi, Vanessa Willett and Mark Lada
**ABSENT:** None
**OTHERS:** Matteo Passalacqua (Carlisle Wortman Associates) [City Planner], Drew Benson (Assistant City Manager) and Nancy Fisher (Recording Secretary)

**Determination of a Quorum:**
A quorum of the Planning Commission was present for this meeting.

**Agenda:**
No additions or changes were made to the agenda.

**Approval of the May 18, 2026 Planning Commission Meeting Minutes:**
**MOTION** and seconded by Commissioners Dornan and Lada to approve the May 18, 2026 Planning Commission Meeting Minutes.

**VOTE:** **MOTION CARRIED**

**Correspondence:**
1. City Manager Report – May 12, 2026
2. City Manager Report – May 19, 2026

**Call to the Public:**
Dennis Griffin, West Industrial One, LLC, 2300 Burdette, Ferndale. Earlier today he sent a letter to the Planning Commissioners regarding the draft Data Center Ordinance. He appreciates the last meeting, being on the same team and the City hiring a sound engineer; Soundscape is great. The more he learns the better a developer he becomes. He appreciates the City making the nuanced change to allow emergency use of generators. Soundscape wants a reasonable Ordinance. He would like to point out two things: they equate it to a suburban neighborhood which is north of Pontiac Trail. His area is not a suburban neighborhood. Soundscape wants to simplify the Ordinance to stay away from Hertz (Hz) measurements so there is a bit of a contradiction. There is a tonal penalty which is complex but it goes through a Hertz measurement. He wants to hear from the sound engineer regarding 10 decibels across the board which is a 50-90 percent noise reduction which is massive. The measurements in the table could probably never be realistically met. The Ordinance moves toward additional responsibilities for data centers to prove that they have power. They have an agreement with DTE and are eager to share when the time is right. They will not abuse water. They understand the basis of it. The decommissioning plan is more detailed than a traditional user coming into IRO, M-1 or M-2. There is a higher burden on them regarding noise limits which is hard for him to reconcile. However, how can they be quieter than those around them? When they are up and running and if they do a static test, someone can be louder although they have permissive rights and in perpetuity to

have louder conditional noise; i.e., DBA DBC, than him. That defeats the purpose. The fair position is to have higher standards on a setback adjacent to residential but they should be the same standards for noise levels. It's like Minority Report 2—they are guilty already. The noise ordinance should withstand scrutiny and be fair and equal. A 500-foot setback is larger than for other Ordinance setbacks; it is usually 300 feet across the board. The way the Ordinance reads now is very prescriptive. It is denied since there is no mechanism for discussion. Their residential is not under construction. They have not yet pulled a permit. Here are some of what are its immediate adjacencies:

- Pontiac Trail is 500 feet
- 200 feet north is AFC Holcroft
- 700 feet north is Korex
- 500 feet northwest is medical
- 100 feet south is the truck parking club
- 325 feet to the east is Old Wixom Road
- 275 feet south is Vestis
- 450 feet west is a vacant building with heavy power and cranes

Any of these could produce more noise than they are regulated for. The tonal noise and disruptive noises can come from anywhere. At Vestex and Korex it is not quiet by any stretch. However, data centers are being asked to be quiet and silent. That is out of balance. They should offer up the tonal changes (VFD's, different fans and lubers). No one else has a tonality requirement. They can get ahead of it by having Soundscape look at the difference between a carrier direct drive vs. a different type of carrier. He wants to close a project here and he wants it to be the right project. That is the way to approach tonality—getting ahead of it. They have not been able to share a site plan. More distance gives you more relief. M-1 has a 40-foot limit. IRO with a setback can go to 115 feet. M-2 starts at 60 feet. Perhaps an M-1 for his site and others if they voluntarily move back to 750, they could have 4. They would move it back 250 feet, have a taller building, they can put generators behind it and now they can work together. They can keep more green space on it. He can tell them the Hertz measurements. It does not say who gets to decide to read it.

Chairman Day interrupted Mr. Griffin to inform him that he had exceeded his allotted 5-minute speaking limit.

