# EXHIBIT 26

much noise and uh data that they need to use depends upon if they're true data centers or if there are like the Bitcoin type. Um and then the next question is one minute. Thank you. Um, with all the data centers that are going up, I have a we have over 5,000 already in the US and other countries there are only ranging about 400 to 500. When is the bubble going to burst? When are they going to build so many that they can't even sustain the amount of money that it takes to keep these going and to keep their to keep their business going? And with the sub pumpers, our township with the water going uphill, as one of our um businesses said, we have sump pumps right down in downtown Wixom that anything gets in our water system, it's going to end up in our homes in our breathing air. When that sub comes up, 15 seconds. Um, and also the noise noise ordinance 900 pm is ridiculous because we are out spending time with our families downtown enjoying the local stores and the businesses, spending time outside. That loud noise is going to interrupt your business. Thank you.

1:35:55
At the second call to the public, you came. At the second call to the public. Is there anybody else for the first call to the public? Last call. I'm going to close. First call to the public. Thank you for your comments. We'll move on.

(Council moves on to other business)

* * *

(Back to data center issues – first reading of ordinance revision)

1:56:26
That concludes the unfinished business portion of tonight's meeting. We'll move on to new business number one. New business number one is the introduction and first reading of an ordinance to amend the Wixom code of ordinances title 18 amends section 18.01 industrial districts section 18.09.020-m2 zoning districts amend section 18.09.04 04 standards applicable to specific uses to provide specific standards for data center uses in the M1 and M2 zoning districts and amend section 18.24.030 to provide definitions for data centers. Do I have a motion? So move. Assistant city manager Benson.

1:57:15
Thank you, Mayor. Good evening, members of city council and members of the public who have joined us tonight. Uh we do have a little presentation for this agenda item as opposed to just verbal. Um this is a similar presentation as what was given at the planning commission meeting. So I do apologize for anyone who is in the audience at that meeting. You'll get the opportunity to see this twice. But for the purposes of you know how important this discussion is. We felt that um you know really walking through what's proposed by from the planning commission is is pretty important here. So, uh, myself and our planning consultant, Matteo Posalak, will kind of walk through it and then, uh, it'll be the opportunity for you all to discuss what you see, discuss any proposed amendments or modifications or what your desired next steps look like. Um, so with that in mind, uh, as you know, as city council, uh, you all directed staff and the planning commission to begin investigating, uh, ordinance amendments to specifically regulate data centers back on November 18th, 2025. And on March 24th, 2026, you approved a resolution imposing a temporary moratorum

uh for a period of six months on the establishing, consideration, permitting, uh approval, location or installation of any data centers in the city. So that's just the you know the the context behind you know what brings us to these ordinance amendments tonight.

Um since that original motion, the planning commission has met uh what nine total times now u you know approximately once a month working on you know what what is the scope of these ordinance amendments uh researching different aspects of uh what other communities do for regulating data centers and trying to understand the use better to then make a recommendation to the city council. Can I interrupt for what is there any chance of turning that screen more to the audience? I see some people trying to read it but thank you. Um so this uh this whole process concluded with a public hearing uh which is the first step of the required steps for an ordinance amendment to uh move forward for city council. A public hearing must be held where planning commission makes the recommendation to you all and then you all hold a first reading. Um if you like the language or modify it to a degree that you do like it then you hold a second reading and adoption.

1:59:28
Um just to give kind of the the overarching context for Wixom u Wixom is one of the larger commercial and industrial communities in Metro Detroit and we do maintain a significant amount of uh industrially zoned property. Most of which is M1 light industrial um and a couple parcels are M2. Uh the city purchases this water from the Great Lakes Water Authority and we are not on a community well system. Um I know that's a that's a key kind of consideration and just an important um you know underlying factor to point out. We also operate our own wastewater treatment facility although there are limits on our capacity on both the water and uh wastewater sides of things. Um and we're served by DTE for electricity um and consumers for natural gas as a whole. There are a variety of types and sizes of data centers. They are not all the same. The most, you know, common ones that are referenced are, you know, the the uh hypers scale ones like what we see in Selen, uh what's proposed in Lion Township. Uh the reality is is that there are also much smaller ones. Um but as a whole, they are relatively new, especially in the size and scope that we are now discussing here, which is one of the key reasons why a new definition um is recommended to you all.

As a whole without understanding the individual context of any individual proposal, it is very difficult to say whether we have the infrastructure or uh DTE does or any other entity whether we could actually support one or not. We simply do not know. Um when we talk about creating zoning ordinance regulations, it's important to remember that the zoning ordinance uh text that is put in place regulates the use for every situation and every context in the city. Uh so whether it's a reoccupancy of an existing building or whether it's a request to build a new facility, you know, the set of standards that are adopted by the city apply to all of those uses. Um again, whether big, whether small, whether whatever. Uh, another thing, and it's was pointed out by a couple uh, members of the public who spoke tonight, uh, the the city is enabled to to have zoning by the Michigan Zoning Enabling Act, and specifically MCL25.3207 uh, states a zoning ordinance generally may not totally prohibit a lawful land use where there is a demonstrated need and an appropriate location exists within the city. Therefore, when coming up with regulations, it's important to have a balance between compatibility, feasibility, and uh having regulations that mitigate the impacts of whatever a proposal is. Uh ultimately, it is at the discretion of the planning commission and the city

council to determine what those um regulations should be. You know, what is compatibility and what is feasibility. Um but again, those are just key things to consider.

2:02:18
Oh, sorry, I'm looking at different things. Um that all being said, public uh comments are important to consider. Obviously has been uh part of the planning commission consideration and your consideration to uh tonight. Uh I kind of already covered those points. U just they come in various different sizes. Um you know, and could be as small as 5 acres or as large as 250 acres. Um just very quickly, uh at the June 29th meeting, there was a similar number of people, maybe a little less, a little more. It's hard to say. Um, and at the end of that meeting, uh, planning commission took in all of the various comments that were received, uh, most of which were similar to what we heard tonight about, um, seeking, you know, stronger regulations, perhaps more time to to consider regulations, uh, those sorts of things.

Ultimately, the planning commission made a variety of motions. Um, I realize that this is small and hard to read, but I felt it was very important for the city council to be aware of all five of the motions that the planning commission made. The very first thing that they did was approved a motion to request that city council consider extending the moratorium on data centers to allow more time for study as it relates to regulating data center uses. Second, uh after discussion, they approved a motion to amend the draft ordinance to allow data centers only to be considered as special land uses in the M1 and M2 zoning districts and to not be permitted in the IRO's uh zoning district and it was already was recommended to not be permitted in the office service one zoning district. Um therefore they also removed the specific standards for uh that would have been applicable to IR zoning which would have been chapter 18.08040. um since it would no longer be applicable given the uses not permitted in that zoning district.

They also amended the draft ordinance to increase the setback from 500 feet to 1500 ft uh in the M1 and M2 zoning districts and uh directed staff to to change all references to May to Shell as appropriate and um that you know those were all put together and then they finally move approved the motion to move this forward to you all. So uh I'll kick it over to Mr. Posal Aqua to kind of walk through what this ordinance now says. Um, specifically, you know, both the specific standards as well as the general standards.

2:04:42
Good evening. Matteo Pasqua, Carl Wartman Associates. We are the planning consultants for the city. Um, so as Mr. Benson had indicated, the slides that we'll kind of go through next uh are the specific language from the ordinance. Um, it is not typically my mo to read them verbatim. However, given the importance of the evening and the understanding of what we're writing, I will do so, but I'd be happy to answer any questions or provide clarifications um when council uh discusses the ordinance. Uh so, text amendments to the zoning ordinance section 1824 0, I'm sorry, 030, definitions C through D. The definition of a data center is proposed to be the to be identified as a facility or group of buildings whose primary function is the housing operation and maintenance of computer services, data storage systems, telecommunications equipment and associated infrastructure used for the processing, storage or transmission of digital information. Such facilities may include backup power generation, cooling systems, fuel storage and security infrastructure.

This term does not include server rooms or data processing facilities that are accessory and incidental to to a primary permitted use.

Tax amendments to the zoning ordinance section 1809020 schedule of uses data centers as newly defined would be special land uses in the M1 light industrial district M2 and M2 general industrial district districts found in chapter 1809. Data centers would by default be prohibited in all other zoning districts. So all of your residential and commercial districts uh would not permit the use of a data center.

Text amendments to zoning ordinance adding section 1809040 N standards applicable to specific uses. This section provides specific standards for data center uses. Standards references minimum dis distances from residential zoned properties, required noise studies, noise regulations, cooling system design, anticipated utility usage and capacity verification, traffic analysis, security measures, and decommissioning plans. These standards that I'm about to go through are reflective of the changes directed by the planning commission during the public hearing.

Required application submittals. The addition to the materials required for a special land use and site plan review. Applications for data center shall include the following. Utility capacity verification which will be written documentation from the electrical utility provider confirming available capacity and identifying any required system upgrades. documentation from the city or appropriate authority verifying water supply and wastewater capacity. An electrical demand statement which will be an estimate of average and peak electrical demand expressed in kilowatts and megavolt ampers including a description of redundancy and resiliency systems. Cooling and water use plan a description of cooling technologies to be utilized estimated average and peak daily water usage and identification of portable versus non-potable water sources.

Uh section D does cover noise standards which we'll cover in a slide uh in a few slides down as it's uh there's more technicality to it and one of the more important or finer points of the ordinance. Uh these standards were prepared with assistance from Soundscape Engineering, a firm that specializes in sound studies and has an extensive background helping communities regulate data centers nationwide.

Part E of the required application materials would be a backup power and fuel storage plan. the number, size, and location of generators, type and volume of fuel storage, containment methods, and fire suppression measure measures. If one or more generator units are proposed as a part of a data center application, air quality permits may be required via the Michigan Department of Environment, Great Lakes, and Energy, also known as Eagle, or its successor agency, unless such requirement is waved by that agency. Routine generator testing shall occur only between 9:00 a.m. and 5:00 p.m. during weekdays, but excluding holidays. All noise from generator usage is subject to the ordinance limits except for temporary use during utility power outage emergency.

Traffic and delivery analyses. Identification of anticipated truck traffic associated with construction equipment delivery and ongoing operations if applicable. Security and access plan which would be a description of proposed fencing controlled access points, lighting and coordination with emergency services. a decommissioning plan which would be a plan describing procedures for facility shutdown, removal of equipment and restoration or reuse of the site.

2:08:57
So backpedaling to part D which is the noise noise studies. Uh so the noise studies that would be required uh in addition to the standard set forth in section 1812130e which is your current noise standards um for uses in the city data centers. So those standards apply and then the standards we're about to go through would be new standards applicable for data centers. Uh data centers may not exceed the equivalent hourly LEQ sound level limits in table one at any location at or beyond the nearest receiving property line for the relevant land use. The measurements or predictions shall be conducted at 5 ft above grade or at the elevation of maximum predicted impact. If data center equipment produces tonal sound, a 10 decel penalty applies.

Uh so, well, to kind of go through the requirements, um for residential properties between the hours of 6:00 a.m. and 10 p.m., the maximum allowable noise would be 55 dBAs or 70 dbc's. DBAs is more of kind of a general daily noise measurement, whereas in DBC's are for low frequency noises. Uh, nighttime requirements at residential properties from 10 p.m. to 6 a.m. would be 45 dbas and 60 dbc's. Uh, the noise requirements for daytime and nighttime at institutional or public parks would be 60 dbas. If the data center creates tonal noise, which I'll explain what that is to the best uh my ability as outlined in the ordinance, but if they create tonal noise, you subtract 10 dB from each value. So if a data center creates tonal noise, the 55 dBA goes to 45, the 45 dBA goes to 35, the 70 dbc goes to 60, and the 60 dbc goes to 50. Uh the total noise penalty um as described by soundsscape um was an effective manner in which to deal with the low frequency noise uh issues that these data centers can create. So tonal sound is any sound that can be heard as a single pitch or combination of pitches or any sound in which the 1/3 octave band sound pressure level in the band with the tone exceeds the arithmic average of the levels in the two contiguous 1/3 octave bands by 5 dBs in bands 500 htz and above by 8 dBs for bands between 160 and 400 htz and by 15 dbs for bands below 160. Just to clarify that that language was written and proposed by soundsscape engineering which was contracted by the city of Wixom to assess the ordinance and provide guidance.

And just for kind of some additional, you know, thoughts on that one, uh it it seemed that the planning commission was pretty appreciative of having uh basically more nuanced sound language than your average noise ordinance. That actually was one of the things after going through this process that they would be interested in revisiting section 18.12.0. 0130e the city's general noise ordinance as applies to all uses within the city to try to have similar levels of specificity to prevent issues in other scenarios. But um you know we do certainly recognize that a lot of this is very technical and very dry language.

