# EXHIBIT 27

CITY OF WIXOM
49045 PONTIAC TRAIL
REGULAR CITY COUNCIL MEETING MINUTES
TUESDAY, JULY 14, 2026

Mayor Beagle called the meeting to order at 7:01 p.m., and the Pledge of Allegiance was recited.

Present:

| | |
|---|---|
| Mayor: | P. Beagle |
| Deputy Mayor: | K. Gottschall |
| Councilmembers: | P. Behrmann |
| | T. Gronlund-Fox (exc.) |
| | J. Kennedy |
| | N. O'Dea |
| | V. Simmons |

Also Present: City Manager Brown
Assistant City Manager Benson
City Clerk Opalko
Planning Consultant Passalacqua
City Attorney Schultz
Chief of Police Langmeyer

AGENDA CHANGES: (None)

APPROVAL OF MINUTES:
CM-07-70-26: Moved and seconded by Councilmembers O'Dea and Kennedy to approve the City Council Special meeting minutes of June 23, 2026.

CM-07-71-26: Moved and seconded by Councilmembers Kennedy and Simmons to approve the City Council Regular meeting minutes of June 23, 2026.

Vote: Motion Carried

CORRESPONDENCE:
Mayor Beagle mentioned that he received eleven email correspondence relating to data centers.

CALL TO THE PUBLIC:
Tom Rzeznik, 1636 Weyhill Drive, expressed support for extending the current moratorium on data centers rather than granting a waiver. He stated that additional time is needed to further review and refine the proposed zoning ordinance and referenced pending state legislation that would extend a statewide moratorium through April of the following year. Mr. Resnik thanked the Planning Commission for its work on the draft ordinance but suggested additional modifications should be considered. He proposed evaluating alternative zoning approaches, including relocating MHP-zoned property and creating a data center overlay district in areas adjacent to the freeway. He urged the Council not to rush adoption of the ordinance and encouraged extending the moratorium to allow additional public review and consideration of alternatives. He concluded by asking the Council to prioritize the interests of Wixom residents in its decision-making.

Katie Weeks, 1725 Norton Creek Court, expressed concerns regarding the proposed data center at 3625 Wixom Road, the requested moratorium waiver, and future data center development within the City. She asked whether any members of City Council signed non-disclosure agreements with data center developers, after which members of the Council

responded that they had not. Ms. Weeks raised concerns regarding potential noise impacts, citing information about another data center and its effects on nearby residents. She also expressed concerns about potential water consumption, wastewater, and impacts on groundwater resources. Ms. Weeks urged the Council to maintain the current moratorium and continue restricting data center development while additional review is conducted.

Jessica Buck, 3014 Madison Street, thanked the City Council for its transparency and encouraged the Council to extend the data center moratorium and deny the requested waiver. She expressed concerns regarding potential health, environmental, and noise impacts associated with data centers, referencing reports of litigation involving facilities in other states. Ms. Buck stated that additional information regarding the long-term impacts of data centers is still emerging and suggested that future changes in state law could affect local regulation. She also recommended that the proposed ordinance include stronger enforcement provisions for violations of noise and water usage standards, including more significant penalties for non-compliance.

Alexis Madsen, 1402 Trailside Boulevard, spoke in opposition to the proposed data center and requested that the Council extend the current moratorium and deny the requested waiver. She expressed concerns regarding the potential long-term impacts of data centers on public infrastructure, natural resources, public health, and municipal finances, citing examples from other communities. Ms. Madsen also raised concerns regarding tax incentives and the potential costs to local government and public services. She encouraged the Council to adopt strong zoning regulations, require developers to bear the full cost of necessary infrastructure improvements, provide independent environmental monitoring, establish community benefit requirements, and ensure that any agreements remain subject to public review and hearings.

Annette LeBaron, District Director for State Senator Jim Runestad, read a statement on behalf of Senator Runestad. The statement acknowledged concerns raised by Wixom residents regarding the proposed lifting of the data center moratorium and emphasized the importance of careful consideration and transparency. It noted that Senator Runestad had introduced legislation to establish a statewide one-year moratorium on new data center projects to allow time for the development of standards and protections related to issues such as infrastructure, environmental impacts, public health, local oversight, and taxpayer interests. The statement further indicated that Senator Runestad would continue to monitor the issue and advocate for transparency and public involvement in the review of proposed data center projects.

Heather Paruch, 1658 Brookside Court, expressed concerns about the proximity of the proposed data center to residential neighborhoods, the new Wixom Elementary School, and planned community recreation areas. She stated that she was concerned about the potential impacts of the facility and its supporting infrastructure on nearby residents, particularly children. Ms. Paruch encouraged the Council to continue the moratorium to allow additional time to evaluate the issue, monitor potential changes in state law, and maintain safeguards for the community. She also thanked the Council for its transparency and continued attention to the matter.

Nick Cartier, 1837 Swaney Drive, Walled Lake, expressed concerns regarding the potential effects of data center noise on wildlife and the surrounding ecosystem. He stated that additional research should be conducted regarding the impacts of low-frequency noise on animals and pollinators before additional data center development is considered. Mr. Cartier also thanked the Council for providing residents with the opportunity to share their comments and for its continued engagement with the community.

Michael Foster, owner of Foster Specialty Floors, 30681 Wixom Road, expressed opposition to the proposed data center and discussed potential impacts on existing businesses located near the proposed site. He raised concerns regarding the absence of setback requirements for adjacent commercial and industrial properties, potential noise impacts on employees and business operations, and possible environmental effects, including groundwater contamination. Mr. Foster also expressed concerns regarding potential legal and financial risks to the City and encouraged the Council to continue the moratorium while developing a comprehensive ordinance with strong enforcement provisions to protect existing businesses and residents.

Mike Bartell, 729 Sibley Court, thanked the Council for its efforts to carefully consider the proposed data center ordinance. He expressed concerns regarding acceptable noise levels and suggested that greater separation distances should be considered between data centers and downtown or other developed areas. Mr. Bartell also expressed concerns that granting a waiver to the moratorium could expose the City to future legal challenges if a developer makes investments before final decisions are made. He further encouraged the Council to consider the potential impacts of data center development on neighboring communities when evaluating future proposals.

Stacey Johnson, 2024 Medina Drive, thanked the Council for providing an opportunity for public comment and expressed opposition to the requested data center waiver. She stated that she believed data centers provide limited long-term employment benefits relative to their anticipated demands on water, electricity, and other public resources. Ms. Johnson expressed concerns regarding potential power generation infrastructure, noise, air quality, and the adequacy of enforcement measures. She encouraged the Council to deny the waiver request and consider alternative uses for the City's resources that would provide greater long-term community benefits.