**New Business:**

1. **PUBLIC HEARING FOR SPECIAL LAND USE SLU #26-002: 30517 ANDERSEN COURT, WIXOM, MI 48393**: The applicant is seeking a special land use approval to operate an existing facility as a truck, automobile and equipment sales, rentals, storage, repair and towing service business in the M-1 district under **Section 18.09.020**, Schedule of Uses. The application states the site is to be used as a repair facility with little to no sales or rental activity. The parcel is zoned M-1, Light Industrial and the parcel number is 22-05-276-005.

Mr. Passalacqua displayed up a Google area map depicting the site. It involves an application for special land use to utilize an existing warehouse building. This site was developed in 1989. Trucks, automobiles and equipment sales are special land uses in the M-1 district. No outdoor storage is proposed. Since it is a special land use, all activity will take place indoors. If needed, the applicant will have to come back before the Planning Commission. The vehicles in process will be kept inside the building. Their regular business hours are 7 a.m. to 7 p.m. although the days of the week were not specified and they have asked the applicant to specify that. The Planning Commission has discretion over what standards should be brought into greater compliance and what can be waived. The Site is zoned M-1 and is designated as Light Industrial. The building and the parking lot are existing. No modifications are proposed to the building or the lot. There may be some existing non-conformities. There are no wetlands. No tree removal is proposed but they may want to expand the parking lot in the future. There are discrepancies between the initial information

provided and what is onsite. The site will need 27-28 parking spots. They have 29. The parking lot needs to be restriped but the existing parking should be adequate. They may expand the parking to the south at some point which would require approval. There is a truck loading zone on the east side of the building. There is a shared driveway off Andersen Court which is a private road. No circulation plan was provided. Installation of a sidewalk along Andersen Court is not required. No landscaping plan was provided. Some mature trees could be counted toward the greenbelt requirement. It would probably only require the planting of a few more trees. There are no buffer landscaping requirements. They need two parking lot trees and 200 square feet of buffer landscaping. They need one parking lot island and one tree although the Planning Commission can waive that. They do have existing rooftop mechanical equipment that does not have screening and that is typically required. There is a dumpster enclosure in the rear yard. He did a site inspection on May 20th. The enclosures seem fine. It would just require a functional gate which should be part of a conditional approval. No lighting plan was provided although they did provide a basic plot plan of the property and floor plans. Technically the architectural standards do not apply. There are some rust/hard water stains on the facades which could benefit from some attention (put a fresh coat of paint on it or powerwash it). There are no specific special land use standards; just the general standards apply. The site is designated as Light Industrial on the Future Master Plan. The proposed use fits within the M-1 district. It is compatible with neighboring uses. There were no concerns by the City's public safety departments. If everything takes place indoors, they do not anticipate issues with neighboring properties. He reviewed what needs to be clarified/areas areas of concern. Waivers to consider when making a motion:

- Consider mature trees present along Andersen Court and require the planting of supplemental trees to meet the greenbelt requirement
- Installation of a parking lot island with a tree in it
- Additional landscaping around the existing trash enclosure
- Whether or not to require rooftop screening

Commissioner Dornan noted that Mr. Passlacqua's summary noted that it would be the same. As an umbrella comment, he has noticed that many recent meetings have had the Commissioners considering special land use approvals. Based on the sheer number of them, should they be re-examining the Ordinance? Is something wrong with the Ordinance? Should we fix it or maintain its flexibility? Mr. Benson noted that they have had four or five businesses come in every month. The Planning Commissioners see a lot of automotive repair which is the most common. He does not see it as a problem as much as a consistent pattern of types of uses. However, it might be a good idea to review for industrial uses.

Commissioner Tacy noted that a landscaping plan was provided. Could the Commissioners have requested a landscaping plan so they would know if they wanted to waive it or request a waiver? Mr. Passalacqua noted that with what was currently onsite and what they were proposing, two to three more trees would have made them compliant. Other uses have more strenuous standards. In the M-1 district, there are not as many standards so he made a judgment call on that. Commissioner Tacy wants to know ahead of time what waivers there will be.

Commissioner Tacy noted that the applicant anticipates five to seven bays. However, she does not see how that can be accomplished on the interior. Mr. Passlacqua noted that the applicant can address this.