Uh we do have materials from our sound engineer. They uh presented at the planning commission meeting. Um I'll admit it was a little bit long and maybe not well received. Um, but I do believe that that presentation is on our website and we are happy to provide the information and kind of background um to this to to anyone that may be interested. A copy of their presentation was given to city council in your agenda packets. Um, but again, for the purposes of time and you know, everyone's investment, we didn't necessarily think that bringing soundscape this time was uh the right decision, but they certainly can come out to future meetings if ever desired.

2:12:46
All right. So required application materials uh as it relates to NOID studies, data centers and associated equipment shall not produce perceptible ground vibration as defined by the ANSI which

is the American National Standard Institute at the nearest residential zoned or used property. Compliance shall be verified through noise impact studies submitted with the special land use application and review construction permitting review prior to issuance of a building permit and post construction review prior to issuance of a certificate of occupancy. Pre and post construction sound study shall be conducted by an NCAC, National Council of Acoustical Consultants member, firm or INCE board certified acoustics uh acoustic consultant and independently reviewed and verified at the expense of the applicant. The noise study shall be sight specific and evaluate noise generated by all site operations and scenarios, normal operations, maintenance, power outages, etc. including all noise generating mechanical and electrical equipment such as chillers, generators, transformers, cooling towers, air handling units, etc.

The initial noise study shall include the following. Baseline ambient LEQ sound level measurements of the existing pre-construction environment taken at the quietest accessible locations near the nearest residential property to the project site in each of the four cardinal directions. These measurements shall be at least 24-hour duration to capture daytime and nighttime hourly LEQ levels. Predictive 3D modeling to demonstrate compliance with applicable noise standards outlined outlined in this section in section 1812130e.

The predictive modeling shall be conducted on an octave band basis and provide contour map showing overall noise transmissions in DBA and DBC. For the initial study, noise source data for the equipment can be based on generic data. The pro the purpose of the initial study is to demonstrate the feasibility of meeting the noise ordinance through the site layout, equipment type selections and practical noise mitigation methods. The final noise study shall include the following refined predict predictive 3D modeling to demonstrate compliance with applicable noise standards outlined in this section in section 1812130e. Predictive modeling shall be con conducted on an active band basis and provide contour maps showing overall noise transmissions in DBA and DBC. manufacturer provided octave band noise source data for the specific models of equipment planned for the project. Data center developers must include a mitigation plan in their noise study to ensure that operational noise does not exceed the local noise limits detailed in this section in section 1812130e, including the penalty for tonal equipment.

The report must include enough detail in noise impact report for the independent acoustical consultant to peer review the analysis and results. The pre-construction sound level measurements shall be repeated post construction with all equipment operating. The post construction sound study confirming noise standard compliance during daytime and nighttime operation scenarios at all relevant locations will be required prior to a certificate of occupancy. Essentially the way this is structured it is that prior to a building permit, so site plan review, they need to show with some predictive modeling that they can meet the noise order and ordinance before they're allowed to put the shovel in the ground and build the facility.

Once the facility is built, they have to provide us with a post construction sound study that also requires the operation of the site under certain scenarios before they can get a certificate of occupancy, which would be their legal means for operating the building. And if they can't, so the one the one additional thing to point out before we continue on, these are all of the uh recommended required application materials that would have to come with any special land use application. Again, that is both if this was a new use, new construction, as well as for reoccupancy of

an existing structure is a special land use. Any such application would go to the planning commission and would require that a public hearing be scheduled and held alongside consideration of that use. And these are the bare minimum materials that an applicant would have to provide to the planning commission and really you know have the planning commission be able to scrutinize um you know as as we go through this the following points that we'll get into really are the the specific site standards.

Um but again I just wanted to make it clear that these are this is really the first step. this is what you have to give to even you know go before the planning commission for this uh you know before the special land use consideration um and then we go from there. Uh any all studies submitted by an applicant um are paid by the applicant. um they have to submit and this is for any any project um an escrow account is established and all consult consultant review fees are charged to the applicant.

So moving on to site standards uh data center shall adhere to the standards outlined in chapter 1809. A data center shall not be located adjacent to a residentially used or zoned property. Additionally, no data center principal structure or mechanical equipment, including generators, shall not be located within 1500 ft of a residentially zoned or used property line. Uh during the 8 months that the planning commission worked on this ordinance, um we studied a lot of various setbacks uh as it related to adjacent uses. Um we looked at 300, 500, 1,000 ft. Um and ultimately during the public hearing uh and after receiving public testimony, the planning commission uh made the residential setback 1500 feet uh from a residentially zoned or used property. Uh the minimum setback for residential is expanded on by the noise ordinance. In essence, you have to meet both. You have to be at least 1500 ft from the residentially zoned use property and you need to meet the noise requirements.

2:18:47
Additional site standards as it relates to screening and landscaping. Mechanical equipment uh including HVAC generators, fuel storage transformer transformers, and cooling towers shall be fully screened from public view and adjacent properties by masonary walls, architectural panels, or evergreen landscaping in accordance with this ordinance. Rooftop mounted sound barrier shall not exceed 15 ft in height above the surrounding roof surface. Sound barrier shall not be included in the maximum height measurement of a structure. Ground mounted sound barrier shall not exceed 25 ft in height above grade. All sound barriers shall be architecturally compatible in appearance with the principal building. Construction materials must be durable, weather resistant, and rust proof. Standard concrete block walls and port or pre-cast concrete walls are not permitted unless approved by the planning commission who may require aesthetic or other design alterations.

As it relates to water usage, air cooled, hybrid, or closed loop water systems shall be required unless the applicant can provide sufficient data indicating alternative cooling systems are needed. If access to the city's water utility is required, the planning commission shall establish maximum daily or annual water usage limits based on the capacity of the city's water utility. The planning commission may require the use of non-potable or reclaimed water where feasible unless such requirements not deemed to be in the city's best interest by the planning commission or is otherwise not permitted by applicable law, ordinance, or other regulations. Electrical generation, the use of on-site renewable energy gener renewable energy generation, including but not limited to rooftop solar is highly encouraged. Fuel storage uh shall comply with all applicable local, state, and federal regulations and

may be subject to additional setback screening or secondary containment requirements as determined by the fire department.

As it relates to infrastructure mitigation, where a data center requires on or off-site public or private infrastructure or utility improvements, the planning commission shall require a development agreement, financial guarantees, and/or applicant funded improvements. And improvement shall be at the sole cost of the applicant. For operational compliance, the city shall require periodic third-party audits of noise and utility usage to ensure compliance with the site plan and required application materials. Continuous monitoring may be required at certain locations at the city's discretion. on the applicant's expense to ensure noise standard compliance. Audit shall be created by a third party and at the cost of the applicant. Failure to supply said reports within a reasonable time established by the city and/or non-compliance to standards shall result in any citations, fees, permit revocations, or any other penalties available under the city's zoning ordinance, general ordinance, uh, as well as state or federal law.

2:21:16
For parking, one space per employee at peak shift, plus 20 spaces for visitors, corporate vehicles, and contractors. Uh, again, being a special land use, the planning commission shall, as needed, impose reasonable conditions on approval of a data center special land use to ensure compliance with this ordinance and to mitigate impacts on surrounding properties and public services in accordance to chapter 1818, which is the special land use section. So, in referencing these setbacks, where would data centers be allowed? Um, all properties within the red outlines are industrialized parcels that are directly adjacent to residentially zoned or used properties and therefore ineligible for a data center application. So, any parcel outlined in red is immediately disqualified from a data center proposal. All the areas with the blue buffer are areas within 1500 ft of a residentially zoned or used property and therefore ineligible for data center uh structures or equipment to be located if the parcel is elig eligible at all. Any parcel that had any portion of a M1 or M2 parcel that is in the blue shading, that area of the site would not be eligible for any data center um buildings, mechanical equipment, any portion of the lot that is not covered by that buffer would be eligible so long as they can also meet the other requirements of the ordinance being noise, uh the other uh items that we're discussing this evening. And just for uh just for reference, we do realize that the map on the screen here is pretty small. A copy of this map was provided to city council in your agenda packets and is available on the city's website as well.

2:22:52
You can keep Oh, it is May, isn't it? All right. So, uh, as mentioned at the beginning of this, the purpose of this, uh, discussion item is to introduce this ordinance, uh, for city council and give you all the opportunity to, uh, you know, discuss and or modify or whatever you see fit in terms of next steps. Broadly speaking, you have, uh, essentially a couple options here. One, you could approve the zoning ordinance amendments um, and additions as presented and schedule a second reading and adoption for your July 28th meeting. uh you can modify the zoning ordinance amendments that are proposed to you um and then schedule a second reading for the uh July 28th meeting. You can uh modify or comment and send the ordinance back to the planning commission for further review. And in addition to all of those things, uh the the existing moratorum is in place as adopted by city council. It would not expire until September 24th of 2026. So um by if if the if the intent would be to

uh maintain the moratorum as established by the resolution of council um that would not have to be done tonight.

An alternative version of how to establish a moratorum is to uh actually adopt a moratorum as a zoning ordinance amendment. Therefore it would require a similar process to essentially what has taken place to get here. uh that process requires the the drafting of an ordinance, holding of a public hearing and then a first and second reading. Um so that would take a significant amount of time, but it it is an option, right? So we want to give you that option as an alternative way to enact a a temporary moratorum.

Can I make a point? No. No. Nope. So do I get to ask a question ever? You get to ask it at the second call of the public. Thank you. You're welcome. Q&A. I can do a Q&A. You you sure can.

2:24:45
So, uh, as a whole, um, and this was expressed at the planning commission meeting, ultimately moratoriums are not the strongest defense that municipalities can have when it comes to regulating uses. Um, you know, whether done as a resolution or whether done as a zoning ordinance amendment, um, there is always the chance that they could be challenged. And um therefore it is our recommendation that it's in the city city's best interest to adopt an ordinance and adopt updated definitions to define these uses. Ultimately those are decisions that are made by city council how you want to move forward. Uh but I do just want to point that out. The one other thing is that ordin you know any ordinance can be amended by the city council really at any time so long as it follows the required process. So, there is no reason that um even if the city council did decide to move this ordinance forward at this time or some version of it, uh you can continue and have the planning commission continue to work on um further amendments to this ordinance. Um there's no reason that you couldn't adopt an ordinance, let's say, in a month and then come back 3 months later with further amendments to the ordinance um that you just adopted. Um but with all of that in mind, there's, you know, there's a lot of kind of pieces in play here. Um, and really we're, you know, handing the floor over to you all to discuss and happy to answer any questions you may have.

2:26:04
Very good. Council member Kennedy.

2:26:09
So, I I don't know about everyone else, but I was looking through the decibel levels. The first question I have is why is it such a difference for DBC and DBA? I know DBC is outside the range of our hearing, but why would it be 15 dB different.

Our understanding based on what soundscape provided us is that there there are two different types of noise measured in two different ways. So what is perceived to be what is perceived to be I guess I don't want to use necessarily the word harmful but noticeable on a DBA measure isn't the same as the same level as a DBC measure. And that's why those two different levels were established. And then in the next section in section B, right after that, when it talks about um average levels, if it goes down um in this certain band, it's an extra 5 decel.

Is that more restrictive or is that saying it's less restrictive in that band?

Are you talking about the tonal penalty?

Uh yeah. When it starts getting into the bands of between 16 or 16400 htz, um it's an extra eight oneird octave wave.

Yeah. Yeah.

Yes. That that that is more strict and it's related to tonality.

Um I don't know the proper process for this, but I'm just going to say that I would I would really like to see this daytime one drop down to at least 40 because and later on and here it talks about that being the general noise level of um wind in the trees. And if a data center goes in and I'm living anywhere near it and I hear any sound happening, that's more than I want to be hearing the constant thrum of any kind of sound above and beyond what I've already been living with. So, I would first like to see the decibel drop down to normal sound in the area and then at least a 2,000 ft setback. Yes.

2:28:24
Council member Baron.

2:28:28
First, uh, you know, I wanted to thank the planning commission for all the work they did on this and also thank all of you for coming out to the planning commission meeting and then also coming this evening. Um, I kind of wanted to touch on a couple things that people talked about. Um, Friday the 26th of June, my wife and I were hanging out downtown and we ran into planning commissioner Sandro Graassi and the owner of drafting table uh Kristen and Aaron Resnik and we got to talking that none of us have actually heard one of these data centers before. So that Friday night, uh, Kristen and myself and Sandro decided that we were going to drive out Sunday morning to Dwinac. I always say that wrong, so I'm sure I said it wrong. Uh to see what one of these things actually sounded like, cuz none of us have heard one. Um so Sunday morning, uh 7:00 a.m. uh Kristen drove Sandre and I out to uh listen to this data center and it was horrible. Absolutely horrible. And you know, we had the decibel reader on our phone and we listened to those levels and we were standing across the street from it and it was like 65 68 and right behind us was a neighborhood and the people who lived there. Um I mean we saw one like one guy outside, another guy cutting his lawn. We talked to the guy that was outside uh working on his car and he said it never stops. never ever stops. Just can he can't get away from it. He can go in his house. He can close his doors, close his windows. Like it never ever stops.