Keith Krauter, 2906 Blue Heron Drive, thanked the City Council and Planning Commission for incorporating several revisions into the proposed data center ordinance, including changes to setback requirements and ordinance language. He encouraged the Council to extend the current moratorium and deny the requested waiver to allow additional time for review. Mr. Krauter also recommended that the ordinance require independent third-party testing of wastewater and noise, with associated costs borne by the developer, and suggested stronger enforcement measures, including increased penalties and operational restrictions for violations of ordinance standards.

Donald Gambrell, 272 Wright Street, encouraged the Council to continue prioritizing the health, safety, and welfare of Wixom residents when considering future development decisions. He referenced statements from the City's website regarding the responsibilities of the Construction and Development Services Department and City Council, as well as provisions of the Michigan Constitution concerning the role of citizens in government. Mr. Gambrell emphasized the importance of public participation and urged the Council to represent the interests of the community in its decision-making.

Kimberly Clancy, 242 Neptune, Walled Lake, addressed the Council from the perspective of her professional experience in accounting and finance. She emphasized the importance of establishing clear monitoring, auditing, and enforcement procedures for any data center regulations, including standards related to noise, water, air quality, and electricity usage. Ms. Clancy questioned how compliance would be verified, how frequently independent audits would occur, and what penalties would apply for ordinance violations. She also expressed concerns regarding potential tax incentives for data center developers and encouraged the Council to ensure that accountability and oversight measures are clearly defined within the ordinance.

Kelly Schrubba, 2047 Grassmere Drive, expressed opposition to the proposed data center development and encouraged the Council to maintain the current moratorium. She stated that she was concerned about the potential environmental impacts of data centers, including increased electricity and water usage, noise, air quality, and the potential effects on natural resources and the community's quality of life. Ms. Schrubba questioned the long-term economic benefits of data centers relative to their impacts and urged the Council to prioritize sustainable development that protects residents and future generations.

Greg Kelley, 2304 Pawnee, expressed opposition to the proposed data center and voiced support for maintaining the current moratorium. He stated that he believes data center development is inconsistent with Wixom's character and community planning efforts and encouraged the Council to prioritize the interests of residents when making its decision. Mr. Kelley urged the Council to deny the requested waiver and continue the moratorium.

Rayetta Hartley, 2481 Balsam Court, expressed support for maintaining the current data center moratorium and opposed granting the requested waiver. She stated that the moratorium provides the City with time to evaluate zoning regulations and protect the community. Ms. Hartley expressed concerns regarding potential impacts on electrical and water infrastructure, environmental resources, noise, and the proximity of data centers to residential areas, schools, and businesses. She also questioned the long-term economic benefits of data center development relative to its potential impacts and encouraged the Council to continue pursuing growth that aligns with the character of the community.

Tim Moore, 369 Decker Road, Walled Lake, believes the City should conduct additional due diligence before considering a data center. He encouraged Council members to visit communities where data centers already exist, speak with residents about their experiences, and determine whether property values have been negatively impacted. He suggested that, if property values decline as a result of a data center, the developer should compensate affected property owners for the loss in value. He noted that he shared the same comments with the Planning Commission and urged Council to thoroughly research the issue before making a decision.

Katherine Dyer, owner of Wixom Family Pet Practice, 49315 Pontiac Trail, stated that her veterinary practice is located near the proposed data center site. She explained that when she purchased the practice, she intended for it to remain a locally owned business and part of the community rather than be sold to a corporation. Ms. Dyer commented that the City's recent investments, including the new parking lot, park, and bike trail, have strengthened the community and made it easier to recruit employees following the COVID-19 pandemic. She expressed concern that noise generated by a nearby data center could negatively affect the animals treated at her practice, noting that many pets are highly sensitive to sound. She urged Council to consider the potential impacts of the project on both residents and animals when evaluating the proposal.

Michael Moore, 2061 Maple North Trail, expressed concern that the City had not adequately considered the long-term financial responsibility of the developer and future data center operator. He questioned the long-term benefits of the proposed facility, noting its anticipated utility demands and limited permanent employment opportunities. Mr. Moore encouraged Council to consider the long-term costs associated with decommissioning the facility, including potential environmental remediation and site restoration. He recommended requiring the developer to provide financial assurances, such as an upfront escrow or other secured funding, to cover future cleanup, restoration, and other obligations should the facility cease operations or ownership change. He urged Council to hold the developer financially accountable and conduct thorough due diligence before approving the project.

Tony Midea, 1857 Downham Drive, believed the large turnout for the meeting reflected the significance of the proposed data center to the community. He concluded by stating that a community's character is measured by how it protects and supports its most vulnerable members rather than its most privileged, and he encouraged Council to make a wise decision regarding the proposal.

Aaron Rzeznik, owner of Drafting Table Brewing Company, 49438 Pontiac Trail, thanked Council for listening to the public's concerns and urged Council not to lift the moratorium on data centers. He requested that the moratorium be extended for an additional year to allow for further research into the potential impacts and unintended consequences of data centers. Mr. Rzeznik referenced a recently issued executive order in New York establishing a one-year moratorium on new large-scale data centers and encouraged Council to take similar action rather than allowing Wixom to serve as a test case for future development.

Steve Joppich, 2017 Teaneck Circle, stated that the large number of residents attending and speaking at the meeting demonstrated the community's opposition to the proposed data center. He urged Council to recognize that many additional residents who did not speak likely shared the same concerns. Mr. Joppich, a lifelong Wixom resident, commented that the proposed data center represented an unproven technology with unknown long-term impacts and expressed concern about the lasting effects the decision could have on future generations. He encouraged Council to carefully consider the long-term consequences of its decision before taking action.

David W., Northville, stated that he was speaking to ensure the community's voice was reflected in the proposed data center ordinance. He commended the Planning Commission for revising the ordinance to replace discretionary language with mandatory requirements, stating that the changes strengthened the ordinance by making key provisions legally binding, including standards related to water usage, infrastructure commitments, setbacks, and enforcement. Mr. W. recommended several additional revisions, including requiring independent third-party verification of projected electrical demand, adding a sunset clause to require periodic review of the ordinance as technology evolves, and strengthening the reclaimed water provision by eliminating discretionary language. He encouraged Council to continue refining the ordinance and to establish a standard for future ordinances that prioritizes the interests of the community.

Nate Carmody, 1349 Chanticlair Circle, stated that many of his concerns had already been expressed by previous speakers. He questioned the long-term financial viability of the data center industry, expressing concern that the rapid growth of artificial intelligence could create economic risks if demand declines. Mr. Carmody also expressed concern about the potential uses of artificial intelligence and data centers, stating that the technology could contribute to increased government surveillance and privacy concerns. He urged Council to consider the long-term implications of the proposed development before making a decision.