Ryan Silsbee, 30517 Anderson Court, Wixom. His hours of operation will be Monday through Friday 7 a.m. to 7 p.m. They are happy to comply with the landscaping requirements. Commissioner Tacy noted that if he is willing to comply the Commissioners do not have to consider the landscaping waiver. Chairman Day said that he would like to waive the requirement for additional landscaping and the trash enclosure. Commissioner Lada inquired about the parking lot island and the tree. Mr. Passalacqua noted that the Commissioners can deny the waiver for the greenbelt and approve the waiver for landscaping around the

dumpster and the parking lot. Chairman Day noted that there is not a formal waiver request and that they can just waive the requirement for the parking lot island and the landscaping requirements.

Commissioner Grossi noted that he drove by the site and he thinks the landscaping is sufficient along the greenbelt. He does not see a need to address the trees. Mr. Passalacqua noted that it would amount to six canopy trees, six ornamentals and 30 shrubs. However, there are some existing and so they can be counted and they would then install the difference.

Commissioner Willett, piggybacking on the other Commissioner's comments regarding the bay capacity, noted that there was a previous issue with an automotive repair shop in the City. What is the need to expand the parking lot in the future if they are not storing vehicles outside? Can they manage in that size building between the towing capacity and car repair while not storing them outside? This was a problem with another automotive repair shop. With traffic flow, they have two rollup doors total. Moving cars around will be tough as well as not storing them outside overnight. The applicant said he will have five to seven tractors per day on average and potentially one trailer. It is about twice the size of a heavy-duty repair garage so they can store multiple trailers and tractors in the business at one time. Commissioner Willett inquired about the capacity for towing. The applicant noted that they have multiple locations throughout metro Detroit. This is their sixth location.

Commissioner Tacy noted that this is a great opportunity to bring the rooftop mechanical screening into greater conformity. Commissioner Willett inquired whether the roof will require replacement. The applicant said that he does not know. Chairman Day said that would be a landlord problem. Commissioner Willett noted that she is okay with the rooftop screening.

Commissioner Tacy asked whether the applicant could apply a fresh coat of exterior paint. The applicant said that is fine.

Chairman Day said that he has no problem with the special land use and that it will be great to have the building occupied. Commissioner Lada confirmed that requiring a functional gate will be a condition of any approval tonight.

Commissioner Lada asked whether the tractors are industrial or agricultural. The applicant said that they are industrial.

**Call to the Public:**
There were no comments made by the public.

**MOTION** and seconded by Commissioners Tacy and Lada to approve SLU #26-002's request for special land use approval to operate an existing facility as a truck, automobile and equipment sales, rentals, storage, repair and towing service business. The parcel is zoned M-1, Light Industrial, and the parcel number is 22-05-276-005. This approval is conditioned upon:

1. Any issues cited by the City Engineer are addressed;
2. Any issues cited by Public Safety are addressed;
3. Days of operation are clarified to be Monday through Friday;
4. The parking lot shall be striped to confirm that the parking counts and aisles meet driving standards;
5. Dimensions shall be added to the truck well and to the outside overhead doors to confirm compliance with the 10-foot by 50-foot requirement;

6. The existing trash enclosure shall have a functional gate constructed of wood or other high-quality material installed;
7. A fresh coat of paint or cleaning will be installed to address discoloration on the building facades;
8. The installation of trees and shrubs to be compliant with Andersen Court greenbelt requirements which has been waived;
9. The installation of one tree and one parking lot island to meet the interior parking lot landscaping requirement has been waived;
10. The installation of supplemental landscaping around the existing trash enclosure has been waived;
11. Rooftop screening must be installed to all existing rooftop mechanical equipment as outlined in Section 18.16.040.

**VOTE: MOTION CARRIED**

**Unfinished Business:**

1. **Consideration of Revised Draft Zoning Ordinance Text Amendments to Address Data Center Definitions, Permissibility and Performance Standards.**

Mr. Passalacqua noted that there are two considerations for the Planning Commission tonight regarding data centers: 1) reviewing the sound engineer's report; 2) determining an appropriate time to schedule a public hearing for the Data Center Ordinance which ties into the Master Plan. During the April 26, 2026 meeting regarding the data center, the Planning Commission accepted all the redlines in the March 30, 2026 draft with the exception of the noise and vibration impact study. The Planning Commission also determined that a 500-foot buffer setback would be used for mechanical equipment or structures from residentially owned or used properties. After public comment, the Planning Commission directed the staff to contract with an independent sound engineer to assist in writing the noise and vibration part of the Data Center Ordinance and Soundscape was selected. They operate in Virginia within what is considered Data Center Alley. The data provided by Soundscape are contained within the Commissioners' meeting package. Once the draft Data Center Ordinance is finalized, the Planning Commission will hold a public hearing. The breadth of any changes will determine whether a second public hearing is needed. Then it goes to City Council which can eventually involve a second reading which is kind of an unofficial approval or it could be sent back to the Planning Commission with comments and recommendations. The next available dates for a public hearing are July 6th, July 20th, August 15th or a specially scheduled meeting.