Now, the sound requirements in that municipality um are higher than what we're proposing our ordinance. Um so hopefully that there in itself will help. But um you know we wanted to kind of do our our homework on this. So we we walked 500 ft away from the data center and we listened and we took videos and then we we walked 1,000 ft away from the data center and we could still hear it. Uh we listened to videos. We got as far as far away as we could from it. Uh kind of where the street started to turn the neighborhood was ending. we'd have to go on private property and if you wanted to hear it, you could you could still hear it, but like the neighbor's air conditioning unit was

clearly louder at that point than the data center. We I don't think we were quite 1500 ft away yet. Um, we were getting close. But so to put that in perspective, I feel that with the lower sound requirements on our ordinance and 1500 ft, you're not going to be able to hear it.

Now, I I I can't talk for whether or not your dog's going to hear or all those other things. I'll leave that to uh uh my vet who came up here and spoke earlier this evening. Um, and maybe that's something we need to look into. But I am really glad that the planning commission took took time to to ex listen to the residents and expand the setback. And I heard a lot of people talking at the planning commission meeting that or I heard concern from one person at the planning commission meeting that five, 1500 ft was too much. Um, so I I wanted to look into that. U developer. It was that was a developer.

2:32:11
You are correct. You are correct. Um Jefferson County, uh Colorado, um uh their setback that they're proposing and putting through right now is at 1500 ft. Uh Jonesboro, Tennessee, their setback that they're requiring right now is 1500 ft. Aurora, Illinois is also proposing to go forward uh 1500 ft. And they also are putting some really stringent sound restrictions in theirs kind of like our ordinances here in Wixom. Uh I mean key characteristics of the municipalities are getting ahead of this um is they're they're looking to address this uh by setback noise control screening and then obviously monitoring the water and energy using that's going to be required. Um, but probably the most useful resource I found was something put out by the Kentucky Resources Council. It's a uh a nonprofit, nonpartisan environmental group uh in in Kentucky, uh, which is a statewide public interest environmental uh, law organization. They provide free legal advice and representation and strategic advice to individuals, grassroots organizations, and local governments facing environmental challenges. They took the time to put together a draft ordinance that they believe municipalities in Kentucky or possibly throughout the entire United States should consider use using to regulate data centers.

Uh setbacks is one of them. Um and uh I mean 1500 ft was basically the aggregate number that they were looking at in a lot of it. But one of the one of the uh interesting setbacks they required was an interior setback of the property on where a data center is going. And they're recommending at least a 500 ft setback from the data center on their own property. So they got to absorb the sound on their own property before it even gets to the property line. So, it's not the hardwood floor company that has to listen to it 50 ft from his office. It is there's going to be a 500 ft buffer between on the property of the data center before it's even going to get to a neighboring person's property. I think that's something we should look into. I think an interior setback, making the applicant absorb their own sound on their own property would be extremely important. at least a 1500 foot setback from any sensitive use. And they define sensitive use of any residential, commercial, or even agriculture land. I mean, there's studies out there that plants don't grow, cattle don't grow. I mean, there's all these things that we need to look at that we don't know, but that's at least a 1500 foot setback. Uh, including, I believe, the 500 ft on the property. There's so much more that we can look at here and and and and I do believe that passing something is better than nothing. And I believe we can come back and do more later, but but I think increasing the setback is the number one thing we should do.

And I think looking at including an interior setback on the property because as you're going to see later this evening there the the the site plan or that was in the packet. U there's no inter there's no

interior setback. I mean that's is within like 50 ft of the property line. There's not even bushes between the building and and what they're looking to propose. And that's not fair to the industrial neighbors that are next to them. Uh, and then the Kentucky or ordinance suggestion also did have the the the lower decibel number and they were at 40 to 60 between 10 and 7 uh 10 10 p.m. and 7:00 a.m. and 45 and 65 during the day. So about 5 dB lower than what we were proposing.

Um and then lastly, um as I was continuing to go through that, um I saw Bowling Green, they just decided to move forward and adopt the basically the same proposal from that, uh think tank in Kentucky as their ordinance. Um, I saw I'm going to say this wrong, Gerard Township earlier this week, which is over by Cold Water. They just enacted uh a data center ordinance um I believe earlier this week or last week that is limiting a data center to only one piece of property in in in their township. They're taking a very aggressive approach. Uh granted they only have one piece of property in their township that's zoned industrial and they're saying that's the only place it could go. Um South Stra Strain Township in Pennsylvania just approved a 1500 uh foot setback in June. And then lastly uh really a question for our consultant.

2:37:30
Um this being proposed is a special land use. Correct.

Correct. So, it's only going to go to planning commission, correct?

Uh, it would go to planning commission, but a public hearing would be required uh for that review. So, once we approve this ordinance, we the elected body of the city is are never going to see this again. It's just going to be on planning commission. Is that's what you're saying? Correct.

So, you guys see where I'm going? Um why not uh a PUD agreement where it would have to come back to us for the approval of the PUD agreement. If the goal would be that that site plan review would ultimately be decided by the city council, we would have to look into what the appropriate measure to do so would be.

Well, I would I would have you look at Pittsfield Township, which is a township that your company has written the zoning ordinance for, and your zoning ordinance for data centers, and Pittsfield Township is proposing a PUD, so I don't know why you need to look into it. I mean it the nicest way possible. Your your company has done that.

2:38:44
No, I'm familiar with that ordinance. I I guess my my hesitation at the PUD direction is we're establishing some very specific requirements for data centers. PUD's kind of imply that there's a lot of give and take and a lot of flexibility involved. So I'm not I'm not saying we can't look at ways in which it comes to you. I'm just saying I don't know if a PUD would be the right way to do it based on what on how PUDs are typically used with a with a high level of flexibility.

That's all the the what I I I'll let you go Drew in a second. What I would say is a PUD would allow us to get a lot what we want a lot. We would be able to put that in our contract with the developer. What they're going to do or allow us to put what the penalties are going to be in the contract with the developer. And you're saying zoning only allows us to five find them $500. a PUB agreement is

going to allow us to put in there that we can find them $500,000 if they don't listen. And I and I also I I trust our planning commission, but they're not voted in by the residents that are here. And I feel like the residents are going to feel a lot more comfortable if we're the ones that are making the decision if a planning if a data center could be approved. So, I I would like to see this either a PUD or something that has more teeth that's going to have to come back before us.

2:40:18
That is that is certainly a fine direction. I just wanted to to support what Mr. Pllock was saying. One of the key things you're in the city of Wixom PUDs are enabled by and I'd have to find the exact zoning ordinance section. It's chapter 1811. That is the key concern is does our current PUD ordinance allow for that to be structured the way that you're saying. I'm not saying it can or can't. I'm just saying that that's not something that's been researched ahead of this meeting. So, we are hesitant to say 100% that can work exactly the way that you want. I'm not saying it can or can't. That's just just to clarify.

No, please let's not interrupt. We never interrupted public uh comments. Please don't interrupt our business portion here.

2:41:02
The the one other thing is there are special land uses in the city that uh specifically call for them to be sent to uh to city council. Airports are actually one of them um that are uh special land use I believe in the M2 zoning district. So just for clarity, we could do both either one of those things can happen whether it has to come to city council as a special land use or it has to come through as a PUD. We would just need to investigate that one way or the other to give you better advice. I would be comfortable putting something on the record this evening and passing something with the addition that it has to come before us and if we ultimately decide to make an amendment several months from now to make it a a PU PUD, we can take get bigger teeth into it, then we can address that. I agree that having something is better than nothing, which is where we're at now. Um I I just concerns me that the same planning consultant is recommending a PUD to one municipality and a special land use to another and I don't I I don't feel comfortable with the response there. Uh it it it should be one or the other, right? I guess I I I guess all I can offer is uh we don't treat every community the same way that we work with our planning commissions we work with to kind of do our research and see apply the context of the community to the ordinance that we're proposing in the planning commission's direction. Understood.

Good. Deputy Mayor Gota.

2:42:33
Thank you. Uh got a few pages here so hopefully everybody will bear with me. Um, and all these could turn into um, proposed amendments to what we have or just do it as one unless people speak out and say they don't like something. Um, but I did want to first thank also everybody for coming out tonight um, and being informed of what's happening in our city. I do though want to ask as your neighbor, somebody who's lived here for 38 years, so I probably have a good portion of you beat in terms of being a Wixom resident. um to help push back against some of the rumors and misinformation you're seeing online. And so we've heard people speak out tonight, then why are you building a data center? We aren't building anything and we're discussing rules about how to

make regulations work for the city. So just in one post alone, there have been comments about NDAs even got asked tonight, which is insulting to um everybody's character up here when you haven't come to know us. um question about a $10 million bribe. Don't even know where that came from. But more concerningly from a video which was trying to raise awareness of this meeting, which I appreciate having everybody here and raise uh bringing awareness of the meeting to everybody.

I'm going to read you comments. These lawmakers need to be scared of the people. They need to believe their lives are in danger because they voted these data centers through. Again, we haven't voted data centers through and I hope you will begin to fight against that kind of language. Some people have shared it. You share those comments when you share the videos. Please do better on that.

Another one which was also posted and we heard from comments tonight tying flock to to data centers and a a data centers about our meeting tonight. make sure even their family knows the dangers of being a traitor to America. And we take these tyrannical criminal flock supporters out on site and by whatever means necessary. It's disgusting.

And then the light stuff is to have our character question about NDAs and bribes. I've been here for 38 years. There are people in the crowd who have known me since I was a kid. It's sad that we run here to represent you. You're all my neighbors and I don't know most of you, but I think of you as my neighbors. That's what I get up here to do. Please stop sharing that crap and start commenting against it. You are all here. You all know what is happening in our meetings. You're all our most informed residents. Please help us spread the word. I know a lot of people came here to the planning commission meeting thinking we were at odds. Planning commission, the city, and you. It's not remotely the case. The most proactive thing that we can do as a city is establish ordinance language to protect you. That is why I motioned and brought this up in November. It is why I brought up a moratorum to protect you. So, let's all understand and get back to teamwork makes the dream work. please.

2:46:03
The rest of it is going to get technical and boring. Um, but I do want to preface the rest of this by saying, and I know from planning commission, you brought up, they want to review the decibel levels. I think there's a lot that has come up in this that we found our ordinance language in a lot of areas is outdated and we can probably adjust a lot and there are new issues environmental concerns that came up that didn't exist in the 70s. So I think we need to have a really good look at all of our ordinance language in the very near future um not later on this year. Um now to go through what has been proposed and I'll kind of read out the sections. so people can follow along um if you want to. It's all on the city website too, but you'll be scrolling like a maniac on your phone.

So, um so section two and then subsections N1B um section two is the overall um but in terms of electrical demand statement adjust the language. So, it is not an estimate. It's an exact amount of the demand needed and that it will be verified independently by an expert chosen by the city but paid for by the operator.

Section what?

Sorry, that was on page two subsection B. Thank you.

Yep. Right below that cooling and water use plan. uh include wording related to the estimated discharge and mitigation technologies used to prevent bacteria and chemicals being discharged in the wastewater system. Um Cheyenne's water system has been um from a meta data center infected with a bacteria that is metal resistant they found due to um them flushing and preparing their closing system. So, we need um ongoing testing, but we also need a statement in their plan as to what they in intend to be discharging as well as um any chemicals.

2:48:14
Uh getting into the table for the actual um sound levels and limits. First, I would like to amend the daytime hours from 6:00 a.m. to 10:00 p.m. Um, which is wild to me, but 8:00 a.m. to 6:00 p.m. being daytime, and then that would make nighttime 6:00 p.m. to 8:00 a.m. Uh, I'd like to amend the limits listed. So, right now, we've got hard numbers in there. The more research that I did, um, it kind of came out to be maybe a better since we're going to be doing sound studies anyway. um it came out to be better. So, we're not adding too um noticeably the ambient noise to change those instead of hard numbers to the LEQ of the sound study. And then the residential and industrial every use would just be plus one decel A and plus one decel C. So, they're not adding noticeably to the existing ambient noise levels. um rather than having hard and fast numbers because I think nobody knows what they're going to get when we say a number, but they're going to do a study anyway and so we should be within what is already existing. Um luckily we have a lot of good industrial users and good neighbors in that respect who don't make noise all day. Um, that's kind of where this comes from is I couldn't tell you every business on West Road and there's a lot of businesses over there, but the point is that they don't become a nuisance for our residents and that's kind of in line with where I'm headed with all of this.