Kristina Campbell, Hartland, stated that she has worked for the past four years at a manufacturing facility on Pontiac Trail adjacent to the proposed data center site. She expressed opposition to the proposal, citing concerns about the area's natural environment and wildlife. Ms. Campbell stated that the undeveloped property provides valuable habitat and contributes to the ecological health of the community. She encouraged Council to preserve the site and, if data centers are developed, to consider previously developed or industrial properties rather than undeveloped land.

Belynda Gambrell, 272 Wright Street, stated that she has a background in information technology and expressed concerns about the proliferation of data centers and their potential impacts. She also discussed the importance of civic education and referenced the Declaration of Independence, stating that government derives its authority from the consent of the governed. Ms. Gambrell stated that she believes the community does not support the proposed data center and urged Council to represent the interests of Wixom residents when

considering the proposal. She also encouraged Council to remain independent in its decision-making and to prioritize the safety and well-being of the community.

Maryann Harper, 1614 Brentwood Drive, expressed support for extending the moratorium on data centers, referencing a recent action taken by the State of New York. She encouraged Council to carefully consider the long-term impacts of allowing a data center to utilize local water resources and raised concerns about existing traffic, truck noise, and congestion in the area. Ms. Harper also questioned how the presence of a data center could affect the community's desirability and residents' willingness to continue supporting future millage proposals intended to improve local services and amenities.

John Palmer, 277 Wright Street, stated that Council's responsibility is to protect the interests of the Wixom community. He expressed his belief that many residents oppose the proposed data center and encouraged Council to adopt the strongest ordinance legally permissible to discourage data center development within the City. Mr. Palmer urged Council to prioritize the community's interests when considering the proposed ordinance.

Wayne Glessner, 2045 Hazel, expressed agreement with the concerns raised by previous speakers regarding the proposed data center. He stated that data centers should be viewed as manufacturing facilities rather than traditional data storage facilities due to their significant resource demands. Mr. Glessner suggested that data centers be classified as heavy industrial uses and stated that they are incompatible with M-1 and M-2 zoning districts. He also expressed support for extending the moratorium and encouraged Council to ensure the ordinance contains clear, specific, and enforceable language.

Michelle Hendrian, 1935 Hopkins Drive, stated that she had conducted additional research on data centers since the previous meeting and expressed concerns regarding their potential environmental and public health impacts. She cited concerns related to increased temperatures, energy demand, air quality, water quality, and noise, and recommended that environmental monitoring be conducted by independent third parties selected by the City. Ms. Hendrian also questioned the long-term economic benefits of data centers, stating that many associated jobs are temporary or contractual, and expressed concern about the long-term viability of the industry. She urged Council to consider the potential impacts on residents, local businesses, and the community before approving a data center.

CITY MANAGER REPORTS:

1.) Fire Report – May 2026
2.) Police Report – May 2026

Councilmember Behrmann inquired whether the death of the delivery driver would be reflected in the City's homicide statistics and requested an update on the status of the case.

Chief Langmeyer responded that the incident could increase the City's homicide count once officially reported and considering this was still an active investigation, he couldn't make any additional comments.

CONSENT AGENDA:

CM-07-72-26: Moved and seconded by Deputy Mayor Gottschall and Councilmember O'Dea to approve the Consent Agenda as presented which included:

1.) Approve to receive and file:
    a. Downtown Development Authority Minutes of April 28, 2026

2.) Recommendation to Authorize the Purchase of a Single-Axle Hook Lift (SwapLoader®) Freightliner Truck Chassis from Wolverine Freightliner- Westside of Ypsilanti, MI in the Amount of $121,000, and Related Snow and Ice Control

Equipment from Truck and Trailer Specialties of Howell, MI, in an Amount Not to Exceed $195,055, for a Total Cost of $316,055 from Dump Truck Equipment and Replacement Account Number 401-441-973.362

3.) Recommendation to Approve the Local Road Improvement Matching Fund Program Cost Participation Agreement with the Road Commission for Oakland County for the Amount of $37,653 with a Local Share Not to Exceed $52,347 with $25,000 from Pavement Preservation Account #203-554-976.393 and $27,347 from Local Road Construction Account #203-554-971.399 and Authorize DPW Director Tim Sikma to Sign the Agreement

4.) Recommendation to Adopt a Memorandum of Understanding and Cooperative Services Agreement Between the City of Wixom and the Downtown Development Authority for Service Cost Sharing for the Period of July 1, 2026 through June 30, 2027

Vote: Motion Carried

UNFINISHED BUSINESS:

1.) Recommendation to Approve a Cost Participation Agreement with Walled Lake Consolidated School District (WLCSD) Regarding Public Infrastructure Improvements Associated with the New Wixom Elementary School Located at 3515 W. Maple Road and Authorize the Mayor to Execute the Agreement

CM-07-73-26: Moved and seconded by Councilmembers Behrmann and O'Dea to approve a Cost Participation Agreement with Walled Lake Consolidated School District (WLCSD) Regarding Public Infrastructure Improvements Associated with the new Wixom Elementary School located at 3515 W. Maple Road and authorize the Mayor to execute the agreement.

City Manager Brown reviewed the proposed Cost Participation Agreement between the City of Wixom and the WLCSD for infrastructure improvements on West Maple Road associated with the construction of the new Wixom Elementary School. He stated that Council had previously expressed concerns that the original agreement did not provide a sufficient commitment from the School District to participate in the project costs. Following additional discussions, a revised agreement was developed that included language defining "reasonable cause" for termination of the agreement, including circumstances where the final design does not include the roadway improvements identified in the agreement. He advised that WLCSD agreed to the revised language following distribution of the Council packet. He indicated that the revised agreement was intended to address Council's concerns by providing a stronger commitment from WLCSD toward the proposed infrastructure improvements. He noted that the agreement required City Council approval and that the School District Superintendent would be authorized to execute the agreement on behalf of the District upon Council approval.

Councilmember Simmons asked about the anticipated timeline for finalizing the agreement and completing the roadway improvements. City Manager Brown responded that construction is anticipated during the 2027 construction season following design, bidding, and contract award. He noted that while the agreement includes a December 31 deadline, the work to finalize project costs could be completed sooner, with the deadline providing additional flexibility.

Assistant City Manager Benson added that, if the agreement is approved, staff would return to Council with a proposal for design engineering services to begin the project. He

explained that the design phase would establish the final project costs, which staff anticipates completing before the December 31 deadline, allowing the project to be bid in late winter or early spring for construction during the 2027 construction season.

Councilmember Kennedy asked whether the School District was unwilling to increase its $450,000 cost participation commitment.

City Manager Brown responded that WLCSD did not offer any additional funding beyond the $450,000 commitment, which was included as part of its bond planning for potential roadway improvements. He explained that the agreement requires WLCSD to contribute the lesser of $450,000 or 50 percent of the project cost, although staff anticipates the total project cost will exceed that amount. Councilmember Kennedy would like WLCSD to contribute a larger share of the project costs, given that the new school is driving the need for the roadway improvements.