Nathan Sevener, Soundscape Engineering, LLC, 7029 W. Ann Arbor Trail, Plymouth. Soundscape was asked to review a draft noise ordinance and make recommendations. He admits that there are challenges with data centers since they house servers to power the Internet, cloud computing and artificial intelligence (AI). They run 24/7 365 days a year and are always on. Most of the noise comes from the cooling equipment, power generators and power backup. Some of the equipment can be tonal but it is not necessarily all tonal. This has to be considered during the design phase. There are different types of cooling equipment. Some can produce tonal noise and some can produce low frequency noise. The existing Ordinance has a 60 DB limit 75 DB for M-1 and M-2 but 60 DB for everything else. They tried to incorporate consideration of day and nighttime sound levels and limits at or beyond the property line. A noise level can be met at the property line where the source is located but not met beyond that. One common possibility is to put up a noise barrier wall; however, you can have a diminishing benefit the more you move beyond that wall. You want to measure where the receiving property is. That is something he changed in the Ordinance. He put a DBC limit to help control low frequency noise. The existing Ordinance does not specify whether it is A weighted or C weighted. Most ordinances have an A weighted limit. There is a 500-foot recommended setback that was not his figure but which is common in other ordinances. He incorporated three parts to demonstrate that the noise ordinance is being met and can be met: 1) showing

feasibility at the land use approval stage; 2) once it is designed, you update your predictions as the developer and show that with the noise control you have selected, your predictions will meet the Ordinance; 3) measuring noise levels at the time of the Certificate of Occupancy.

Routine generator testing which has to happen is covered by the limits in the Ordinance but is limited to 9 to 5 weekdays and excluding holidays. That means they cycle through generators when testing. They do not turn them on at the same time because it becomes hard to meet the Ordinance. Generators are proposed to be exempt when being used during a utility power outage. They have put two options into this Ordinance for discussion: 1) 60 DBA daytime limit; 2) 50 DBA nighttime limit. A weighted means A weighted decibels. It is the most common and is used most frequently in environmental ordinances. C weighted means C weighted decibels. Medium frequency sound is usually human voices. High frequency sound is usually crickets or birds. Our ears do not hear all sounds equally well. They do hear human speech frequency as well. They do not hear low frequency and high frequency well, but especially low frequency. Sound that is measured at the low frequencies are discounted by the A weighted curve to better represent what we hear. The C weighted curve is less weighted and they are using it here to limit low frequency sound. It does not discount the low frequency sound assumption. If they do not limit low frequency, they do not know what frequency spectrum they will eventually have. If you happen to have all your noise at the low frequency, the DBA limit could not be exceeded but it could still be exceeded. If the spectrum is flat, you would have a number that would work but that is often not the case. The other approach to handling low frequency is to get more detailed with the measurements. Some ordinances do this but most local ones do not. You would measure every octave band but that is much more detailed. Most sound engineers measure A and C weighted levels. It becomes difficult to validate when you are measuring the octave bands. The DC developer and the sound engineer will have the octave band in order to do the predictions. Low frequency sound travels farther. You can get farther from it and still hear it. There are two options: 1) 60 DBA daytime; 2) 50 DBA nighttime for residential. 60 DBA daytime matches up with the existing Ordinance that is not data center specific. The 60 and 55 DBA for daytime limits are very common. The 10 DB penalty for tonality is not as common.

Commissioner Willett noted that it looks like Option No. 2 does not take into account the extra 5 DB in the penalty. So is Option No. 1 a wash because they are giving them an extra 5? Mr. Sevener said yes but noted that would only happen if there is a tonal noise.