Um, I also wanted to expand the table to include three or uh four different groups. Right now, we just have residential and then in institutional and public parks. Um I think group one should be residential and inclusive of all three VCA types. Um group two should be schools both public and private as well as places of worship and faith. Group three is existing parks, habitats and recreation areas including but not limited to our city parks, county parks, regional, state, and national parks. Not that we have any of those around here. Um and then group four, any existing overnight hospitality businesses. uh i.e. hotels and motel since we've got a bunch of those in the city as well.

Yes.

2:50:41
I ju I just wanted to clarify uh for residential all of the VCA districts are considered residential because residential uses are permitted. It's fine to clarify. I just wanted to make sure that was um so instead of having residential and institutional and public parks on there, I think all four of those categories should be broken down. Um, sorry I was jumping around here as well as I was typing all of this.

Uh, just to be clear, the the standard for all of those would be that there's an ambient sound study that kind of establishes an average and they can't be more than one over that.

Correct. So, by the current language, we're saying that they're going to do their sound study at the nearest accessible point for each receiving property. We would call all we'd need the nearest receiving property for each of those groups and then it would be based off of that.

Correct. Um I had page three below subsection B but I don't know where. So that's the top of um page three. um change the wording of the paragraph which is data center and associated equipment shall not produce perceptible groundborn vibration as defined by ANSI um beyond the properties or the site's property line. Um so right now it says data center and associated equipment shall not produce perceptible ground vibration as vi by ANSI at the nearest residential or zoned or residential zoned or used properties. I don't think it's fair to just say residential only when we've got schools, offices, um businesses. It should be there's no vibrations beyond the site's property line. Um subsection A on page three. So about mid page um adjust the wording so that the initial sound study provides existing preconstruction environment readings taken at the quietest accessible locations not just for the nearst but the nearest the furthest and an intermediate or median receiving property for groups one through four that I already said. And right now we've got a 24-hour duration in there. I believe 48 hour would give a better understanding of the actual ambient noise. Um, so I'd like to bump that up to 48 hours. Um, section B at the bottom of page three will require that the final noise study shall be based on the exact equipment to be used in the development of the plan and that only equipment with manufacturer specifications for noise output may be used in the plan and development. It's been found in other areas that some of the equipment being used, it does not have manufacturer output information for noise. So, their modeling isn't accurate because it's based on something that was made up or what they guessed. Um, all equipment used should have manufacturing specs for noise and that is the only stuff allowed to be used.

Um, jumping to page four, subsection B, adjust the language so that the compliance in all scenarios will be required prior to commitment commencement of operations under a temporary CFO or full CFO. Right now it just reads uh CFO and we do let businesses begin operating while they're under temporary CFO and I'd hate to see a loophole where we've got a TCO out and we're not complying with the rules. So um it that needs to be adjusted for the commencement of operations. We need compliance. Um then section two subsection N one then E um require that if generators are to be used for backup power only tier 4 or more efficient and less polluting generators are used and require the generator manufacturer and model type to be listed. Um, right now that isn't required in the ordinance and I believe that would be useful for the fire department probably to know if something does come up, what equipment is on site. Um, also prohibit nuclear micro reactors or nuclear small modular reactors and any sort of future nuclear power generation on site. Um, also remove the language accepting. So right now we say when there's utility power outage emergency we accept the noise requirements. I don't believe that's appropriate with all of the equipment running including generators in a worst case scenario. The facility should be compliant with our ordinances. So that that language should be adjusted.

2:55:32
Um then section 2 N1H um add language that the decommissioning plan shall include full environmental reclamation of the property. Strip miners do that. I don't know why we can't ask an industrial use to do that. So, um, moving on to section 2 N2A, increase the setback distance to 1/2 mile and add schools, places of worship and parks as the designated phys or setback areas as well as

residential properties. um that is based on a variety of factors including noise and findings in studies for residential property value um and equity loss.

Section 2 N2D amend the language stating that the maximum daily or annual usage limits be established um and instead just set a daily maximum. I can foresee instances where we'd have intermittent but extreme draws to cooling systems or what have you and extreme draws could strain our system. So I think if we control a daily maximum then we also have control over the annual maximum but um it's much safer for our system because it keeps things standardized with a daily maximum. Um, I'd also like to add that in the event of, and nobody's had this in the last few years, add that in the event of a water service line break in the city water system or GLWA system that has any possibility or likelihood to impact Wixom's water customers, such as water main breaks we've had, um, or cause the city to need to use the water tower supply as we do in emergencies. that any data center shall be prohibited from drawing on the city's infrastructure immediately after they are provided notice by phone, email, or in-person notification. And that prohib prohibition from use shall be maintained until such time that full service is restored. And then full service restoration should be diff differentiated from our temporary or partial restorations when we've worked through a smaller line from West Bloomfield that's 24 in instead of 48 in. It should be full service restoration.

2:58:01
Um, I'd also like to add another subsection related to water discharge and require prior to discharge into the city system or natural environment that water discharge is tested for bacteria and chemicals. An outline mitigation measures to ensure neither enters the city system or natural environment. Um, and have an outline plan such as we've had to install with Tribar when they were here for PAS. I'm not saying it'll be the same things, but we need a mitigation system in place and testing as we did um with Tribar and add language that any material that can reasonably be traced to the operation of the data center that results in non-compliance with discharge standards shall result in all operations to immediately terminate upon notice provided by city by the city via phone, email, mail, posted notice, or inerson notice. Um going back again to the Cheyenne water system in Wyoming. Um and then add a subsection that states that you no utility upgrades necessitated by the existence of the development shall be shall result in the force sale or seizure of other property within the city. And that comes from the fact that a Georgia electric grid provider is um forcing the sale of a number of properties so they can install new transmission lines which they even say um is 80% for data center use and the remainder would only be serving the residents. But they're kicking people out of their homes and forcing the sale of properties um to upgrade for data centers. That's not right.

Um section 2 and three uh add language to include that public safety, fire and public works equipment purchases and upgrades that are necessitated by the development um are purchased by or paid for by the operator. and add language that the development agreement shall include that equivalent passon costs of any utility customer rate increases for electric water ga gas infrastructure that are necessary due to the existence of the development or operation shall be fully paid for for a 10-year period following the development commencing construction and operation. Um section 2 and 4 adjusts the language to state continuous monitoring shall be required at the nearest receiving property for each of the groups one through four that I had mentioned at the applicant's expense and the operator's expense to ensure noise standard compliance. Um right now I think that's kind of loosely written as a may or we'd have an audit. I it should be continuous monitoring. Um, I also believe we should adjust the language related to non-compliance to state that operations shall

immediately cease upon notice by the city via phone, email, mail, or physical posting um of non-compliance with noise standards and the resumption shall not begin until all compliance issues are corrected and include that the city may undertake independent audit based upon complaints received from residents or nearby businesses. And if non-compliance is found, then the operator shall be responsible for reimbursing the city in full for any audit activities undertaken. Um section 2 and six, and this is the last of the specific things for for what we have. Um change the wording to state that the planning commission and city council shall review things. Um to council member Berman's point, this was also in my notes. We are elected, planning commission is appointed. I don't believe that they should be bearing the weight of decisions that should be on us. Um, and also add that a community benefit agreement shall be signed with the city outlining specific guarantees including but not limited to local hiring guarantees, water and energy caps, a residential property value protection program and community investment fund funded by the operator. Um then just in general again reiterating city council shall have final approval similar to our condominiums. You had mentioned airports we also do it with condominium plans as well.

Um add language that upon city giving notice of non-compliance issues to the operator all operations and this is for anything all operations shall immediately cease until verification of compliance is verified by the city. that. So, I know it's a lot, but thank you, Council Member Simmons.

3:02:51
Thank you. Um, so obviously, um, that's a hard act to follow. Um, as a new council member, I just want to, uh, say thank you to everyone for coming out. This is the most exciting meeting I've had uh so far. So, it's good to see everyone. Um obviously, it's my job to represent you all. So, it's great um to hear the feedback. Um I get it. I hear you. I understand. Um we're in this issue. I think I'm not going to go through everything because I echo um what deputy mayor has said as well as what uh Councilman uh Burman has said in particular about as a whole we need this to be more stringent um as a whole we need to make sure that we're protected um and that means I think we need to do something um because we have nothing right now but modifications I think we're going to we're going to be in option number two we're going to make be making some modifications tonight uh to get something moving. Um obviously water, energy, noise, I think a lot of that stuff is just too unknown for us right now. Um so I echo that uh sediment. We need time. Uh the planning commission was directed to look into this um starting last year before I was on council um and with the planning consultant as well. to their point, they've made progress, but uh I guess we're just not far enough um to to have good enough information to say where we need to be. Um I do like the concept of figuring out some reasonzoning aspects, but I do think again we have to to make some decisions at least tonight to get some some things moving. Um what my question to administration? Um well I guess before my question to administration uh the timing I agree with everything from deputy mayor. Uh the one change I think the time of day I think we should be 6 to 6 instead of 8 to 6. I think time of daytime should be 6 to 6. I like to sleep.

3:04:57
Okay. Well um and uh the setbacks I'm in full agreement with creating um four uh zones. I we had a couple business owners uh speak up tonight. Obviously, residential is a big concern for all of us, but our businesses should be a big concern as well and understanding what that setback actually looks like for other industrial businesses and schools and parks and things like that. So, I think we need to

analyze that. Um what I would like to know from administration is um uh the concept of this uh sunset clause uh or the addition of that. What does that look like for us? Is that possible from a zoning perspective to have some sort of uh full-fledged uh solidification for us to come back and make changes to this as things go? What does that look like for us?

I mean in in general you have the right to to look at your ordinances at your discretion at any point in time that you want.

Sure. I understand that.

Um if there is the interest in having something in the ordinance that requires a review of that ordinance at at certain intervals in time, we can research what that language might look like a little bit more so if we can structure it properly. Um but you don't you have that power now as it is. I understand the intent of it, but we would need to look into it a little bit more as to how we would structure it appropriately so as to to be the the the correct tool that you want it to be and not more or less be a burden or a hindrance or or something that we don't conceive at tonight's meeting.

Thank you. Good council member OD. Okay. Thank you.

3:06:46
Um, lot going on here tonight, right? And there's a lot of people here. But since any of you who came up for public comment were limited to five minutes, I will endeavor to limit my comments to that as well in fairness uh to all of you. Um, I guess I'll start out by noting I actually was not elected by you. I was appointed to fill a vacancy and I only say that because so you that so that I can convey to you I did that out of the desire at this point in my life where you know my demands of raising kids have gone by the wayside and chose to do something that can be helpful to where I live right and uh be a voice for the citizens and just know that that's what I'm up here to do and you might not hear me ask a ton of questions or get into the weeds as much because I heard everything you said.

Um, you know, we had a lot of comment tonight and while we have focused heavily up to this point on residential and schools, kids, you've all brought up such great uh points that maybe hadn't considered before. obviously the businesses, um, pets, wildlife, right down to, uh, the patterns of bees, right? Things that maybe seem small but are really important in the big picture and really important into perpetuity that we have to take into consideration.

I would also say in a crowd of this size, you would expect to find at least one dissenting point, right? That maybe there would be some healthy debate, but we have had unanimous uh voices speak to us both at the planning commission and then here tonight. So I think that's a pretty uh powerful uh statement or you know situation to take into consideration and know that I am and that I heard all of you.

We talked about the jobs and the data center itself may employ some people. Even the construction I don't truly believe employs Michigan residents. I am fully aware because I have a cousin who lives in Arizona who's being contracted all around the country to build these places. So, it doesn't even create jobs for Michiganers, much less Wixom residents.

Um, I do have some notes here that I took down while everyone was speaking, but just know I don't have pages and pages. is I didn't come with some preprinted lengthy speech because I wanted to come in with well I know I don't want to say an open mind because I already knew where mine was but I wanted to hear what all of you had to say. Um so like I said I didn't have a ton of notes. I didn't go visit anywhere to listen to anything. I'm not here to grandstand or pander to any of you. I don't, you know, I'm just here to listen and um I take in I seriously respect the opinions of our administration as well as our planning consultant. I don't think anybody's here to do anything nefarious. So, um I'm certainly not going to question the advice or direction there.