Councilmember Behrmann stated that WLCSD initially proposed no roadway improvements but subsequently agreed to contribute $450,000 toward the project following discussions with City officials and public input. He appreciated the School Districts willingness to participate in the project and stated that he supported pursuing necessary traffic improvements, particularly a left-turn lane to improve traffic flow and emergency vehicle access, rather than more extensive roadway enhancements.

Deputy Mayor Gottschall stated that he remained concerned about the School District's financial contribution toward the roadway improvements, noting that the proposed $450,000 commitment represented only a portion of the costs generated by the new school. He expressed the opinion that the School District should contribute a greater share of the project costs and suggested the City communicate a specific funding expectation rather than simply requesting reconsideration. While he appreciated that the revised agreement provided a firmer commitment than the previous version, he indicated that he could not support the agreement as presented.

| | | |
|---|---|---|
| Roll Call Vote: | (4) AYES: | Beagle, Behrmann, O'Dea, Simmons |
| | (2) NAY: | Gottschall, Kennedy |
| | (1) ABSENT: | Gronlund-Fox |

Motion Carried

NEW BUSINESS:

1.) Introduction and First Reading of an Ordinance to Amend the Wixom Code of Ordinances, Title 18, Amend Section 18.01- Industrial Districts, Section 18.09.020- Schedule of Uses to Address the Permissibility of Data Centers in the M-1 and M-2 Zoning Districts; Amend Section 18.09.04- Standards Applicable to Specific Uses to Provide Specific Standards for Data Center Uses in the M-1 and M-2 Zoning Districts; and Amend Section 18.24.030 to Provide Definitions for Data Centers

CM-07-74-26: Moved and seconded by Councilmember Kennedy and Deputy Mayor Gottschall to approve the introduction and first reading of an Ordinance to amend the Wixom Code of Ordinances, Title 18, amend Section 18.01- Industrial Districts, Section 18.09.020- Schedule of Uses to Address the Permissibility of Data Centers in the M-1 and M-2 Zoning Districts; amend Section 18.09.04- Standards Applicable to Specific Uses to Provide Specific Standards for Data Center Uses in the M-1 and M-2 Zoning Districts; and amend Section 18.24.030 to Provide Definitions for Data Centers.

Assistant City Manager Benson presented the proposed zoning ordinance amendments regulating data centers. He reviewed the background of the ordinance, noting that City Council directed staff and the Planning Commission to begin researching data center regulations in November 2025 and subsequently adopted a six-month moratorium in March 2026 to allow time for study. He explained that the Planning Commission met multiple times to research data centers, review regulatory approaches used by other communities, and receive public input before developing its recommendations.

Mr. Benson reviewed the ordinance amendment process and provided an overview of the City's industrial zoning, utility infrastructure, and the range of data center sizes and types that could be subject to the proposed regulations. He noted that zoning regulations must apply consistently to all potential data center proposals and explained that the Michigan Zoning Enabling Act generally prohibits municipalities from completely excluding a lawful land use where a demonstrated need and appropriate location exist. He stated that the proposed ordinance was intended to balance compatibility, feasibility, and mitigation of potential impacts, while remaining legally defensible.

Mr. Benson summarized the Planning Commission's recommendations, including a request that City Council consider extending the moratorium to allow additional study; limiting data centers to Special Land Uses in the M-1 and M-2 zoning districts; prohibiting data centers in the IRO and OS-1 zoning districts; increasing the minimum setback from 500 feet to 1,500 feet; and revising the ordinance to replace discretionary language with mandatory requirements where appropriate.

Planning Consultant Passalacqua presented a slide show with the proposed zoning ordinance amendments regarding data centers, noting the presentation was substantially the same as that provided to the Planning Commission. He explained that the purpose of the presentation was to review the Planning Commission's recommendations, discuss the proposed ordinance language, and provide Council with an opportunity to consider amendments or provide direction.

Mr. Benson explained that the Planning Commission met nine times to research data centers, evaluate regulations adopted by other communities, and develop ordinance recommendations. Following a public hearing, the Planning Commission recommended that Council:

- Extend the data center moratorium to allow additional study.
- Permit data centers only as a Special Land Use in the M-1 and M-2 Zoning Districts.
- Prohibit data centers in the IRO and OS-1 Zoning Districts.
- Increase the minimum residential setback from 500 feet to 1,500 feet.
- Revise ordinance language by replacing discretionary "may" language with mandatory "shall" language where appropriate.

Mr. Benson provided an overview of the proposed ordinance, explaining that data centers would require Special Land Use approval and detailed application materials, including utility demand analyses, environmental and noise studies, emergency response plans, and infrastructure evaluations. He noted that applicants would be responsible for all consultant review costs.

The proposed standards include:

- A minimum 1,500-foot setback from residentially used or zoned property.
- Screening and landscaping requirements for mechanical equipment.

- Water use standards encouraging air-cooled, hybrid, or closed-loop cooling systems, with limitations on municipal water usage.
- Infrastructure improvements and financial guarantees at the applicant's expense.
- Ongoing third-party monitoring of noise and utility usage to ensure compliance.
- Parking requirements
- Give authority for the Planning Commission to impose additional conditions through the Special Land Use process.

Mr. Benson also reviewed mapping showing industrial properties where data centers could or could not be located based on the proposed setback requirements.

In closing, Mr. Benson outlined Council's options, which included approving the ordinance as presented, modifying the proposed language, referring the ordinance back to the Planning Commission for additional review, or continuing work while the existing moratorium remained in effect. He noted the current moratorium expires on September 24, 2026, and explained that while a moratorium provides temporary protection, staff believes adopting clear zoning regulations provides a stronger long-term legal framework. He further noted that any ordinance adopted by Council could be amended in the future as needed.

Councilmember Kennedy asked for clarification regarding the proposed noise standards, including the difference between dBA (A-Weighted decibels) and dBC (C-Weighted decibels) measurements and whether the additional tonal penalty provisions made the standards more or less restrictive.

Mr. Benson explained that the dBA and dBC standards measure different types of noise, and the differing allowable levels were established based on recommendations from the City's sound consultant.

Councilmember Kennedy requested lowering the proposed daytime noise limit to 40 dBA to better match existing ambient noise levels and proposed increasing the required setback for data centers to 2,000 feet.

Councilmember Behrmann expressed concern that the proposed ordinance did not provide sufficient enforcement authority should a data center violate ordinance requirements. He questioned whether requiring a special land use approval provided adequate oversight and suggested that a Planned Unit Development (PUD) process, or another mechanism with stronger enforceable development agreements, may provide greater protections. He also stated that he believed City Council, as the elected body, should have the final authority over approving any proposed data center. Staff explained that a PUD could potentially provide additional contractual obligations and enforcement mechanisms, but noted that additional research would be necessary to determine whether the City's current PUD ordinance would accomplish those objectives. Staff further advised that another option could be requiring Special Land Use approvals for data centers to be reviewed by City Council rather than the Planning Commission. Councilmember Behrmann indicated he would support moving forward with the ordinance while directing staff to explore stronger approval and enforcement mechanisms, including the potential use of a PUD.