Commissioner Dornan noted that we have been studying this issue for six months now (since November 2025) and that he has learned a lot from the point where they started. However, with 24/7 operations, this presents a unique impact on the neighborhood and the larger community. He takes that very, very seriously. It is a voracious water user, energy user and sound producer. He has looked at various communities over the past 6 months and even over the past two decades. It appears to him that setback creep is occurring (the setbacks are becoming higher and higher; i.e., they have gone from 300 feet to 500 feet). He noted that the community of Dowagiac has recently filed a class action lawsuit. He believes Mr. Severen on the 55 DB and noted that his letter was well done. He has a lot to say later on about the table that was presented tonight.

Commissioner Lada asked whether the tonality issue is intermittent. Mr. Severen said that it is not necessarily. It would likely be emanated from outdoor air-cooled chillers. Some are notorious for that and will be running constantly. The American National Standards Institute (ANSI) produces standards for sound measurement and noise. They consider 60 DBA to be marginally compatible for a suburban residential environment and 55 DBA is compatible with a suburban residential environment. He summarized some noise ordinances from Virginia that would not work and some that secured a good Ordinance but did not wind up using it. He showed measurements from other states (Virginia, Illinois, etc.). Some have even higher limits. Some ordinances have a tonality penalty and some do not. What he

showed are Michigan ordinances; however, those ordinances are not specific to data centers. None of them have a 10 DB tonality penalty but some have a 5 DB penalty.

Commissioner Dornan noted that Kalamazoo, Dearborn and Canton are all within Wixom's sphere of influence and that there is quite a range between the DBA limits. Chairman Day and Mr. Severen noted that the Ordinances are not data center specific.

Mr. Severen noted that what penalty to apply just depends on how tonal something is. It is a case of knowing it when you hear it. You usually hear it before you even measure it. Typically when there is a tone, it is pretty obvious because it is irritating. Chillers can be offenders. That is why he suggests a 10 DB penalty. Commissioner Lada asked whether Mr. Severen's recommendation for the 10 DB tonal penalty is for 55 to 70. Mr. Severen said if he was starting fresh with an Ordinance, he would recommend 55 for daytime and 45 for nighttime. It is a balance of how much noise control you want. From a resident's perspective, you would put the 10 DB penalty on top of that. The State of Illinois uses a 10 DB penalty statewide. He is presenting this for the Planning Commission's consideration. Or do you make it more restrictive with a tonal penalty? Mr. Benson said for them you distinguish between a 5 and 10 DB penalty. Commissioner Lada sought to confirm that they are only talking about proximity of sound to residential. Mr. Benson said no, this is in general. Commissioner Lada asked what if they built it way back behind Renaissance Logistics. Chairman Day noted it would be the receiving property. Mr. Severen said this applies to noise transmitted to residential properties. He referred to Section 2(H) of the noise ordinance and the table on the bottom of page 2. That applies as measured at the nearest residential use. Commissioner Lada asked what if you are a mile out from residential. Mr. Severen said that would revert to the Commercial (60 and 75 DB). Commissioner Willett said if the tonal noise travels past a wall, how can you determine where the noise is coming from and how does anybody ever meet that standard? Mr. Severen said that you cross over and see if that tone is coming from there. That is where it starts. The character of the sound will be the same. Commissioner Tacy said that they make them do a baseline measurement. Commissioner Willett said that they could have generators clicking on at any time. Who pays for the test? She assumes it is the applicant. Mr. Benson said it is the applicant; it is charged against the developer's escrow.

Commissioner Tacy has a question regarding the backup power and fuel storage regarding temporary use during utility power emergencies. She would like some definition around what is considered 'temporary'. If the grid goes down, what are they anticipating with all those generators running and the sound? Do the limits apply during that time? Commissioner Willett and Chairman Day noted that you cannot limit the use of generators if the power/grid goes down. Commissioner Dornan noted that they could insert language regarding battery backup; i.e., solar and being part of the project to limit the use of resources.