Finally, again, I'll just reiterate. I heard everything all of you have said as residents and you know what we want the city of Wixom to be. And just know every vote that gets put before this council, my vote will reflect your comments, your concerns, and your safety along with that of all the future generations of Wixom. And that's it.

3:10:52
All right. I want to thank planning commission for all the work they've done on this. And I want to thank you all for being here tonight, too. And I'm just going to touch on this for a moment. Um, I've been a resident of Wixom for 40 years. I've been up here representing the city in one way or another for 19 years. And it's pretty damn insulting that the first time something controversial comes up, I'm crooked. Okay? I've signed a non-disclosure. We're taking money. I'll challenge anybody. There's an election next year. Why don't you file and run for a seat up here? Okay. I challenge you guys. We won't get anybody.

But going on with that, um I just have a couple of things here. Um I would like to see put in the um ordinance nothing north of Pontiac Trail. No, no data centers north of Pontiac Trail. That's where all of our residential are. I know at the moment there's not any property probably for that, but in a couple of years we will have a piece of property that's available and I would not want to see anything like that go in there. So, uh that and then um what are the uh penalties for the violation for the noise and utility usage? I know right now it says that the uh applicant will pay for those testings, but is it once every 5 years? once every year, once every quarter, once. We don't have that specified in here. And I think it needs to be specified in here how many times we test. And I know the city already has uh penalties for ordinance violations. And so, but I don't think they're strong enough. So, I think we need to look at that and make the penalty stronger.

And also, we're not in a hurry. So I think we should push back the second reading of this to the to the second reading in August. So that gives us time to look over things, make sure that you guys take all the notes from everybody here tonight, implement those changes in this and we and we move on. And I see the lawyer has a question. Can I jump on that?

You sure can. I have that biting my tongue over here. I know I'm the substitute for tonight and and the new guy for tonight. Uh, but first of all, can you introduce yourself? Oh, I'm sorry. My name's Tom Schultz. I'm uh with the same firm. I'm with the same firm that Beth Sarella, your normal council is with.

Um, so I think that's a great idea. And in fact, I would suggest maybe you modify it a little bit and not actually vote on the first reading yet. That was probably I've been doing this for a long time the

most kind of subject to and proposed amendments that I've seen to an ordinance. So with my communities that I normally represent with that much discussion, some of which was great and seems pretty easy to implement. Some of which frankly I'm going to tell you, we're probably going to give you a letter saying it's a great idea, but uh I'm not sure we can do that. So, we would like I I suggest that you give our office staff, consultants an opportunity to go back and listen to the tape, take better notes than I was able to and sort of address them either by just making a proposed amendment to the ordinance that would come back to you in a revised ordinance or addressing it in some way substantively.

some of the issues like you know the PUB question which you know is a is a great idea but is pretty rare thing to do when it's the only way to get a development approved the sunset you know a lot of this is just off the top of my head and and I can't do them all in in one night but the reason why we typically discourage that is because you have a potential you essentially what you do is you make an approved use a non-conforming use so these are things that there are uh good ways for us to have a a discussion on and I think it probably makes more sense to do it as another first reading because that's a lot of stuff that was changed or suggested for change and I think you could have a very good conversation on almost all that at the next meeting and then decide whether or not to put it on to second reading.

3:15:18
Assistant manager Benson. Yeah, ju just to add to that. Um I we will need I' I'd prefer it as a motion. It could potentially be consensus, but just an understanding of specifically which of the changes that were suggested tonight by individual council members. There were some people who said the same things, but again, we don't want to make assumptions about what specifically you want us to change and what you don't. So having a motion or specific action from council saying you know we want these modifications uh you know it's it with m council member Gotchil or deputy mayor Gotels I'm sorry um you know that either could be you know incorporation of council member Gotchel's uh comments as written I assume you have these written down in some way that's sharable um or you could go individually through them again and you know make a motion say I motion to do It's I'm just saying for the for the purposes of recordkeeping and making sure that what we the modifications we make to your ordinance are consistent with the the discretion of all of council. Um that's that's some advice because again we don't want some of you may not agree on one or two sections or those kinds of things. Okay. Council member Kennedy.

3:16:35
I just wanted to say that I thought um Deputy Mayor Gotachel's speech was so perfect for what I was looking for to say. I just didn't have the right words for that. Um, I'd be perfectly fine just voting on his changes. Does it?

Council member Bman, I'm fine withdrawing my request for a PUD if we can put council approval into the special land use as proposed by the deputy mayor. The only concern I have that I need to see in diagram form is whether or not the setback requirements requested by the deputy mayor still leave anything viable. I I I I don't want us to get in a situation where we're we're making something not viable and be challenged that way. So, I would need to see the updated map.

Um, and then lastly, the only thing I would change from what the deputy mayor suggested is I I do still think an interior setback uh which could be uh you know subtracted from the the total setback should be required because I don't think it should be um another industrial use should be 50 ft from the the always problem of a data center. I think there needs to be land on the data center itself that is absorbing the sound and not right next to the office of another industrial use. So I I don't know what that number should be. Uh, I mean, like I said, looking at the the ordinance out of uh recommendation out of Kentucky, it was 500 ft on the property, then plus,500, so 2,000 total. Um, maybe that's something we can have a just an educated discussion on once we have some maps to look at. So maybe that would be the only thing I'd say that I I'm fine with all the proposed changes by the deputy mayor, but what that number is going to be still needs to flex once we see the maps. Does that make sense?

3:18:52
It does. I one of the things I was just going to add is that's part of the struggle of assigning, you know, specific numbers, you know, and specific setback numbers is yeah, what what parcels would even be left available that could meet those kind of rigid setback numbers. Um, that is one of the benefits of the way that the the planning commission recommended language with you have to be able to meet the noise standard or you have to be set back far enough to do so. Uh, because again, you know, depending on the context of what the underlying application is, if this is a again a hypothetical, a 5acre parcel that's an existing industrial building and they want to convert it to an um to that use um you know, they may not be able to meet that standard and that may be fine, right? That may be the intent. I'm not trying to imply that it isn't. I'm just saying the rigid numbers um can be challenging. So, we'd need to map it for I mean, and it may come down to going back to the same recommendation from the former deputy mayor um this evening.

And then that was also just suggested by, you know, just the property in M2. I mean, a data center is uh a heavy use. It's not like our normal mom and pop tool and die shops we have in the city. So maybe that the property that is zoned already for M2 um should be the only place that we should be considering this at this point in time. And maybe that takes a lot of this problems off the table because that's not by residential. Um, but however we do it, I just want to make sure that we're protecting the city in the best way possible, that there is some some viable land so it meets the Michigan Zoning Enabling Act. Um, but at the same note, you know, if if someone's going to want to come here, they're going to have to work really hard to make sure that they're not affecting the daily lives and the health and safety of of our residents because clearly that's not what we want. Council member Simmons.

3:20:58
Thank you. So the question I guess I just have is for administration maybe for our uh council in our temporary council. um is just understanding I I the in the conversations that we have had previously the um council advice uh was to that we're exposed um and trying to understand what that looks like for our residents currently um from a timeline perspective of not having anything um for protection So, I guess I'm just trying to understand a new time. I'm I want to get it right. So, I'm fine with waiting, but I want to understand from council what that timeline looks like for us. Um, are we just talking about pushing back a meeting? Um, and does that give us are there any negatives with that from your perspective? I mean that you would know of from our actual council through the mayor.

Um there's no particular timeline. I think Drew pointed out the moratorum is still in place. To the extent, you know, there hasn't been a challenge to that. That's that's where you are. Uh you're moving along with an actual ordinance approval process. And I think that it, you know, from a a court's perspective, uh, it shows that you're not simply sitting on your hands. Um, you know, you are you are ultimately trying to put together an ordinance here that's going to be enforceable and found to be reasonable. So, uh, you know, the ordinance that came before you tonight had an awful lot of time and and energy spent in it and a lot of word smithing and a lot of what came up tonight was some fairly quick a fair number of changes that I I think are going to need some review. I I think that review has to happen before you take action to move it on to the next step. If you do, if if you decide, you know, we don't want to wait. We we want to pass this with first reading with all the the comments by Deputy Mayor Gotchel uh to come back to us, that's obviously what your staff would do, right? That's what would come back to you at the next meeting.

Uh but I would come back to you with some explanatory uh you know, comments on some of the things that that we put in there. So you you can do either what what you need to show is that you're actually the moratorum was temporary is temporary and it's to allow you to finish an ordinance.

Great.

And so as long as you're working on it, I think that's helpful.

Great. Good. No. And I'm go ahead.

Uh good with the changes with the six to six time. Add that in there, please. Deputy Mayor Gota, I will relent on that.

Um, I would like to then make a motion directing city staff to review the proposed ordinance to incorporate my comments as well as the comments of uh my f fellow council members as practical and to bring this amendatory ordinance language back for a first reading in the near future. Um, and then also if some of the comments made by council members can't practically be put into the ordinance as alluded to, maybe um ideas of how something similar could be put into effect or if it's just a bad idea to begin with, then a comment as to why we shouldn't do that. Um, that's my motion.

Thank you. Did you get that motion, madam clerk? Sort of. Okay. Any discussion?

3:25:00
Uh, all right. I got a motion and a second to approve the um motion that uh council me or deputy mayor got proposed to us. Is that good enough? Yeah. No.

No. Just make sure make sure clerk gets a copy. Yeah.

All right. All those in favor, please signify by saying I. I. Opposed.

Motion carries. Thank you, Mr. Mayor. What are we going to do with the first motion?

Uh, so we need we need the whoever made the motion in a second to withdraw their motion and second. Correct.

Would it withdraw or just table it? Table.

Where would it be? It'd be postponed, wouldn't it? Technically, if you're going to the next meeting or a future meeting.

Um I was while she looks up who did the motion in a second. I just want to point out we we will attempt to try to turn this around for your next meeting which would be July 28th. Um I just want to be candid. It may take us a little bit more time specifically. We will still be under the moratorum. So that's fine.

I believe the first and second were council member Kennedy first, myself second. Correct. I I think I that's correct.

Okay. Do you want a motion to postpone? Yes.

Motion to post. Did you So was the was the first motion to introduce to approve the introduction and then there was a second I think a withdrawal of that motion given this the one that you just passed mo. I'd withdraw my second from a motion.

Then withdraw the motion. I withdraw my motion. Okay.

All right. You all are getting a lesson in uh Robert's rules of order here this evening. So no extra charge for that.

All right. So now can we move on? Yes.

(Consideration of Waiver Request)

3:27:02
All right. New business number two is a request for a waiver from the adopted resolution imposing a temporary moratorum on the establishing permitting consideration approval location construction and/or installation of any data centers in the city of Wixom to permit the review of a site plan application for a proposed data center at 30625 South Wixom Road partial identification number 22-06-2000-49 as request Ed by Wixom Industrial One LLC. Do I have a motion?

Do I have a motion? I'll move to uh well it so I guess there were a few things outlined in here. Can we ask a question or do we need a motion first? We need a motion.

I Different councils have different practices. Is it your practice to do a motion first? Then you should do that.

I think we have to have the motion first and then discussion. But um I guess the recommendation would be to to make the motion. You're not you know making the motion doesn't you're not deciding what you're doing with the motion. You're just putting the motion on the floor. Okay.

For the purposes of discussion purposes only, I will make the motion.

All right. So, I have a motion and a second.

Uh, Assistant Manager Benson, I think I just have a first right now. What's that?

I think you just have a motion, no second.

I thought you made a move. Okay, I've got a motion. Do I have a second?

I'll second to hear a request.

Okay.

3:28:49
Uh, good evening, mayor, members of city council. Um, so just to just to address the motion part of this first and then we'll get into the kind of the meat and potatoes here. Ultimately, the recommendation or uh you know the the recommended motion coming out of this would be a a motion to approve or deny. You know, you'll pick which of you do um based on whether you find the request to be reasonable or unreasonable. Um so in one in one scenario or another, you're going to need to modify the motion that's on the floor. Really what I I don't have the exact answer. think you made a motion to about the request. So really I guess with the motion on the floor and you can adjust this if you feel so inclined is you know your motion is to discuss the request and then ultimately you'll need to modify that with either approve or deny based on it being reasonable or unreasonable. Does that make sense and jive with the the motion was to discuss.

I'm fine making a modification later if we need to.