Deputy Mayor Gottschall stated that, prior to discussing the ordinance, he wanted to acknowledge recent personal attacks and negative comments directed toward him on social media regarding the data center issue. He stated that while he understood residents were passionate about the topic, he encouraged respectful dialogue and emphasized that elected officials were working through a complex issue while attempting to balance legal considerations with the concerns expressed by the community.

Deputy Mayor Gottschall proposed a series of amendments to the draft data center ordinance intended to strengthen environmental protections, operational standards, enforcement provisions, and community safeguards. He submitted the following amendments to be written into the record as follows:

*Section 2, N, 1, B:*
*Adjust the language so it is an exact amount of demand stated, and not an estimate, and that the stated amount is independently verified by an expert chosen by the city but paid for by the operator.*

*Section 2, N, 1, C:*
*Include wording related to estimated discharge and mitigation technologies used to prevent bacteria and chemicals to be discharged into the city wastewater system.*

*Section 2, N, 1, D & Table:*

a. *Adjust Daytime Hours to 8 a.m. – 6 p.m.*
b. *Adjust Nighttime Hours to 6 p.m. – 8 a.m.*
c. *Amend the limits listed in the chart to instead the Ambient Sound Study average +1dbA and +1dbC*
d. *Include that the nearest receiving property includes properties with the listed zoning that are in adjacent municipalities.*
e. *Expand table to include the following, as separate categories:*
    i. *Group 1: Residential & all three VCA types*
    ii. *Group 2: Schools (public & private), places of worship and faith*
    iii. *Group 3: Existing parks, habitats, and recreation areas, including, but not limited to, city, county, regional, state, and national parks.*
    iv. *Group 4: Existing overnight hospitality businesses (hotels, motels)*
f. *Page 3, below subsection (b): Change wording of the paragraph "Data Center and associated equipment shall not produce perceptible ground-borne vibration (as defined by ANSI) at the site's property line.*
g. *Moving to Subsection A on Page 3: Adjust the wording so that the initial sound study provides existing pre-construction environment readings taken at the quietest accessible locations for the nearest, furthest, and intermediate/median receiving property in Groups 1-4… These measurements shall be at least 48-hour duration to capture daytime and nighttime hourly Leq levels.*
h. *Subection B on Page 3: Require that the final noise study shall be based on the exact equipment to be used in development of the plan, and that only equipment with manufacturer specifications for noise output may be used in the plan and development.*
    i. *It has been found that some of the equipment being used in data centers were made without any manufacturer specs for noise output, and that the sound studies and modeling done relied on incorrect assumptions, and that equipment has since grown to create additional noise and nuisance.*
i. *Subsection C on Page 4: Adjust language so that compliance in all scenarios will be required prior to commencement of operations under a Temporary C of O or full C of O.*
    i. *We have businesses that begin operating while in receipt of only a Temporary C of O, and the current language doesn't account for the issues that could create.*

*Section 2, N, 1, E:*

j. *Require that, if generators are to be used, only Tier 4 or more efficient and less polluting generators be used, and require the generator manufacturer and model type to be listed so that list can be reviewed and maintained by the Fire Department.*
k. *Prohibit nuclear micro-reactors, nuclear Small Modular Reactors, and any sort of future nuclear-power generation.*

*Section 2, N, 1, H:*
*Add language that the decommissioning plan shall include full environmental reclamation of the property.*

l. *We need to get away from the old mentality of leaving polluted sites behind to call Brownfields, and then given tax breaks for someone else to come clean the site up and redevelop it. It should be the original developer and operator that are responsible for cleaning up the site when they vacate, and doing so in a timely manner.*

*Section 2, N, 2, A:*
*Increase the setback distance to 0.5-mile, and add schools, places of worship, and parks to the designated setback. properties.*

*Section 2, N, 2, D:*

m. *Amend the language stating that "maximum daily or annual water usage limits" be established, and instead make this just a daily maximum because there could be instances where there would be a massive draw in a single day, which could strain our system. If we control the daily maximum then we also control the annual draw. Just having an annual maximum would allow for extreme draws every once in a while, but those draws could be a massive issue on our system.*
n. *Add that, in the event of a water service line break in the city or regional-partner water system that has any possibility or likelihood to impact Wixom's water customers, such as the water main breaks we've been experiencing, or cause the city to need to use the water tower supply, that any data center shall be prohibited from drawing on the city's infrastructure immediately after they are provided notice by phone, email, or in-person notification, and that prohibition shall be maintained until such time that full service is restored. Full service restoration should be differentiated from the temporary or partial restorations and bypasses that have been used during the last few main breaks.*
o. *Add another subsection related to water discharge, and require, prior to discharge into the city system or natural environment, that water to be discharged is tested for bacteria and chemicals, and outline mitigation measures to ensure neither enters the city system or natural environment (follow PFAS and PFOS testing standards for frequency). Add language that any material that can reasonably be traced to the operations of the data center that results in non-compliance with discharge standards shall result in all operations to immediately terminate upon notice provided by city via phone, email, mail, posted notice, or in-person notice.*
    i. *Bacteria has been found to have entered a city water system in Wyoming during discharge from the preparation of a Meta data center closed loop system, and I think Wixom has endured enough toxic discharge through our system in recent years and needs to ensure we are closing gaps that create future issues.*
p. *Add a subsection that states that no utility upgrades necessitated by the existence of the development shall result in the forced sale or seizure of other property within the city.*
    i. *A Georgia electric company is actively forcing the sale of properties so they can add transmission lines and infrastructure to accommodate data centers, and by their own statement, the upgrades would be used 80% for data centers, and the rest would be serving residents.*

*Section 2, N, 3:*

q. *Add language to include public safety, fire, and public works equipment purchases and upgrades that are necessitated by the development.*
r. *Add language that the development agreement shall include that the equivalent pass-on costs of any utility customer rate increase for electric, water, or gas infrastructure, that are necessary due to the existence of the development or*

*operation shall be fully paid for the 10 year period following the development are fully funded by the operator.*

*Section 2, N, 4:*

- s. *Adjust the language to state: "Continuous monitoring shall be required at the nearest receiving property of each Group 1-4, at the applicant's expense, to ensure noise-standard compliance."*
- t. *Adjust the language related to non-compliance to state that operations shall immediately cease upon notice by the city via phone, email, mail, or physical posting, and that resumption shall not begin until all compliance issues are corrected. And, include that the city may undertake independent audit based upon complaints received, and if non-compliance is found then the operator shall be responsible for reimbursing the city in full for any audit activities undertaken.*