Commissioner Lada asked whether the Option 2 standards (55/45 DB with a 10 DB tonality penalty) are an achievable metric. Mr. Severen said that there are other data centers going into other municipalities that have been able to achieve levels similar to that with the 10 DB penalty. With 55, except for the backup generator testing, 55 will not apply because most of the equipment will be running in the middle of the night. They have to design it to meet it at night. He was careful with the wording about exempting the emergency generator noise. He noted that data center sizes can vary. There is a large data center in Illinois and they ran on emergency generators for over a year. When it was designed, they did not do any noise control. There were many complaints. They had an internal issue with their power. It was not a utility outage. Commissioner Willett noted that was a really early data center and they know better now. Commissioner Lada noted that there is a lot of noise generated during the daytime by the air conditioners. Mr. Severen said that is actually generated by the processors which run 24 hours a day. The reason they need so much cooling is not from the sun but because the equipment inside needs to be cooled. Commissioner Lada asked whether any data centers are using geothermal as opposed to rooftop air conditioning. Mr. Severen said that they are not although some use different cooling mechanisms. Some

have cooling towers. Out West they have power generation onsite rather than trying to pull power from the grid. He has not come across that in the Midwest though; they pull power from the grid and use backup generators. Commissioner Dornan asked about looped water systems. He noted that closed loop is an Ordinance requirement. Mr. Severen said that is outside his wheelhouse.

Mr. Griffin of Wixom Industrial One, LLC noted the baseline ambient component and asked about the purpose for that. Mr. Severen noted that whether or not people are bothered by noise depends on how much noise there is. A suburban environment is different than an urban environment so ambient noise does matter. That is not the reason for the measurement. It is to find out what baseline noise level is before the data center is turned on so you can tell what comes from the data center. In some ways, it is to protect the developer. That is why you want to measure it before the data center is operational.

Commissioner Tacy noted that over the weekend she ran across an article regarding generators in the Virginia data centers. Is air quality regulated by the State; i.e., EGLE? Does air quality need to be addressed in the City's Ordinance? Mr. Benson noted that air quality is regulated by EGLE. He has to check whether this applies to temporary generators. He will get back with the Commissioners regarding this.

Chairman Day noted that he has a problem with establishing different noise levels for data centers than for other uses. Commissioner Dornan noted that those are not the same thing; they are two different animals. Commissioner Lada said that the only thing that should change your mind is getting new information and we have new information. As those companies that are grandfathered in change over, they would have to conform. Chairman Day said that he would recommend that the Ordinance is changed for everyone to be 55 DB and 10 DB for the tonal penalty. Mr. Passalacqua said that he would have to figure out the mechanics of how that would work. Commissioner Lada noted that this can move forward as long as the other one is in progress. The end goal is consistency across the board. He does not want to hold up the Data Center Ordinance. Commissioner Dornan does not believe they should be stuck to a calendar. They should request City Council to extend the moratorium. Chairman Day and Commissioner Lada noted that noise was the last hurdle. Commissioner Dornan stated the Wixom Industrial One, LLC mentioned an incentive for development was a function of height vs. distance; i.e., allowing a building to go to a second floor, believing that the taller a building is the more it blocks the noise. They are offering 750 feet. Commissioner Dornan believes that setback should be 1,500 feet which falls in line with setback creep. Chairman Day does not have a problem with the 500-foot setback as long as they have a noise ordinance. He is comfortable moving ahead with the adjustments to 55 DBA, (Option 2) and the Residential column contained on page 2. Commissioner Lada confirmed that the next step is a Planning Commission public hearing.

Commissioner Dornan noted that the whole topic of decommissioning is left hanging. It was covered in two sentences. He wants more detail along with a performance bond up front. He asked if data centers were a national security issue or a fad since they are going up everywhere. It needs to be completely packaged before a public hearing. Commissioner Willett noted that you cannot predict what will be needed in 20-25 years' time. There is a big difference between decommissioning and demolishing the building. The language says they have to return the property to its historical condition (restoration). Commissioner Lada asked whether there are any hazardous materials in data centers. Mr. Passalacqua said perhaps only some server components and only then under deterioration. He noted that in the beginning they were worried about storage of the diesel fuels but now they use a drop-in unit. Mr. Benson noted that they have an opportunity to critique the plans that the City receives.

Commissioner Lada noted that there must be some oversight of this. Mr. Benson noted that there are previous chrome plating facilities within the City that are now reoccupied. The problem with performance bonds is the consistency of application. It is very similar to Renaissance Global Logistics. They are looking at reoccupancy.

Commissioner Lada confirmed with Mr. Benson that the use of generators is only done during power outages. Chairman Day said that is something that they have control over. He is satisfied with the language that is there. The consensus seems to be to get this in shape for a public hearing although he will not be at the July 5th meeting. Commissioner Lada said that it is probably best to avoid scheduling a public hearing so close to a major holiday that often involves travel. Chairman Day suggested scheduling it for July 20th.