Okay. All right. Uh so the uh the the request before you tonight is in relationship to the moratorum uh that was established by resolution of city council on March 24th, 2026. Specifically, section three of that morator of that resolution stated, "A waiver of the moratorum may be granted upon the request of an applicant if the city council finds that a waiver would not impact the health, safety, welfare of the city and is deemed reasonable by the city council in exercising its legislative authority over land use regulation to remain consistent with the city zoning ordinance." That's uh it's pretty boilerplate language. That's it's a common you know text that is in uh moratoriums and it really offers a first administrative remedy for individuals who are uh seemingly impacted by the moratorium in place. So that's the context of of you know what sets up this in this particular uh scenario. Wixom Industrial 1 LLC has submitted a formal written request requesting that city council consider a waiver of that moratorum. Um alongside that they submitted a site plan application. These materials were submitted to the si city on June 2nd. Um consistent with the moratorum that is in place city staff is not permitted to review consider or put any put it through the routine site plan uh review process. So we have not in your agenda packet you will you will not find

the customary planning consultant review, engineering review, fire department review or any of those things.

And one of the key things to keep in mind is the question before you tonight is not whether this uh site plan is satisfactory, whether it meets standards, whether you know we want it or not. The question ultimately is just do you think it is reasonable to wave the moratorum to allow this project to go through site plan uh to enter the site plan review process where it would then be uh you know reviewed by the planning commission both in terms of the use category that the applicant is suggesting um and in terms of whether their their site plan meets the current ordinance standards um as the revised data center ordinance um amendments have not been approved at. So again, that's just the overarching context.

Um the the applicant is here tonight and they will have the opportunity um to to present their case to you. Um but I will give just a quick overview of kind of um you know what the context is. Um this is a 54.1 acre site located west of South Wixom Road and east of Oak Creek Drive at 3 30625 South Wixom Road. U it has an 87 foot wide um frontage on South Wixom Road and approximately 650 ft of frontage on Oak Creek Drive.

Uh the applicant in their site plan submission proposes to construct three buildings totaling more than 519,000 square ft. Um it also proposes approximately 170,000 square ft of uh mechanical yard. Um although the the kind of context of that is doesn't seem to be well defined. Um there was no provided operational statement as a part of the application package. Um so we cannot you know comment and perhaps this is up to the applicant to uh talk about anything related to the end user hours of operation noise impacts number of employees um or uh current or future utility impacts. Um that information was not provided. Um they did provide some information related to reviews from Eagle. Um this none of that has been verified by the city.

Um the applicant uh uh proposes that uh they be reviewed as a permitted use by right um as opposed to um any other kind of category. Uh, sorry, I'm just kind of going back through this. Um, that use categorization uh may uh may actually need to be determined by the planning or by the zoning board of appeals for a use interpretation. That is the body in the city that adjudicates um use verifications. Um, but with all that in mind, um, I will pull up the applicant's presentation and you all will be able to hear from them and discuss their request.

3:34:42
Good evening. Uh, my name is Richard Rassel, 380 North Old Woodward in Birmingham, uh, Michigan. I am legal counsel to Wixom Industrial One Limited Liability Company. I have with me this evening uh to make the presentation to you on the merits uh Mr. Dennis Griffin who is a member of the uh organization Wixom Industrial One. Um we're here this evening of course not in connection with a site plan review. We're not here in connection with an interpretation of an ordinance. We're here with a moratorum waiver request which was submitted uh to this body on June 2nd. Uh this the site plan that we are um anxiously awaiting to move forward with in your city was also submitted for approval on that same day. Uh our plan is by right. Our plan is without project variances and our plan uh firmly fits within the waiver request criteria because it is consistent with the health, safety and welfare of the city of Wixom. And u our position here this evening is that um we are concerned about a number of different things from a legal standpoint.

Um, our site plan, which was received by the city on June 2nd of this year, has not been processed. Our application has not been presented to staff for review. Our application has not been presented to the planning commission. Uh, and is apparently uh being u put into the position of awaiting the process of the consideration of a new ordinance amendment. uh and there has been what we believe to be uh substantial delay in the consideration of a moratorium waiver request. So we're here respectfully uh to make a request this evening that the waiver request that was set forth and documented and it's going to be substantiated on the merits by Mr. Griffin uh be granted by this board this evening. Uh we would then move forward in good faith with your project with our project in your city. Uh we do not need any project variances. we are of right under the ordinance that exists today. Uh and we ask uh that we be allowed to move forward and of course that our project be treated equally with all similarly situated project uh applicants before the city uh in any industrial or commercial district uh in the city today.

Um we can answer questions for you. uh your staff has been very respectful um and accommodating to us and we've had the chance to participate at the planning commission and uh share our comments on the ordinance changes some of which were made in connection with an ordinance uh amendment proposed by the planning commission which differs greatly than what we heard tonight. Uh but that looks like that process may have another chance for uh for comment. So, we we'll share those for another day, but we we'd like the council to focus on our moratorium waiver request as set forth in your uh your March moratorum resolution. Thank you. And I I can address any questions you have, but I turned the table over to Mr. Griffin uh to walk you through uh the merits of our request which supplement our June 2nd letter. Thank you.

(Dennis's Presentation)

3:38:02
Good evening everyone. My name is Dennis Griffin. um representing Wixom Industrial 1. Um I'm actually very proud to be here today. I'm proud of our um progress on our project. Um I'm proud to present that this is a safe project. Um I ask for, you know, respectful objective um consideration of of what I present today. Um, I want everyone to know that there's never been any discussion of NDA or secrecy or anything from my group or from any of the public bodies here has never come up. Um, and we have been entirely transparent from day one. Um, we are not new to this process and we began our investigation in this exact project in late 2023. Um, starting with a site that really was, you know, lost. It was lost with a big corporate name. UPS owned it. Um, it was brought to me by CBRE, you know, one of the the largest um, real estate group in the country. And they're like, you know, Dennis, you know, you're probably one person that can start to figure this out. There's no survey, no environmental, um, nothing. It was literally a surplus property for UPS.

It took me a long time to figure it out. I worked very closely with um Phil Sprag who is our representative immediately put me in touch with Mr. Benson, Mr. Pasal Aakba and we dug in. Um we validated zoning, utilities, soils, access, all of it, the things that we would do as a sophisticated developer. Um and I'll stop there for a m minute and go to my um philosophy for development. Um, I'm a corporate developer. I started out very much suit and tie. I got wiped out in 2008. Um, now I go more personal projects, fulfillment projects. I'm not looking for fights in any communities. The projects I do, generally the communities sometimes don't agree with it, but they applaud it

when I'm finished. um projects I've personally um designed, planned, been constructed with and sold, still own um in downtown Royal Oak, the High Place, the Apartments, Regis. That was my project. Um the mayor at the time um asked me personally said, "We need a hotel. Can you help?" I did help. Um in downtown, not downtown Ferndale, Ferndale and Pleasant Ridge. There really is no downtown Pleasant Ridge. Um, I did a complete redevelopment with my partners of a former um, steel factory, Walker Wire, and it was a mess. And we cleared out PCBs, and we we brought in a fitness center, we brought in tech companies, we cleaned it up. We worked with the city, we worked with the state, we worked with the agencies, did a cross multi-jurisdictional project. It's beautiful. There's new housing, there's new apartments. It was clean. We're proud of it.

I sold it to my partners and we moved on and we moved south into Woodward Heights in Walcott area in Ferndale. We have breweries there. We have Urban Rest Brewery. And I was asked personally, take these young people under your wing and help them so they don't screw up. Um I don't come and trod across cities. Never would. Um the overall arching idea of data centers is unfair. Um data centers are are produced by people that are good people, people that their wives love them. You know, mine does. And you know, I'm not here to do anything terrible to anyone. And I can tell Yeah, she does. She really does. and and you know and I have asked you know early on in in the um planning commission for the exact things that you all mentioned respect I said the things that the public bodies say they affect me and the things that have been said about my company without knowing me you're upset I don't know if I'm upset it doesn't surprise me it hurts it's not appropriate and the things that I would show you today everything is thoughtful about this community. I don't build projects that I'm not proud of. I don't build projects that trod on municipalities.

Um it is apparent that everyone has decided that's all that's going to happen. Um open your your minds a little bit perhaps if it's possible. Who knows? Um so we went through that process and in October 24 we purchased the first 40 acres. Um the entire city from the staff was was aware of it. Um at that time we had validated that data uses data centers were by right. You know we didn't say hey we want to hide a data center. We asked said yeah it's by right. Our agent CBRE marketed it, broadcast it across the country for data centers. You know, Wixom is a redevelopment ready community, pro business. That was the things that we were told to say because they were true. We did. We said those exact things. We have great interest because you're a business ready community. That's the way I marketed it. That's what I believed. We also reszoned um residential in that exact corridor from residential to M1. That's what you all wanted. It was a no-brainer. You know, residential doesn't fit there. So, we consolidated property. We purchased an additional 15 acres. We presented a first data center site plan in October of 2025. And we did. We presented it to staff, you know, with my partners and we took comments and we modified it and we presented another plan. That's the plan you have today.

Our plan is a smart plan. It's one that's conscientious. It takes into account, you know, site back setbacks takes into account smart planning, repurposing buildings. We own buildings forever. We're not going to build a building that can't be repurposed. I'm an adaptive reuse developer. That's what we do. So, that's the general project history. Um, and I said to the honorable mayor um here at a planning commission meeting, I come in peace. I do. I absolutely do. That's my essence. I'm not going to do a crappy project. Maybe I won't do a project at all, but if I do, it's going to be one we're all proud of. No questions asked

Excuse me.

3:44:57
So for health, safety and welfare, this is very important to me and it's a very defined thing. The in the in the um moratorium it says it shall not impact the health, safety and welfare under the current ordinance. Um I can prove that to you exactly that we we would not impact negatively impact these exact items. You have very good um noise ordinance in place today. It's got a daytime, a nighttime. It's also got um language that includes um annoying and tonality and you know those type of items. So, we've considered it. We also looked and followed very closely your sound consultant. I was at maybe I missed one, but I was at every planning commission meeting. I was at the first public hearing. It was me, my team, and maybe one or two other folks. It wasn't this. This was I don't know. I don't I I don't

I'm not upset at all about people being concerned and maybe even afraid. It makes a lot of sense to me. But, um, there also I can help educate. I know more about these buildings and how to quiet them down, how to position them. sure anyone in this room because that's what I do. That's my job. You know, I know how to um line up EC motors, serrated fans, how to point um generator exhaust fans in one direction, how to put critical exhaust systems on them, how to do, you know, caned soundwalls. I can make a building virtually quiet, but you won't let me do a virtually quiet building when you can't even let me put it on my land, you know. So, this it's not even knee-jerk. This is this is preemptive before you even let me present.

I said the same thing to planning commission. Why won't you see my plan? No, because we don't like you. We hate data centers. Everything is scientifically available to fix. The data center world is going very fast. The people are in it have made mistakes. Um, you probably all made a mistake when you went to a Bitcoin mining 1970s building in DeWAc. You know, that's a that's a Mac truck. You know, we're working in Teslas. That's not the same. It's not close. You know, that's right on top. We I grew up in a small town. That's where factories were right across the street. We don't have that situation here. Um, and I respect very much. I've driven all the neighborhoods here. I know where they are. I know that I can't send sound to them the way that you're afraid of. I just can't do. It's physically impossible for me to do. And I'll show you that tonight. Physically impossible for me to do.

3:47:58
So we reference the standards that you've presented to us existing ordinance ANSI EPA typical levels and we presented a receptor by receptor analysis that we are safe and we will not hurt the health safety or welfare single family apartments and there's um they're they're all way north of of Pontiac Trail. you know, by Corx or Cortex. I screw it up sometimes. And then I know where the other ones are in town. I know where the other multif family is across Wixom Road. And and there's an oddball receptor that is being measured now. It's um it was approved as condos in a space. We're going to call it receptor D that's sandwiched between Pontiac Trail and a truckyard. I mean, that's that's tough to to say that we want to protect residents, but also the city approved, you know, front doors 15 ft off from Pontiac Trail. That's a 45 mph, five lane highway that's humming 70, 80, 85 DBs, you know, so who's getting protected all the time? Are we protecting everybody? Are we looking at every plan or are we just attacking data center plans? I would have never oriented those buildings

that way. No way. I would never sell, you know, I I don't want to say anything about, you know, someone else's property, but we got to look at planning in context. And we have to look at existing um elements in context.

Our site is 100% surrounded by industrial. I mean, it's not a large site compared to other data centers. It's the right size and right location. In my um not opinion, I'll show you that it's beyond safe. You know, it it really cannot negatively impact the health, safety, or welfare of the city. And so, our modeling basis is 65 dBA nighttime um in Wixom. And we're offering that as a worst case scenario because our equipment won't be that loud at the property line. Um, when we have our our gener gen sets right, our RT use right, our screen walls, right, we move them off from the property lines, we have the best equipment in terms of serrated fans, um, offset um, chiller systems. Um, it's it's a Tesla. It really is.