*Section 2, N, 6:*

- u. *Change wording to state that the Planning Commission and City Council shall…*
- v. *Add that a Community Benefit Agreement shall be signed with the city outlining specific guarantees, including but not limited to local hiring guarantees, water and energy caps, a residential property value protection program and community investment fund funded by the operator.*

*GENERAL LANGUAGE CHANGES:*

- ***i.*** *Add language that see that City Council shall have final approval of all data center plans, similar to our condominium approval workflow. Approval shouldn't solely rest on a fully appointed commission.*
- ***ii.*** *Add language that upon the city giving notice of any non-compliance issues to the operator, all operations shall immediately cease until verification of compliance is verified by the city.*

Councilmember Simmons thanked the residents who attended and provided public comment, stating she appreciated hearing the community's concerns and recognized her responsibility to represent them. She expressed support for strengthening the proposed ordinance, noting that additional time was needed to address uncertainties related to water usage, energy demand, and noise impacts. She stated her support for modifying the ordinance to move the process forward while continuing to refine its provisions. Councilmember Simmons also expressed support for revising the permitted daytime noise hours to 6:00 a.m. to 6:00 p.m., evaluating additional setback requirements for residential areas, businesses, schools, and parks, and exploring the inclusion of a sunset review provision requiring the ordinance to be revisited periodically as technology and industry standards evolve.

In response to Councilmember Simmons' inquiry regarding a sunset review provision, Planning Consultant Passalacqua explained that City Council already has the authority to amend ordinances at any time. He stated that staff could research language requiring periodic reviews of the ordinance if Council wished to include such a provision, but noted that additional review would be necessary to ensure the language was structured appropriately and functioned as intended.

Councilmember O'Dea thanked the residents for attending and participating in the discussion, noting the significant public interest in the issue. She stated that although she had been appointed to the Council rather than elected, she accepted the position to serve the community and represent its residents. She emphasized that she had carefully listened to the public comments and appreciated the wide range of concerns expressed, including impacts on residents, businesses, wildlife, and the environment. She observed that the public comments presented a remarkably unified perspective both at the Planning Commission meeting and at the City Council meeting, which she believed was important for Council to consider. Councilmember O'Dea also questioned the extent of the local economic benefits

associated with data centers, noting her understanding that construction work is often performed by contractors from outside Michigan. She stated that she respected the expertise and guidance provided by City administration and the City's planning consultant and expressed confidence that they were acting in the City's best interest. She concluded by assuring residents that her future votes on the matter would reflect the concerns, safety, and long-term interests expressed by the community and future generations of Wixom.

Mayor Beagle thanked the Planning Commission for its extensive work on the proposed ordinance and thanked the residents who attended the meeting. He addressed allegations made during public comment suggesting City officials had signed non-disclosure agreements or acted improperly, stating that after serving the City for 19 years and living in Wixom for 40 years, he found those accusations insulting. He challenged anyone questioning the Council's integrity to run for office.

Mayor Beagle proposed several additional ordinance changes, including prohibiting data centers north of Pontiac Trail to protect residential areas. He also questioned how compliance with noise and utility usage standards would be monitored, suggesting the ordinance specify the frequency of required testing and strengthen penalties for violations. Finally, he stated that the City was not under pressure to adopt the ordinance immediately and recommended delaying the second reading until the second meeting in August to allow staff additional time to incorporate Council and public comments into the proposed ordinance.

Attorney Tom Schultz, serving in place of the City's regular legal counsel, agreed with the suggestion to delay action on the ordinance. He recommended that Council not approve the first reading that evening due to the significant number of proposed amendments and discussion. He explained that several of the suggested changes appeared straightforward to implement, while others would require additional legal review and could present legal concerns. He recommended allowing legal counsel, staff, and consultants time to review the meeting discussion, evaluate each proposal, and prepare revised ordinance language or provide recommendations where changes may not be legally feasible. Mr. Schultz stated that bringing the ordinance back as a revised first reading would allow Council to fully consider the proposed revisions before determining whether to proceed to a second reading.

Assistant City Manager Benson recommended that Council provide clear direction regarding the specific ordinance amendments they wished staff to incorporate before the item returned for consideration. He explained that while several Council members expressed similar ideas, staff did not want to make assumptions about which proposed changes had Council support. He suggested that Council either adopt a motion identifying the desired modifications or otherwise reach a clear consensus so staff could accurately revise the ordinance in accordance with Council's direction before bringing it back for another first reading.

Councilmember Kennedy supported the ordinance with the changes suggested by the Deputy Mayor.

Councilmember Behrmann stated that he was willing to withdraw his request to require a Planned Unit Development (PUD) if Council approval were incorporated into the Special Land Use process as proposed by the Deputy Mayor. He expressed concern that the proposed setback requirements could make data centers infeasible and requested updated maps showing the remaining developable areas before finalizing setback distances. He also supported requiring an interior setback on the data center property itself to provide additional buffering for adjacent industrial uses. While referencing another community's ordinance as an example, he stated that the appropriate setback distance should be discussed further after reviewing the mapping. Overall, he indicated his support for the

Deputy Mayor's proposed changes, with the understanding that setback requirements could be refined following additional analysis.

Assistant City Manager Benson acknowledged Councilmember Behrmann's concerns and explained that establishing fixed setback distances presents challenges because staff must evaluate what properties, if any, would remain eligible for data center development under those standards. He noted that one advantage of the Planning Commission's recommended approach was that it focused on meeting the required noise standards rather than relying solely on rigid setback distances, allowing flexibility based on the specifics of each proposal. He added that mapping the proposed setbacks would help illustrate their practical impacts and suggested that additional analysis may ultimately support revisiting the Planning Commission's earlier recommendations.

Councilmember Behrmann suggested that Council may ultimately want to consider limiting data centers to M-2 Heavy Industrial zoning districts only, noting that data centers are a heavy industrial use rather than a typical light industrial business. He stated that restricting the use to M-2 properties could alleviate many of the concerns regarding proximity to residential areas. Councilmember Behrmann emphasized that while the ordinance should preserve some viable land to comply with the Michigan Zoning Enabling Act, any future data center proposal should be required to demonstrate that it will not negatively impact the health, safety, or quality of life of Wixom residents.

Councilmember Simmons asked for clarification from administration and legal counsel regarding the potential timeline and legal implications of delaying action on the proposed ordinance. While expressing support for taking additional time to ensure the ordinance was done correctly, she also wanted to understand the risks of postponing adoption, including how long the City would remain without permanent regulations and whether delaying the first reading by one meeting would create any legal or practical concerns.