Commissioner Dornan noted that regarding the IRO, a Japanese company developed it under IRO. He does not want to see a neutered development by a data center cooking the land underneath it instead of it being potentially used by another business. He noted that data centers do not employ a lot of people outside the initial construction phase. Mr. Benson stated that they do not know how data centers are going to play out and that Oakland University is planning one. The City does have some acreage although it is located far from residential. Many IRO's are industrial in nature. He does not anticipate a 20,000-square foot data center proposal.

**MOTION** and seconded by Commissioners Willett and Grossi to recommend that Staff schedule a public hearing for July 20, 2026 to consider the text amendments and the Zoning Ordinance Sections 18.24.030(C)-(D), 18.08.020 and 18.09.020 and the addition of Section 18.08.040(H) and 18.09.040(N) referencing Option 2 compatible with Residential regarding data center regulation.

**VOTE: MOTION CARRIED**

2. **<u>2026 Master Plan Revisions – Next Steps Discussion</u>**:

Mr. Passalacqua noted that they are nearing the end of the 63-day review period on June 23rd. They have contacted the County and expect to receive feedback. After the Planning Commission holds a public hearing, they can: 1) send it to City Council as is; 2) approve the plan with minor amendments to go to City Council; 3) or if there are major amendments, it comes back to the Planning Commission. During the April 14, 2026 regular meeting, City Council had a very positive reception to the proposed Master Plan and proposed minor edits which have been provided in redline format to the Planning Commissioners.

You cannot have a residential use on the first floor in the VCAC. Mr. Benson said it is text that would amend the Ordinance for PUD applications as opposed to requiring something by right. Commissioner Tacy confirmed that would not be true along Pontiac Trail. Both Chairman Day and Commissioner Tacy want a strict prohibition on that. Mr. Passalacqua noted that if there is a 250,000-square foot building, they could get to a 5-story building. It is a maximum of 5 with a setback after the second. Mr. Benson noted that they are not beholden to that standard since none of the sites are that large. City Council wanted some clarification.

Chairman Day inquired about the setback. Mr. Passalacqua stated that they could step back to where the covered parking is. Those numbers are not concrete. It is more of an approximate square footage. Commissioner Tacy confirmed that they have to meet both of those standards. Mr. Benson noted that it is more illustrative of what is meant.

Mr. Passlacqua noted that edits that come out of this evening will be incorporated into the draft that will be presented at the public hearing. When do the Commissioners want to schedule the public hearing? Mr. Benson noted that the City observes the July 4th holiday on the 2nd.

**MOTION** and seconded by Commissioners Tacy and Grossi to accept the proposed changes to the Master Plan revisions with the exception of the word 'preferably' as it pertains to development along Pontiac Trail and specifically those residential options of removing it from the dense VCA buildout.

**VOTE: MOTION CARRIED**

**MOTION** and seconded by Commissioners Grossi and Tacy to schedule a public hearing for August 5, 2026 to review the proposed Master Plan.

**VOTE: MOTION CARRIED**

**Call to the Public:**
There were no comments made by the public.

**Staff Comments:**
Mr. Benson noted that the City's staff and volunteer appreciation picnic is scheduled for June 4th. He hopes that the Commissioners can attend.

Mr. Benson noted that the next meetings for the 300 Landrow Development have not been scheduled although it may come back to the Commissioners for the June 15th meeting. They will try to keep the July 6th meeting clear or possibly July 20th.

**Commission Comments:**
Chairman Day complimented Staff on the work that was done regarding the data center sound/noise issue. Mr. Passalacqua said that he appreciates the Commissioners' input.

Commissioner Lada noted that the Wixom Community Foundation will be holding a road rally that explores various spots in the City the last Saturday in July. He encouraged everyone to consider participating.

Commissioner Lada asked whether things were taken into consideration when the traffic study for the Amazon facility was undertaken. It is virtually a crashup derby where private couriers (not Amazon trucks) are running the traffic lights there. Mr. Benson noted that the traffic study did account for it being a Last Mile delivery facility. It has not exceeded the original threshold. Commissioner Lada noted that it is the responsibility of the contracted drivers themselves.

**ADJOURNMENT:**
This meeting of the Planning Commission was motioned and adjourned at 9:12 p.m.

Nancy Fisher
Recording Secretary