So, here's some um terminology that's from your uh consultant, and I think it's very very important. Probably going to be hard hard to see, but I remember him saying that apartment next to freeway, no one would live there. And I agree with that. Um, but we also have a downtown um, excuse me, urban row housing on a major avenue. That's the plan that's between Pontiac Trail and Gibson. There's no question. Know everyone would say Pontiac Trail is a major avenue. Um, and that is rowousing. We also have um older urban residential areas. Not so much of that here. We have wood wooded residential and then the other um areas of absolute decibelbased descriptions. These are from your sound engineer based off from published um governmental data.

This lays out what our basis from our measurement is is what M1 is allowed to produce under your current ordinance. Not. Well, this is actually the same metric that will be in your new ordinance. The way it's trending. The the operative measure is 70 days 65 night at our property line. Regardless of what happens with the rest of it at a receptor, the current ordinance, Matteo, you would agree does not change that.

Correct.

My so these standards stay in place for property lines that are adjacent to zones other than residential.

Correct.

So that is the source property line of how we have to measure from there. Are we not impacting negatively the health, safety and welfare as it exists in in Wixom today. Here is the um land use compat compatibility and interesting here I I've heard mentions of 40 and 35 45 is a lower limit in every classification as presented um by the by the um entities and your consultant. So we have single family residential we respect a 45 to 55 compatible um notion we have residential multif family moderate outdoor use that's what we're going to qualify any apartments um that are next adjacent to our project and the rest of them you can see there was a discussion of what is compatible marginally compatible marginally compatible is, you know, it's compatible, maybe not perfect, but what we've we've put is the low level to the high level and we've provided an average, which seemed very fair. It's squarely and compatible.

Um, as we go on, this is the map of our project. Um, and the distances to A, the closest single family, which is 2,300 ft away. B, the closest urban apartment, which is 2,200 square 2,200 ft away. I'm a developer. I say square square feet a lot. Um, suburban apartment, that's to the east. That's 2,800 feet away. And then we had the proposed condo which is D which is 530 ft away. And from what I can tell that's expired on its own merits for no construction during the time frame. So that's um those are the modeled receptors.

So looking at receptor A the single family um 2300 ft away the ANIE category is single family extensive outdoor use compatible range is 45 to 55 dB average of 50 um on the thermometer that's the one up and down with the different um components that's called wooded residential from the thermometer and your consultant um using two components. It's sound um spreading over distance and a loss of sound through going through a built environment and we were the distance is very much scientific. The built environment we made a conservative estimate. So our project at a worst case 65 dBA which we're lawfully allowed to deliver um is 30.5 dBA delivered to that residential receptor.

The thermometer equivalent is below wilderness ambient. It's the quietest category on the EPA reference scale. We literally are s sending silence to these homes at 2,300 ft. Um, and practically we heard some of the folks say, "Well, all the noise is coming from down below." The ambient level, and I appreciate the deputy mayor's, you know, thinking about the ambient, the ambient is, you know, I don't I it's not even a guess. It's going to be above 30 for sure. um you know and already this is well well below your consultants and the government's estimates of what is compatible 30.5 dBA from our project at those single family homes that is safe that is not um impact impacting and making a ne negative impact to the health safety welfare of those homes as far as sound is concerned the urban apartment this behind Wixom Road and Pontiac Trail, 2200 ft from our project. The multif family moderate outdoor use compatible ranges 45 to 60 dva. We went 52.5.

The thermometer category allows at urban row housing on a major avenue 69 dB. Our modeled measurement on two very um trustworthy and they're from your own consultants um data is 31 dBA delivered to that site from our project. That's below wilder wilderness ambient coming from our project to those apartments in downtown Wixom. 21.5 dB below the ANSI average, 77.5% quieter perceived loudness than what is allowed per um government data.

Receptor D is the proposed town home condominium. This distance is 530 ft from our property line and the ANSI category is M multifamily moderate outdoor use. Again, our position now is that it's expired. Um, but it's also sandwiched between um a truck parking lot on the south um Pontiac Trail on the north um and generally it's surrounded by commercial. Um I think we all can um say that anyone that's living there has a different perception of what their built environment is. Also, we checked it um in the exact same measurements at 530 ft away. We measure 45 dBA. Um this is equivalent to agricultural agricultural crop land from your consultants thermometer. We're delivering agricultural crop land noise to this receptor. Everyone would conclude that that is not impacting negatively the health, safety or welfare of that site and 7.5 dB below the ANSI average.

Again, this is worst case legal amount of noise we can deliver from our property line and we can do better and we will. This is also something that I think is very important when we're looking at

health, safety, and welfare and also as you're deliberating on these ordinances and data centers and their use may be being treated very very unfairly and inappropriately.

So between us and this receptor D is a project called Matrix. There's a project called Vestus. There's another large building that happens to be Baker right now. Those are allowed to deliver the exact same sound at the property line as we are 65 dB. They're allowed to be, you know, a sideyard 20 ft off from the road. So that property can deliver two receptor D 64 DBs to that property line. So our contribution to that property is 45dB and our modeled again appropriately modeled is nearly 20dB below what an adjacent property can deliver to it. No question our project is not negatively impacting the health, safety, welfare of that property. It's physically impossible. We cannot throw quiet over a wall. Can't be done.

Again, um the category here is urban row housing, which your own consultant says should be expected at 69 dB. Um but we're modeling it and we're seven um and a half dB below the compatibility range. Um and we would all agree, everyone that's been over there, that is not a quiet area. And if you look at the ambient, our consultant measured the ambient on that between, you know, 48 and 50. So we're we're well within the range there. So the conclusion here on noise which is the number one concern across the board is our project um for the receptors that is defined cannot um negatively impact the health, safety or welfare as far as noise on those projects. I want to talk now about the project site and infrastructure profile. And there's a lot of discussion and concern about power and water. It makes a lot of sense. Those are consumable items. A developer doesn't want to consume them and their expense items. you know, we don't, you know, we're concerned about, you know, having sewer charges sometimes coming out of of sprinklers. I mean, we're we're not cheap, but we're efficient, you know, that's one thing for sure. So, um, our sarcan characteristics, I want to show you some renderings of building his eye and and the site massing. Um, this project, um, and Drew and Matteo saw that early on.

Um very early on we were looking at a traditional built um business park. We had some iterations where the first round of data centers were they were big. They were too big. They were two stories. Um they were not appropriately positioned for generators and we had a session with Drew and Matteo and we worked on it. Um we went back to kind of a hybrid of our first plant. Um and a big part of it was that exact thing. concern say what do you have with the building? I mean obsolescence right now is in office buildings going to Troy going to Southfield. They're sitting there vacant. People are putting self storage in it. Um we left our geometry here to be um universally ready for traditional industrial most likely multi- um tenant industrial. So you'll see our generator courts have a dimension that allow them to be pulled out and they go into into truck courts very easily.

Um you talk about traffic impact and the comparisons um to uses that are already permitted by right the traffic is you know ridiculously low comparatively. Um, some may say, "Well, that's tied because you don't have any jobs." But it also is not um, you know, diesel fumes, diesel noise, you know, the wear and tear on the roads. Um, that's a that's a safety and welfare item that this project actually um is actually predictable and improving those components. um infrastructure and safety. We verified very early on with the Detroit Regional Partnership um with with Drew and Matteo and your DPW and we worked together and we actually we we got a VIP program together for this exact site.

It's a site that's as um desirable for corporate use in Southeast Michigan. Detroit Regional Partnership, um Oakland County, and we we did it together. Um zoning consistency. Um it's zoned M1 as we said. Um and then we'll conclude that, you know, this is consistent with the health, safety, and welfare standard. So the project here I think it's important um to show a couple things and we'll get into them but in general you'll see the layout um the layout of the buildings they are north oriented to them but that's actually to mitigate sound and what we do is inside of the buildings it's called an acoustic canyon and our generators are contained sound is absorbed between buildings things and it literally can't escape. We put a wall on the north side of this. We point the fan south and this is quiet. The our generators alone are going to be delivering maybe 30 dBs to receptor D. That's the design of them. And on the roof, if we do RTUs rooftop units, then those will have mechanical shields, but they're EC electric controlled variable frequency drive.

what you heard in DeWAc, those are belt driven screamers. And it's a Bitcoin miner. I looked at it. I' I've had Bitcoin miners in my buildings. They're chaos. I mean, they're they're terrible. And them allowing them to continue to go, I think, is is inappropriate. And I also think that some of the other large scale data centers that are being proposed, including Lion Township and others, they're not thoughtful. you know, they're parked right next to horse farms and and apartment complexes and a golf course that's going to be turned into homes. You know, that's not the same context we have here. Not even close. I think the Lion Township was one of the reasons where people said, "Okay, we have to really start protecting." No one talked to me about it. So, when we working on two years, what do we do together? You know, don't let this happen. No one said boo to me. You know, that's kind of insulting the way you were insulted. You know, it's it's very tough sledding when you're working with someone that long and no one even talks to you and you're the expert. You know, we become the experts. We're here to help.

We're not here to trot on any city. And you'll also see that we're preserving wetlands and acres and acres of them. And this was a decision very early on with my partner and me. It's like, you know, we can mitigate these. We can get them out of here. We can get more land. And we're like, why? You know, this can be a very calm class A location. That was our choice. You know, we're a little bit longer in the tooth with development. Those are the choices we make. We're making fulfillment choices. This is one. And we're not stretching the density here. We've got 50% in perus. We can go to 75 for your ordinance. That's 13 acres of land that's left here in the city. I think that's commendable. I don't think that's something to be afraid of of a data center developer. I think that's someone that's doing the right thing. No one is going to say, "Yeah, you're right." I know. I don't expect it, but it is right. Here's an aerial view, more rendered, which shows our projects and the green areas and that we're completely surrounded by industrial every direction. I heard um the the man from Foster Forest, we're not right on top of him. Our generators are tucked behind. Our IT RTUs are up top and they're shielded.

You know, we've got a corporate um location facing him, but still 600 feet off the road, 600 feet. Um to the north of us is Vestus. Right in between our generator yard is a large industrial building providing that shielding, providing the exact shielding that people want to see. This is thoughtful design. The next step between receptor D as we're calling it is a 24/7 truckyard. No, this is not us deciding what is the built environment. That was a city that approved that use. That was a city that zoned this. So, we're working with the environment the best we can. And we believe in data center use done right. Is a Tesla. It's not a Mac truck.

This will show the context in different directions. This is a northwest view. You'll see the large industrial buildings. What you don't see with the other industrial buildings is this much green space. You won't find it. You might find some, you know, different areas, but people that have done a complete park, they haven't left it this green. No one's contemplated that. Everyone else is saying, "How much can I get?" We're not saying that at all.

This is a northeast view. And getting a little more context, I guess that would be going towards town. So, and there's the intersection of old Wixom and Wixom Road. And then there's Gibson Drive and Pontiac. That is not a quiet area by any stretch. um any noise, any tones coming about out of our project. Um already we're limited what can be at the property line, but they're masked. Anything your sound engineer will say it, we know it. Next thing that comes out of there is masked. You know, the sound is masked. We cannot literally um negatively impact the health, safety, and welfare of the city. It's it's practically scientifically impossible for us to do it and following the rules of your ordinance.

This is the souththeast view and again the same context. We're surrounded by similar scale buildings and 100% surrounded by industrial. And you can see now those are actually the gen sets. And interestingly, those gen sets, they're not going to be running all the time. They're going to be tested seldom. But it's practically the same device. It's inside of a tractor of a semi as a gen set running all the time, running around the roads. Ours are in one spot with with controlled um testing.

Here's a southwest view. Um, just to continue recognizing the views, site design highlights that are very important for us to communicate. And the building depths are sized to the data halls, but they're also sized for future uses. They're 212 ft deep. They're very good for light industrial for um not they're not real good for um large uh warehouse. That's not our intent. That's really not our business model. The truck courts are set up um future s truck courts right now. They're gen set courts um and equipment courts. The parking and access as designed in the plan is per the industrial um M1 counts. Um it's perfectly set for a decommissioning plan if that has to come. We wouldn't wreck these buildings. We would turn the genet courts into truck courts um and bring in new clients.

Um shielded mechanical equipment. Um the equipment is progressively moves away from the north. the the most attenuated equipment are the RTUs and the generators that are closest to the north progressively going south. They get further and further and further away. And our distance to receptors A and single family, the apartments and even receptor D is at our property line. Very very quickly you're 2200 2,300 ft from single family. That equipment is now, you know, 3,000 feet away. It's progressively further away. It's it's designed very smartly to have limited impact. The science is perfect on how distance and masking and stacking of equipment works. Um, I didn't invent it, but I've studied it and that's exactly how it works. It's immutable. And the efficient acoustic canyons by the building massing is very smart design and it works for the gen sets. They have a different um I wouldn't say a tonality. They're they're more of a of a rumbler, but they also because because of their design, they're easier to mask. You can grab that sound next to buildings. You can grab it next to um acoustical walls. And that's exactly what we'll do. And the campus is secured. Um there's min minimal strain on public utilities.