Attorney Schultz advised that there was no specific deadline requiring Council to act immediately on the ordinance. He noted that the temporary moratorium remained in effect and, because the City was actively working through the ordinance adoption process, it demonstrated that Council was making good-faith progress toward adopting reasonable and enforceable regulations. He explained that the proposed ordinance had already undergone substantial review and that the numerous amendments discussed during the meeting warranted additional legal analysis before advancing to the next step. While Council could proceed with a first reading and incorporate revisions later, he recommended allowing staff, legal counsel, and consultants time to evaluate the proposed changes and return with revised language and explanatory comments before Council considered the ordinance again. He emphasized that the purpose of the temporary moratorium was to provide the City sufficient time to complete that process.

CM-07-75-26: Moved and seconded by Deputy Mayor Gottschall and Councilmember Kennedy to direct City staff to review the proposed ordinance and incorporate, where practical, the amendments Deputy Mayor Gottschall proposed as well as the comments and recommendations made by other Council members. Deputy Mayor Gottschall requested that the revised ordinance be brought back to Council for another first reading. He further directed staff to provide explanations where suggested amendments could not be incorporated, including alternative approaches that could achieve a similar objective or the reasons why a proposed change would not be legally or practically advisable.

Vote: Motion Carried

** The original motion, Council Motion 07-74-26 that was moved and seconded by Councilmember Kennedy and Deputy Mayor Gottschall was withdrawn.*

2.) Request for a Waiver from the Adopted Resolution Imposing a Temporary Moratorium on the Establishing, Permitting, Consideration, Approval, Location, Construction, and/or Installation of Any Data Centers in the City of Wixom to Permit the Review of a Site Plan Application for a Proposed Data Center at 30625 S. Wixom Road, Parcel Identification Number: 22-06-200-049, As Requested By Wixom Industrial One, LLC

CM-07-76-26: Moved and seconded by Councilmembers Behrmann and O'Dea to discuss the requested waiver from the Adopted Resolution Imposing a Temporary Moratorium on the Establishing, Permitting, Consideration, Approval, Location, Construction, and/or Installation of Any Data Centers in the City of Wixom to Permit the Review of a Site Plan Application for a Proposed Data Center at 30625 S. Wixom Road, Parcel Identification Number: 22-06-200-049, As Requested By Wixom Industrial One, LLC

Assistant City Manager Benson reviewed the request from Wixom Industrial 1 LLC for a waiver of the temporary data center moratorium. He explained that the March 24, 2026, moratorium resolution allows City Council to grant a waiver if it determines the request would not adversely affect the health, safety, or welfare of the City and is consistent with the City's legislative authority over land use regulations.

Mr. Benson stated that the applicant submitted a formal waiver request and site plan application on June 2, 2026. Because the moratorium remains in effect, City staff has not conducted the customary site plan review, including reviews by planning, engineering, fire, or other departments. He emphasized that the question before Council was not whether to approve the proposed development, but whether to waive the moratorium and allow the application to enter the normal site plan review process.

Mr. Benson provided an overview of the proposal, noting the project is located on approximately 54.1 acres west of South Wixom Road and east of Oak Creek Drive. The application proposes three buildings totaling more than 519,000 square feet, along with approximately 170,000 square feet of mechanical yard space. He noted the application did not include an operational statement describing anticipated operations, hours, noise impacts, employee counts, or utility demands, and staff had not independently verified information submitted regarding state environmental reviews. He also explained that the applicant requested the use be classified as a permitted use by right, but indicated that a formal use interpretation by the Zoning Board of Appeals may ultimately be required to determine the appropriate zoning classification. Mr. Benson concluded by introducing the applicant's presentation for Council's consideration.

Richard Rassel, legal counsel for Wixom Industrial One LLC, addressed Council regarding the applicant's request for a waiver of the data center moratorium. He stated the request and accompanying site plan application were submitted on June 2, 2026, and emphasized that the applicant was seeking only a waiver of the moratorium, not site plan approval or an ordinance interpretation. Mr. Rassel asserted that the proposed development is a permitted use under the current zoning ordinance, requires no variances, and satisfies the waiver criteria by being consistent with the health, safety, and welfare of the City. He expressed concern that the application had not been processed or reviewed by staff or the Planning Commission due to the moratorium and stated the applicant believed there had been substantial delay in consideration of the waiver request. He requested that City Council approve the waiver to allow the project to proceed through the normal site plan

review process and stated the applicant wished to be treated the same as other similarly situated industrial and commercial developments. Mr. Rassel concluded by turning the presentation over to Dennis Griffin to discuss the merits of the waiver request.

Dennis Griffin, Wixom Industrial One LLC, presented an overview of the proposed development and stated the project was designed as a smaller-scale "Tesla vs. Mack truck" data center intended to operate within existing zoning regulations. He described the proposed site, building layout, utility connections, noise mitigation measures, emergency generator testing procedures, and landscaping. Mr. Griffin stated the project would utilize existing infrastructure, comply with applicable regulations, and would not adversely impact surrounding properties, public utilities, or public health and safety. He also compared the proposal to significantly larger data center developments elsewhere, emphasizing that the proposed Wixom facility was substantially smaller in scale and located entirely within an existing M-1 Industrial District surrounded by similar industrial uses. He concluded by requesting that Council approve the waiver of the moratorium to allow the project to proceed through the City's normal site plan review process.

Councilmember Behrmann questioned whether the applicant could identify an existing example of a modern, low-impact data center comparable to the "Tesla" analogy previously discussed. The applicant acknowledged he did not have a specific example but stated that his proposed design would utilize modern equipment and acoustic engineering intended to exceed current industry standards. He indicated he would work to identify an example of a comparable facility.

Councilmember Behrmann stated he would welcome the opportunity to visit a modern, low-impact data center if one could be identified, to better understand the technology. He emphasized that the City's primary responsibility is to its residents and noted that the proposed development had originally been presented as a light industrial park during the rezoning process, with the potential for a data center only becoming known later during Planning Commission discussions. He explained that this prompted the City Council to adopt the temporary moratorium to allow time to develop appropriate regulations. Councilmember Behrmann stated he believed it was reasonable to complete the data center ordinance before considering a waiver request and thanked the applicant for the presentation.

Vote: Motion Carried

CM-07-77-26: Moved and seconded by Councilmember Behrmann and Deputy Mayor Gottschall to deny the requested waiver from the adopted resolution imposing a temporary moratorium on the establishing, permitting, consideration, approval, location, construction, and/or installation of any data centers in the City of Wixom to permit the review of a site plan application for a proposed data center at 30625 S. Wixom Road, Parcel Identification Number: 22-06-200-049, as requested by Wixom Industrial One, LLC due to the request being unreasonable as it relates to the potential health, safety, and welfare impacts on the City.

Vote: Motion Carried

CALL TO THE PUBLIC:

Samantha Moore, 2061 Maple North Trail, stated that while she understood the frustration over false accusations made on social media, residents have a responsibility to ask questions

about matters affecting public health and safety. She noted that no one at the meeting had accused Council of wrongdoing and expressed sympathy regarding false bribery allegations. Ms. Moore thanked Council for its diligence and attention to detail, specifically recognizing the Deputy Mayor and Councilmember Behrmann for their efforts. She concluded by stating that many residents had worked all day to attend the meeting and did not come to be reprimanded over comments made on social media.