Um absolutely secure campus. Um it's full access maintained for fire and life safety. This is vacant land today. Every building is going to be brand new. Every roadway is going to be designed per your standards. Storm water is for um Oakland County and your standards. Um every impact of this building is better than even some of the things that Drew mentioned. a project that may go into an existing building and by its own design, by your own raw um rules and we were obligated to follow them. We can't negatively impact the health, safety or welfare from that site. The scale is appropriate. You've seen it. Our buildings range from 130 to 200,000 ft. That's the range of buildings that are floating through that through that neighborhood. No question.

The traffic impact is um quite telling. The average daily trips if this were built out as M1 is 1,200 are from you know one of the most qualified traffic engineers in the country is 310. It's 950 fewer trips. Um the AM trips are 191 lower. PM trips are 300 lower. Daily truck trips 182 lower. um very very significant reductions and predictable um for a very controlled environment. It's healthy, safe and good for the welfare um infrastructure and site design.

Um the water system is already in your um proposed ordinance. It's also smart design. It's a closed loop system. It's a combination of of glycol, water, um, and it's it's filled once and it gets topped off. That's it for water. That's the way it works. You know, it's it's less water than a golf course. It's less water than a whole host. You know, one of our early groups that was looking at this was um a bottle packaging company for soda. They would been consuming water like crazy. We're not even close. That same use could come in here anytime. You know, we have we have a limited water use, probably the most predictable and lowest water use of most users. Industrial processes use much more water for cooling. And it's going to go in the drains. This doesn't go in the drains.

We're going to have toilets. We're going to have restrooms. We have break rooms. Minor electrical service. Yeah, we we will um build our own substation. That's the location that Drew was talking about on the site. Um it's about 5 acre substation. It's smaller than our original plan. That was about a million feet. You know, we have 200 megawatts. Um it sounds like a lot. It is a lot, but it's a third of the size of Lion Township. You know, it's what is it? 1.4 gig for Seline. That's, you know, seven times as much.

Lion Township is 170 acres. We're 50. We're not even using 50 of it. We're reserving 13. So, we're using 40. I mean, this is a appropriately scaled project that's not going to impact your city as as you're all like um immediately assuming. Thank you so far for for the for the open mind on this. The utility rate impact um I can tell you our deposits with DT already. We make deposits with them. We're like, what do we need to deposit? like because the law is nothing including your studies can impact any resident. Everything that we spend in that in that site by law by DTE and by the Michigan Public Service Commission says that we are not even allowed to impact the rates for your residents. We can't do it. Even if we tried, couldn't do it. Fire protection um is fully fully sprinkled buildings, brand new. Um, it'll be inspected by the city. You know, it's going to, you know, the standards for fire inspection fire department. No problem there. Storm water, modern storm water, um, retention, outlets, storage, um, four bays, everything is our engineer is web engineering and he's he drew most of the buildings in Oak Creek and Century Park. He knows your city very well. You know, personally, he's one of the best. And impervious coverage, we talked about it. And we're

50% proposed impervious versus 75% which we could do by rate for for industrial 13 acres. 13 acres. That's not what a moneyhungry developer does. They don't do that. That's what we're doing.

Um, backup generators is something that I think people should learn more about. Um, and they're not purposefully regulated by the city. They're regulated by the state for exhaust, for fuel, for performance, for testing. The testing there is is required. Um, it's so when they do fire up, they burn cleanly. And the fuel classification is combustible but not explosive. It's it's again it's diesel. There's there's the best thing to equate it to as a semi-driving or on the road is the generator. It's really how it works and fuel storage and containment is you know per NFD standards. Um it's not up to us. These are these are machines that are highly regulated put in place to serve a purpose. testing hours and attenuation. Um, already they're tested during the day. Anything in terms of days and no holidays, that makes perfect sense to us. It's not a problem. And you know, there's going to be a lot of them, but they don't get tested at once. They get tested in batches of two, batches of three for a short period of time. Um, in an acoustic canyon, it's very quiet, very controlled. This is one about the utility. The utility is ahead of this. DTE has laid down the law with us. They're like, "This is your burden. It is that the Michigan Public Service Commission and DTE has mandated that these projects are not going to impact local rates or residents. That's the mandate. We we we have no option to violate that. Zoning consistency again, health, safety, and welfare.

Um, within the existing ordinance, we're zoned M1 light industrial. Um, our use is permitted by right. We're not asking for any variances. None. Um, to the north is M1, to the south is M1, to the east is M1, to the west is M1. Outside improvements, they're not required. Um we're coming off from um Oak Creek Drive as our primary entrance. We're connecting to existing um stubs for water and sanitary. Um it's elegant, clean, um and a great use. I mean, the infrastructure is there. It makes sense for us to use it.

Um city staff, when we were coming through for zoning, there were no identified issues relating to public health, safety, and welfare. That's not putting anyone on the spot. that was something that was already vetted. And so when we're looking at this objectively, objectively, can we negatively impact the health, safety, and welfare of this project? The answer is clearly no. We're not there's arguments across the board that we're protecting the health, safety, and welfare. This is a predictable project um that can run quietly without an undue burden on utilities. It's zoned, currently zoned for this exact use. And it's not scary. I don't want to be a scary person. And I can talk through and and design this. We already have for something everyone can be proud of.

And here's a scale comparison, which I believe from conversations with staff is the boogeyman for for this exercise here. Project Lion that was a a buy right project that probably got jammed through. I've seen the plan. There's no elegance in that plan. That's how much can you fit in and how can you slide it through by right? That's what it looks like. You know, our site area is 55 acres. That's 172 acres. Our developer site area is 40. You know, it's a quarter the size. Their building area is 1.8 million ft². Ours is 525,000 ft. We have three buildings. They have six. Our electrical load is 200 megawws. Theirs is 525 megawws. Ours is zoned M1 surrounded by M1. There's a zoned industrial surrounded by a mix match of incompatible uses. There's no question about it.

We talked about scale. This is a a larger site, but it's not of the scale of the buildings further south of us. It's really not a It's the same size of the buildings that are um immediately west to us, you know,

where Wolverine is and it's it's the right scale and the right location. Third of the sight of these that we've mentioned. Um it's nothing like Dwajak is is no is no comparability. You we couldn't build that. You don't even you don't have the resources to let me mess up that bad. And I think it was a big miss when people started pulling Deagia out as something that we're intending to do. And that's a big miss. And I think that's something that, you know, maybe you could walk back because it's not the same animal. It's not even close. That's that's an abomination. I've I've had those people in my buildings and I heard it. I've screamed it. I hear it screaming. You know, it drives me nuts when we have a a belt loose on one of our industrial fans. I get it. And that's not what we're doing here. Not even close. That's a Mac truck. We're Tesla. There's no question about it.

Yeah. I'll say it again. It's true.

Um, our proposed use is permitted by right. And you can giggle it. It's fine. But, um, your job also is to is to to look at property rights and look at developers and give them respect. Um, and I'm here before you just like everyone else. My preparation is based on facts and data, not emotion. I My job is to deliver class A projects. Um there's all different types of users and I haven't had a marijuana user and not that I'm against it, just haven't had one come come across me at Bitcoin. I've got breweries. I've got makers in Grand Rapids, coffee shops, I've got Ford, I've got all kinds of users. I don't discriminate, but they're not going to come in and make a mess out of my projects. And I'm not going to come in and make a mess out of any city.

So, if you actually can objectively look at the rule here for your own waiver and what I just presented, you'll see that we cannot negatively impact the health, safety, or welfare of your community based on today's ordinance. That's what I'm asking. Thank you very much. Thank you.

Any discussion?

4:25:30
Council member Barman, given your analogy to Mac truck and Tesla, um, where would you please, please, where where would you describe that there is a Tesla we could look at? Because frankly speaking, all we know is what we know that we could research ourselves and no one has told us where there's a Tesla we could go look at.

Well, that's a very good question, but I know we can find them. I I I know that my development partners, they're dealing with this day in and day out. You know, my development partner is one of the largest um mechanical providers in in the United States.

So, so, so, so you haven't built a Tesla yet? No. You see where we're concerned?

I see the concern. Exactly. But your your rules, which I am not legally allowed to break, force me to have a Tesla compared to your comparison. The rest of it, it's empirical what what the equipment is. Our clients are no joke. They they demand the best and they are some of the greenest um companies on the planet. These are these are not what you guys think of people coming through like Bitcoin miners. So I' I'd like to find an example of that exact Tesla. But I can tell you that my acoustic design that has been seen by other develop um data center developers and my own partner is superior. It's superior.

Wow. Would you would you endeavor to find a Tesla or are you going to endeavor to find, you know, something that that is repulsive?

I I'd be happy to look at a Tesla if you had one to show me. And frankly speaking, I think that's something I I I would implore everybody to to look at the Mac truck and the Tesla if you could find one. Yes. And then and then make an informed decision from there.

Um I mean you you mentioned your clients would would not settle for that. Our clients are sitting out here in the audience. Okay. Yeah. And and that's what we have to listen to within the confines of our ordinance.

Um, and within I mean I I know you you referenced earlier that you were having conversations with staff regarding this potentially being a data center development, but when you came to council last year for the resoning, it was presented as a light industrial park by yourself. And when then the minutes in the planning commission support that as well. And the first that council learned that there was even a potential of data center use was when you went to the planning commission meeting and said that and we read it in the planning commission minutes and at that point we as council decided that we had to do the moratorium until we could figure this out. So within th that those that confines right there. I I think it's in that health is very reasonable for the health and safety of this municipality that we finish our ordinance before we grant you a waiver and we only got two months left on the moratorum. So let us finish our let us finish our ordinance and respectfully and I appreciate your presentation this evening. Respectfully I will modify my motion to deny based upon the reasonleness uh of the health and safety for the the the residents and and the city at this point in time.

Well, there the that's not accurate what you said about my presentation at zoning. My presentation exactly said um use is permitted in M1. Um and CBRE formally was marketing this as a data center last April. There is no way that I'm delivering a site of this magnitude to the marketplace without verifying its permitted use with your staff. would never happen.

Well, we're not going to debate it this evening. I mean, what staff says is not what council says, and council speaks for the city. So, again, I I'd like to modify my my motion if if the mayor would allow that. And um let let's move forward with our ordinance.

Cool. You're going to withdraw withdraw the original motion?

Well, the original motion was for discussion. So, I'd like to modify or withdraw however the the attorney would like it to uh deny the waiver request due to the reasonleness of the health and safety concerns. I believe that's what you wanted, correct?

Okay. Respectfully, if I can just make a suggestion, right, that what we were trying to interpret your earlier motion was basically just to say a motion to discuss uh and then pick up the rest of the language after approved and deny pro approve or deny, right?

However you would like it. That's and instead we're going to now say motion to deny and the rest of the language the same.

That's fine.

That would be the easiest part to deal with. Whatever makes it easier for her. Thank you.

Council member Got or Deputy Mayor Gotchel.

Thank you. I guess just to clarify because there is another section that has a slash for reasonable unreasonable. It would be unreasonable then. Correct for your motion.

Right. Correct. Due to the health and safety. So I have a motion. Do I have a second?

Second. All right. Any further discussion?

Uh let me make this clear. We have a motion uh by city council to deny the request waiver from the adopted resolution imposing a temporary moratorium on the establishing permitting consideration approval location construction and/or installation of any data centers in the city of Wixom to permit the review of a site plan application for proposed data center at 30625 South Wixom Road. Parcel identification number 22-06-2000-049 as requested by Wixom Industrial One LLC due to the request of unreasonable as it relates to the potential health, safety and welfare impacts in the city. Is that correct?

All right, that's the motion and a second. All those in favor, please signify by saying I. I opposed.

4:32:35
Motion carries. Thank you.

(Back to public comment again)

4:32:42
4 hours, 32 minutes, 42 seconds
That that concludes the business portion of this meeting tonight. We'll move on to the second call to the public. I'll read those rules again. The public shall
4:32:50
4 hours, 32 minutes, 50 seconds
address the council during the call to the public which shall be included on the agenda immediately after correspondence and again immediately after new business. The first call to
4:32:58
4 hours, 32 minutes, 58 seconds
the public immediately after correspondence shall be limited to agenda items only. A person shall not address the council in excess of 5 minutes unless the time is extended by a majority vote of the council present.
4:33:08
4 hours, 33 minutes, 8 seconds