John Palmer, 277 Wright Street, commended the Deputy Mayor and Councilmember Behrmann for their work on the proposed ordinance. He expressed concern that pending state legislation could limit the City's ability to extend the data center moratorium and urged Council to act before any such changes occur. Mr. Palmer supported stronger setback requirements, including an interior property setback in addition to the proposed 1,500-foot setback, and referenced regulations adopted in Kentucky as a potential model. He thanked Council for representing residents' interests and concluded by dismissing allegations that Council members had accepted bribes.

Michael Moore, 2061 Maple North Trail, questioned the applicant's commitment to addressing residents' concerns, noting that the applicant left the meeting before its conclusion. He encouraged Council to take the time necessary to develop a thorough and enforceable data center ordinance, emphasizing that it would have long-term implications beyond the current proposal. Mr. Moore expressed concern that future owners could modify a project after its initial approval and stated that noise was only one of several important issues associated with data centers. He urged Council to consider extending the moratorium, if possible, to ensure the ordinance adequately protects future generations, and thanked Council for its efforts.

Kelly Schrubba, 2047 Grasmere Lane, thanked City Council for its diligence and efforts to research data center impacts. She questioned why the City should feel obligated to accommodate the applicant's timeline rather than prioritize the interests of Wixom residents. Ms. Schrubba expressed concern about the potential impacts on the City's water resources, stating that water quality should be a primary consideration. She also criticized the applicant's presentation and remarks, stating they were dismissive of residents' concerns, and encouraged Council to extend the moratorium as needed to ensure the ordinance reflects the community's priorities.

Heather Paruch, 1658 Brookside Court, thanked City Council for its thoughtful consideration of the proposed data center ordinance and expressed appreciation for the Deputy Mayor's attention to detail. She questioned how "demonstrated need" and "appropriate location" are determined under the Michigan Zoning Enabling Act and encouraged Council to consider whether limiting data centers to heavy industrial zoning would provide additional protections. Ms. Paruch supported stronger noise standards extending to businesses and schools and recommended that the ordinance also require ongoing air and water quality monitoring. She further urged Council to consider monitoring electromagnetic field (EMF) exposure and related infrastructure impacts, expressing concern about potential long-term effects on residents and children.

Katie Weeks, 1725 Norton Creek Court, apologized for previously asking about non-disclosure agreements, explaining her intent was to ensure transparency rather than question anyone's integrity. She thanked Council for listening to residents and expressed appreciation for its thoughtful approach. Deputy Mayor Gottschall accepted the apology, explained his concerns stemmed from personal attacks made on social media rather than residents asking legitimate questions, and reaffirmed his commitment to being accessible and transparent.

Cecil George, Lyon Township, a candidate for State Senate, commended Council for its proactive approach to regulating data centers. He suggested that while community benefit agreements may not be permissible, the City could require development agreements to establish enforceable commitments. He also recommended incorporating wellhead protection measures, strengthening ordinance safeguards, and further reducing allowable noise levels to better protect residents.

Mary Harper, 1614 Brentwood, asked whether a proposed development consisting of three data center buildings would generate more noise than a single facility and expressed concern about cumulative noise impacts. Staff responded that the City had not received or reviewed the applicant's referenced sound study and therefore could not verify its conclusions. Staff further explained that the proposal would be evaluated as a single development rather than three separate developments. Ms. Harper also questioned the applicant's comparisons to existing truck traffic noise, noting she does not observe significant truck traffic during nighttime hours, and thanked Council for listening to residents and considering their concerns.

Donald Gambrell, 272 Wright Street, thanked Council for representing the interests of residents and encouraged them to continue prioritizing the will of the community. He shared his background in military service and law enforcement and expressed concerns about existing environmental issues in Wixom, including water contamination and air pollution, citing his own involvement in reporting environmental concerns to state regulators. He urged the City to focus on addressing existing environmental challenges before considering additional industrial development and stated his opposition to the proposed data center project.

## CITY MANAGER COMMENTS:

City Manager Brown addressed comments made earlier in the meeting regarding social media posts directed at public officials, stating that while questions from residents are appropriate, threats or intimidating comments toward elected officials or their families are unacceptable and should not be tolerated. He highlighted several ongoing City projects, including sidewalk improvements, park enhancements, residential developments, and road paving, noting that numerous positive initiatives are underway throughout the City.

Assistant City Manager Benson confirmed for the record that no members of City staff have signed any non-disclosure agreements related to the proposed data center project or any other project.

## COUNCIL COMMENTS:

**Councilmember Behrmann** thanked residents for their participation and the time they invested in the discussion regarding data centers. He also thanked City staff, including the City Manager, Assistant City Manager, City Clerk, Planning Consultant, and other staff, for their work in preparing for the meeting and assisting Council throughout the ordinance review process. He acknowledged the extensive effort devoted by both residents and City officials to evaluating the issue and expressed appreciation for everyone's professionalism and commitment.

**Councilmember Simmons** thanked residents for attending and participating in the meeting. She also thanked City staff for improving the meeting accommodations for attendees, including seating and presentation displays. She expressed appreciation for the completion of the WLCSD related matter and looked forward to finalizing the proposed data center ordinance.

Councilmember Kennedy thanked everyone for attending the meeting and noted the overwhelming public opposition to the proposed data center. He addressed concerns expressed during public comment, stating that Council was not inviting or encouraging the development but was instead working to protect the City and its residents by carefully evaluating the issue and strengthening the proposed ordinance.

Councilmember O'Dea thanked residents for attending and participating throughout the lengthy meeting, stating that their involvement demonstrated the value of local government and public engagement. She expressed appreciation for City staff's efforts and encouraged continued community involvement as the City works to finalize the proposed data center ordinance.

Deputy Mayor Gottschall thanked residents for attending the meeting and those who submitted written comments by email. He also thanked City staff for improving meeting accommodations for attendees. Additionally, he raised concerns regarding reports of property damage, including sprinkler lines and mailboxes, associated with ongoing road construction in the Hillsboro and Millstream subdivisions, and requested that staff work with the contractor to reduce future damage.

Mayor Beagle thanked residents for attending the meeting and expressed appreciation to City staff for accommodating the large audience. He also recognized the efforts of the City's police and fire personnel, noting that no officers were injured during a recent police pursuit despite two patrol vehicles being damaged, and commended the Fire Department for its quick response to a recent commercial structure fire.

ADJOURNMENT:
The meeting was adjourned at 12:11 a.m.

Respectfully Submitted,

Crystal Opalko
City Clerk

**APPROVED:
7/28/2026**